1  CYNTHIA E. RICHMAN (*pro hac vice*)
       CRichman@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, N.W.
3  Washington, D.C.  20036-5306
   Telephone:     202.955.8500
4  Facsimile:     202.467.0539

5  DANIEL G. SWANSON, SBN 116556
       DSwanson@gibsondunn.com
6  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
7  Los Angeles, CA  90071-3197
   Telephone:     213.229-7000
8  Facsimile:     213.229.7520

9  JULIAN W. KLEINBRODT, SBN 302085
       JKleinbrodt@gibsondunn.com
10 One Embarcadero Center, Suite 2600
   San Francisco, CA  94111-3715
11 Telephone:     415.393.8200
   Facsimile:     415.393.8306

12
   *Attorneys for Defendant*
13 *APPLE INC.*

14

15                    UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                     SAN FRANCISCO DIVISION

18 LUISA BAKAY, ELISA JONES, and LETICIA      CASE NO. 3:24-cv-00476-RS
   SHAW, individually and on behalf of all others
19 similarly situated,                        **DEFENDANT'S NOTICE OF MOTION
                                              AND MOTION TO DISMISS CLASS
20              Plaintiffs,                    ACTION COMPLAINT**

21       v.                                   Date:       June 13, 2024
                                              Time:       1:30 p.m.
22 APPLE INC.,                                Location:   San Francisco Courthouse,
                                                          Courtroom 3 – 17th Fl.
23              Defendant.                     Judge:      Hon. Richard Seeborg

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO THIS HONORABLE COURT, THE PARTIES, AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE THAT on June 13, 2024 at 1:30 p.m. in Courtroom 3 of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Apple Inc. ("Apple") will and hereby does move to dismiss with prejudice the Complaint filed by Plaintiffs Luisa Bakay, Elisa Jones, and Leticia Shaw ("Plaintiffs").

The present Motion to Dismiss is made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs lack Article III and antitrust standing, they do not allege sufficient facts to state a claim for violation of Section 1 or Section 2 of the Sherman Act, and their claims are facially time-barred. This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, all pleadings and other papers filed in this matter, oral argument of counsel, and such other matters that the Court may consider on this Motion.

1

**TABLE OF CONTENTS**

2

<u>Page</u>

3

INTRODUCTION ................................................................................................1

4

STATEMENT OF ISSUES ................................................................................3

5

BACKGROUND ................................................................................................3

6

LEGAL STANDARD ........................................................................................6

7

ARGUMENT .....................................................................................................6

8

I. PLAINTIFFS LACK STANDING TO BRING THEIR HIGHLY CONVOLUTED AND
SPECULATIVE CLAIMS. ..........................................................................6

9

A. Plaintiffs fail to plead facts that establish Article III or antitrust standing. ..................7

10

B. Plaintiffs also lack antitrust standing because their alleged injury does not occur in
the market where competition is allegedly restrained. ....................................................15

11

C. Plaintiffs fail to allege redressability as to their claim for injunctive relief. ..............15

12

II. PLAINTIFFS DO NOT PLAUSIBLY PLEAD ANY VIOLATION OF SECTION 1. ...16

13

A. Plaintiffs' conclusory allegations fail to allege an unlawful agreement......................17

14

B. Plaintiffs do not plead a plausible *per se* claim. ..........................................................18

15

C. Plaintiffs do not plead a plausible rule of reason claim..............................................21

16

III. PLAINTIFFS FAIL TO PLEAD A SECTION 2 CONSPIRACY CLAIM ...................22

17

IV. ALL OF PLAINTIFFS' CLAIMS ARE UNTIMELY .....................................................23

18

A. Plaintiffs' damages claim accrued outside of the statute of limitations period. ..........23

19

B. The continuing violations exception does not save Plaintiffs' damages claims..........24

20

C. Plaintiffs' claims for injunctive relief are barred by the doctrine of laches. ..............25

21

CONCLUSION..................................................................................................25

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abulhawa v. United States Dep't of Treas.*,
    239 F. Supp. 3d 24, 34 (D.D.C. 2017) ...........................................................................12

*Allen v. Wright*,
    468 U.S. 737 (1984) ...........................................................................................8, 11, 12

*Am. Ad Mgmt., Inc. v. General Tele. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) .........................................................................................10

*Am. Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010) .........................................................................................................17

*In re American Express Anti-Steering Litig.*,
    19 F.4th 127 (2d Cir. 2021).......................................................................................10, 21

*In re Animation Workers Antitrust Litigation*,
    87 F. Supp. 3d 1195 (N.D. Cal. 2015) ...........................................................................24

*Arcell v. Google LLC*,
    2023 WL 5336865 (N.D. Cal. Aug. 18, 2023).................................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................................6

*Assoc. of Wash. Public Hosp. Dist. v. Philip Morris Inc.*,
    241 F.3d 696 (9th Cir. 2001)........................................................................................8, 10

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) ...........................................................................................7, 8, 11, 14

*Aurora Enters., Inc. v. Nat'l Broad. Co.*,
    688 F.2d 689 (9th Cir. 1982)............................................................................................25

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*,
    118 F.3d 178 (3d Cir. 1997)...............................................................................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................6, 17, 18

*Blix Inc. v. Apple Inc.*,
    2021 WL 2895654 (D. Del. July 9, 2021).......................................................................22

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012)..........................................................................................22

*Bus. Elec. Corp. v. Sharp Elec. Corp.*,
    484 U.S. 717 (1988)..........................................................................................................19

Gibson, Dunn &
Crutcher LLP

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988)......................................................................................................19

*Cameron v. Apple Inc.*,
    No. 19-cv-03074 (N.D. Cal.) ........................................................................................14

*Cargill v. Monfort of Colo. Inc.*,
    479 U.S. 104 (1986).......................................................................................................7

*Cetacean Cmty. v. Bush*,
    386 F.3d 1169 (9th Cir. 2004)........................................................................................6

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021)......................................................................................7, 13

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984)......................................................................................................17

*Davis v. Federal Election Com'n*,
    554 U.S. 724 (2008)......................................................................................................15

*Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*,
    523 F.3d 1116 (9th Cir. 2008)......................................................................................10

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473 (9th Cir. 1986)......................................................................................19

*In re DRAM Antitrust Litig.*,
    536 F. Supp. 2d 1129 (N.D. Cal. 2008) .......................................................................10

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987).........................................................................8, 9, 10, 14

*Epic Games, Inc. v. Apple Inc.*,
    67 F.4th 946 (9th Cir. 2023).........................................................................14, 18, 20, 22

*Feitelson v. Google*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ....................................................................15, 22

*Fernandez v. Brock*,
    840 F.2d 622 (9th Cir. 1988)....................................................................................15, 16

*Flaa v. Hollywood Foreign Press Assoc.*,
    55 F.4th 680 (9th Cir. 2022).........................................................................................20

*Fotobom Media, Inc., v. Google LLC*,
    22-cv-00712, Dkt. 27 (D.D.C. Feb. 27, 2024) .............................................................10

*Frame-Wilson v. Amazon. com, Inc.*,
    591 F. Supp. 3d 975 (W.D. Wash. 2022)....................................................................19

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020).................................................................................15, 21, 22

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ..................................................................................23

*Greenstein v. Noblr Reciprocal Exch.*,
    585 F. Supp. 3d 1220 (N.D. Cal. 2022) ..................................................................................16

*Cal. Ex Rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) ...............................................................................................20

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019) .....................................................................................................13

*Jablon v. Dean Witter & Co.*,
    614 F.2d 677 (9th Cir. 1980) ...................................................................................................6

*Jacobs v. Tempur-Pedic Intern., Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ..............................................................................................20

*Jones v. Micron Tech. Inc.*,
    400 F. Supp. 3d 987 (N.D. Cal. 2019) .....................................................................................9

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...........................................................................6, 16, 17, 18

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) ..................................................................................................12

*Krehl v. Baskin-Robbins Ice Cream Co.*,
    664 F.2d 1348 (9th Cir. 1982) ................................................................................................19

*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009) ..................................................................................................16

*Lorenzo v. Qualcomm*,
    603 F. Supp. 2d 1291 (S.D. Cal. 2009) ....................................................................................9

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998) .................................................................................................7

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................................15

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ....................................................................................8, 11, 13

*In re McCormick & Co., Inc. Pepper Prod. Litig.*,
    275 F. Supp. 3d 218 (D.D.C. 2017) ........................................................................................21

*MedioStream, Inc. v. Microsoft Corp.*,
    869 F. Supp. 2d 1095 (N.D. Cal. 2012) ..................................................................................24

*Metro Indus., Inc. v. Sammi Corp.*,
    82 F.3d 839 (9th Cir. 1996) ....................................................................................................20

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT
CASE NO. 3:24-CV-00476-RS

*In re Multidistrict Vehicle Air Pollution*,
591 F.2d 68 (9th Cir. 1979) ............................................................................................. 24, 25

*In re Musical Instrs. and Equip. Anti. Litig.*,
798 F.3d 1186 (9th Cir. 2015) ................................................................................................ 18

*Nat'l Audubon Soc'y, Inc. v. Davis*,
307 F.3d 835 (9th Cir. 2002) .................................................................................................. 13

*New York v. Meta Platforms, Inc.*
66 F.4th 288 (D.C. Cir. 2023) ................................................................................................ 25

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
202 F.3d 1088 (9th Cir. 2000) ................................................................................................ 19

*Ohio v. American Express Co.*,
585 U.S. 529 (2018) ........................................................................................................... 21, 22

*Oliver v. SD-3C LLC*,
751 F.3d 1081 (9th Cir. 2014) .......................................................................................... 24, 25

*In re Online DVD–Rental Antitrust Litig.*,
779 F.3d 914 (9th Cir. 2015) .................................................................................................... 7

*Optronic Tech., Inc. v. Ningbo Sunny Elec. Co., Ltd.*,
20 F.4th 466 (9th Cir. 2021) ................................................................................................... 23

*Oxbow Carbon & Mons. v. Union Pac. R.R. Co.*,
926 F. Supp. 2d 36 (D.D.C. 2013) .......................................................................................... 23

*Pace Indus., Inc. v. Three Phoenix Co.*,
813 F.2d 234 (9th Cir. 1987) ............................................................................................. 23, 24

*Paladin Assocs., Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ................................................................................................ 22

*Pepper v. Apple Inc.*,
No. 11-cv-6714 (N.D. Cal.) ..................................................................................................... 14

*Pritikin v. Department of Energy*,
254 F.3d 791 (9th Cir. 2001) .................................................................................................. 13

*PSKS, Inc. v. Leegin Creative Leather Products, Inc.*,
615 F. 3d 412 (5th Cir. 2010) ..................................................................................... 18, 19, 20

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) .................................................................................... 25

*Salmon Spawning & Recovery Alliance v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008) ................................................................................................ 16

*Sambreel Holdings LLC v. Facebook, Inc.*,
906 F. Supp. 2d 1070 (S.D. Cal. 2012) ................................................................................... 19

Gibson, Dunn &
Crutcher LLP

*SaurikIT, LLC v. Apple, Inc.*,
    2023 WL 8946200 (9th Cir. Dec. 28, 2023) ...................................................................24

*Schwab Short-Term Funds v. Lloyds Banking Group PLC*,
    22 F.4th 103 (2d Cir. 2021) ...............................................................................................9

*Southaven Land Co., Inc. v. Malone & Hyde, Inc.*,
    715 F.2d 1079 (6th Cir. 1983) ..........................................................................................10

*Standfacts Credit Services, Inc. v. Experian Information Solutions, Inc.*,
    405 F. Supp. 2d 1141 (C.D. Cal. 2005*)*..........................................................................23

*The Jeanery, Inc. v. James Jeans, Inc.*,
    849 F.2d 1148 (9th Cir. 1988) ..........................................................................................17

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) ..............................................................................................8

*Toscana v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) ...........................................................................12

*United Food & Com. Workers Local 1776, et al. v. Teikoku Pharma USA, Inc.*,
    74 F. Supp. 3d 1052 (N.D. Cal. 2014) .............................................................................23

*United States v. Brewbaker*,
    87 F.4th 563 (4th Cir. 2023) .............................................................................................19

*United States v. LSL Biotech.*,
    379 F.3d 672 (9th Cir. 2004) ..............................................................................................8

**Statutes**

15 U.S.C. § 15b ........................................................................................................................23

Sherman Act § 1 ....................................................................................1, 2, 3, 4, 6, 16, 17, 18, 21

Sherman Act § 2 ..............................................................................................1, 2, 3, 4, 22, 23

**Other Authorities**

https://www.bls.gov/data/inflation_calculator.htm ....................................................................6

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* ¶ 335c5 (4th and 5th eds. 2013-2023) .......................13

**Constitutional Provisions**

Article III of the U.S. Constitution ..................................................2, 3, 6, 7, 8, 10, 12, 13, 15

Gibson, Dunn &
Crutcher LLP

# INTRODUCTION

This case turns on a convoluted theory of harm in which Plaintiffs—purchasers of iPhones—claim Apple's rules requiring third-party web browsers to use its open-source browser engine, WebKit, somehow resulted in inflated iPhone prices. The Complaint must be dismissed because Plaintiffs lack standing to pursue their tortured claims, and they fail to state a viable or timely claim under Sections 1 and 2 of the Sherman Act.

In 2007, Apple released the iPhone, revolutionizing the smartphone industry. A core feature of the iPhone's innovative design was its mobile browser—Safari—which gave users an unrivaled ability to surf the web on their phones. A year later, Apple opened its iOS platform to third-party browsers. To ensure third-party browser compatibility with iOS and to maintain compliance with Apple's high standards for security, privacy, and technical performance, Apple's App Store Guidelines have always required browsers to use WebKit.

Plaintiffs' attempt to manufacture a causal connection between Apple's procompetitive and unilateral conduct relating to WebKit on iOS and the prices they paid for their iPhones hinges on hypothetical developments, speculative actions by numerous third parties, and counterfactuals. The short version: According to Plaintiffs, if third-party browser developers did not have to use WebKit on iOS, they would launch non-WebKit-based browsers for iOS; and if those non-WebKit-based browsers were available on iOS, other third-party app developers would then flock to a new class of apps called progressive web apps ("PWAs") that could be accessed via these new browsers rather than directly on mobile operating system app marketplaces; and if developers started favoring PWAs, and if consumers started using them, barriers to entry in the smartphone operating system market would fall because PWAs could be run on any smartphone operating system; and if those barriers fell, new smartphone operating systems would, despite other barriers enumerated in the Complaint, enter the market; and if those new operating systems existed, new smartphone manufacturers ("original equipment manufacturers" or "OEMs") would, despite the presence of multiple existing rival OEMs, enter the smartphone market; and these hypothetical new smartphone and operating system offerings would somehow cause iPhone prices to fall. This wending, implausible theory is fatally flawed in at least four ways.

Gibson, Dunn & Crutcher LLP

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 3:24-CV-00476-RS

*First*, Plaintiffs lack Article III and antitrust standing.  Even aside from pleading no antitrust injury (as they allege no plausible harm to competition), their theory of causation is far too indirect and speculative—a chain of at least eight steps, each relying on sheer supposition about choices a wide array of independent actors would make in a hypothetical world—the antithesis of proximate causation.  Further, Plaintiffs' attenuated theories magnify the risk of duplicative damages and create intractable apportionment complexities.  The antitrust standing doctrine—and causation requirement of Article III standing—bar such convoluted, indirect, and speculative claims.  What is more, Plaintiffs also lack antitrust standing because they allege an injury in the markets for smartphones and smartphone operating systems, but the alleged conduct at issue is in the alleged "U.S. mobile browser market," a different market than that in which their alleged injuries arose.  And Plaintiffs lack Article III standing to pursue their claims for injunctive relief given their failure to allege a redressable harm.

*Second*, Plaintiffs fail to plead a Section 1 claim.  To start, they plead no "market division" with Google or any other unlawful agreement with any browser developer: their only factual allegations relate to independent decisions by Google and other developers to launch competing iOS browser apps using WebKit, a requirement unilaterally adopted by Apple.  But even if the WebKit requirement were deemed to be an agreement between a developer and Apple, that would reflect nothing more than a vertical, intrabrand restraint subject to review under the rule of reason.  Plaintiffs' conclusory and implausible allegations of anticompetitive effects fall far short of stating a claim under the rule of reason framework and come nowhere close to plausibly alleging market division.

*Third*, Plaintiffs fail to plead a Section 2 claim for conspiracy to monopolize.  Even setting aside their lack of standing and failure to plead plausible harm to competition, Plaintiffs' legal theory fails at the starting gate.  In Plaintiffs' telling, Apple and Google set out to *jointly* occupy the alleged operating system market; but an alleged "shared monopoly" is no monopoly at all and is outside the ambit of Section 2—as the Ninth Circuit has repeatedly held.

*Fourth*, all of Plaintiffs' claims are untimely because any alleged act by Apple giving rise to Plaintiffs' alleged injuries occurred far outside the four-year statute of limitations.  Plaintiffs do not (and cannot) allege *any* continuing conduct by Apple that has inflicted a new and distinct injury as opposed to acts that merely reaffirm Apple's long-established decision to require WebKit.

For all of these reasons, Plaintiffs' Complaint should be dismissed with prejudice.

## STATEMENT OF ISSUES

1.  Whether Plaintiffs lack Article III and antitrust standing to bring all claims given the attenuated and speculative nature of their theory of harm?

2.  Whether Plaintiffs fail to plead a plausible Section 1 claim because they do not allege an unlawful agreement on any basis?

3.  Whether Plaintiffs fail to plead a Section 2 conspiracy claim because they do not allege a cognizable conspiracy to monopolize?

4.  Whether Plaintiffs' claims, based on conduct occurring more than a decade ago, are untimely?

## BACKGROUND

In 2007, Apple launched the iPhone, a "device that was like nothing else being sold at the time." Compl. ¶ 42. Running on Apple's proprietary mobile operating system, iOS, *id*. ¶ 27, the original iPhone came with a set of Apple-developed native apps—including the mobile web browser Safari. *Id*. ¶¶ 43, 45. Safari was "the first true web browser on a smartphone" "that could display webpages with the layout and quality available on computer browsers." *Id*. ¶ 45. At the core of Safari's "powerful web browsing functionality" is Apple's iOS version of the open-source browser engine, WebKit. *Id*. ¶¶ 73, 137, 141. WebKit, like other browser engines, serves as a software component of web browsers that "transforms HTML documents and other resources, such as Javascript code, into an interactive visual representation on a user's device." *Id*. ¶ 137. In other words, it is software that makes web content readable and useable for end users.

Safari is just one of many mobile web browsers available on iOS. In 2008, Apple transformed software distribution when it launched the App Store. The App Store and its related software development kit allowed third-party app developers to create and distribute native iOS apps to consumers' iPhones. Compl. ¶¶ 51, 92–94. To protect the integrity of Apple devices and ensure that the apps available on the App Store do not compromise user safety, security, and privacy, Apple developed the App Store Review Guidelines, *id*. ¶ 142, which lay out the technical, content, and design criteria that Apple uses to review all apps. *See* RJN Ex. 1 ("The guiding principle of the App Store is simple—we want to provide a safe experience for users to get apps and a great opportunity for all

developers to be successful."). Today, the App Store contains apps of every kind from thousands of developers. This includes web browsers: Google's Chrome, Mozilla's Firefox, and many other third-party browsers have long been available for download from the App Store. *Id.* ¶¶ 190, 223. Consumers can choose any of these as their default browser. *Id.* ¶ 146. As Plaintiffs acknowledge, these browsers "add functionality" on top of WebKit—capabilities that browser developers extol. Compl. ¶ 223; RJN Ex. 4.

To ensure third-party browser apps are compatible with iPhones and iOS, and to maintain a high standard of privacy, security, and performance for all browsing experiences on iOS devices, Apple makes available (and requires developers to use) the WebKit browser engine. Compl. ¶¶ 143, 223; RJN Ex. 1. The WebKit requirement, enshrined in the App Store Review Guideline 2.5.6, *id.* ¶ 143, ensures that all iOS browsers, whether Apple's Safari or a third-party browser, interact seamlessly with iOS software and apps, and meet Apple's high standards for security, privacy, and technical performance. *See* RJN Ex. 1. It also ensures consumers have access to many options for browsing the web on their Apple devices—with the assurance that all browsers are running on an engine optimized for iOS and compliant with Apple's high security and performance standards.[1]

Plaintiffs are three individuals from California and Illinois, each of whom allegedly purchased one or more iPhones from Apple. Compl. ¶¶ 20–22. They claim that Apple has engaged in market division with Google and unlawfully restrained trade in the U.S. smartphone market in violation of Sherman Act Section 1 (Count 1), *id.* ¶¶ 461–86, engaged in market division with Google and unlawfully restrained trade in the U.S. smartphone operating system market in violation of Sherman Act Section 1 (Count 2), *id.* ¶¶ 487–510, and conspired with Google to monopolize the smartphone operating system market in violation of Sherman Act Section 2 (Count 3), *id.* ¶¶ 511–29. As a result, Plaintiffs allege that they overpaid for their phones or operating systems, for which they seek damages and injunctive relief. *Id.* ¶¶ 23–24, Prayer for Relief.

---

[1] Plaintiffs allege that WebKit makes iPhones less secure, but these allegations are conclusory. For example, they allege that "because WebKit is the iPhone's primary interface to the open Internet, its vulnerabilities are far more severe than general security vulnerabilities." Compl. ¶ 213. But all browsers and browser engines interface with the open internet, and Plaintiffs do not explain how iOS would be *more* secure with multiple browser engines (*e.g.*, multiple points of failure), each of which would be vulnerable to the same types of "cybersecurity threats." *See id.* ¶¶ 219–225.

Plaintiffs' theory of why Apple's conduct is anticompetitive, let alone how it led to increases in iPhone prices, is murky at best. Plaintiffs take aim at alleged "agreements"—referenced over 100 times in the Complaint but scarcely defined—with Google and with other browser and browser-engine developers. *See* Compl. ¶¶ 107, 461, 473–80. While the Complaint obscures how many "agreements" there are or whether they differ from each other, the key terms are allegedly "express." *See, e.g.*, *id*. ¶¶ 191, 193, 197. And the *only* alleged "express" terms identified in the Complaint are found in App Store Review Guideline 2.5.6: Apple's requirement that "Apps that browse the web must use the appropriate WebKit framework and WebKit JavaScript," to which browser developers, including Google, have chosen to adhere in order to offer browser apps on iOS. *See id.* ¶¶ 191, 461.

Continuing down the long and complicated path of allegations in the Complaint, Apple's WebKit requirement prevents developers, such as Mozilla, from launching browser apps for iOS using their own browser engines. Compl. ¶¶ 160–70. If these developers could launch iOS browser apps with their own browser engines, the theory goes, a class of browser-based apps would thrive— progressive web apps ("PWAs"), which could be accessed via these new browsers rather than directly on mobile operating system app marketplaces. *Id*. ¶¶ 103–07. Plaintiffs completely ignore the fact that web apps, including PWAs, already exist on the iPhone and that Apple has expanded their capabilities over time. *Id.* ¶¶ 115–17, 122–23. But setting that aside, they do not allege why these apps would necessarily gain traction, or who would embrace them. *See id.* Regardless, PWAs, they allege, could work across mobile operating systems and "unify" the "smartphone platforms" across Android and iOS devices. *Id*. ¶¶ 119, 198. Plaintiffs again do not explain why this proliferation of PWAs is plausible: For example, Plaintiffs do not contend that such PWAs are used by consumers at any scale on Android (*i.e.*, 45% of the alleged U.S. smartphone operating system market) notwithstanding that Mozilla's non-WebKit-based browser application is already available there. *See, e.g.*, *id.* ¶¶ 183, 319. To the contrary, Plaintiffs concede that even on Android—where WebKit is not required—Google and Mozilla's browsers suffer from "incompatibilities," *id.* ¶¶ 183, 187, contrary to their supposition that the launch of non-WebKit-based browsers on iPhones would create "write once, run-anywhere" PWAs, *id.* ¶ 191.

Plaintiffs next draw a line, though not a straight one, to try to connect the alleged paucity of

PWAs to inflated iPhone prices. They allege that if PWAs were available on all mobile operating systems, and if enough developers wrote PWAs, and if enough consumers used them, there would be entry into the operating system market. *See* Compl. ¶¶ 202–206. The Complaint does not specify, however, who these entrants would be, how they would otherwise develop an operating system, or what smartphones would run their new operating system. *See id.* Nevertheless, by these or some other mechanisms, new smartphone OEMs would also then enter the already-crowded U.S. smartphone market, which Plaintiffs presume (without explication) would in turn lower iPhone and operating system prices (even though device manufacturers, including Apple, do not sell operating systems separately). *Id.* ¶¶ 175, 201–206. The net effect of these events *not happening*, Plaintiffs contend, is higher iPhone prices for consumers.[2] *Id.* ¶ 207.

## LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must allege facts establishing subject-matter jurisdiction, including standing under Article III of the U.S. Constitution, as well as "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). Plausibility requires allegations that answer the "basic questions: who, did what, to whom (or with whom), where, and when?," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008), with alleged "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 557 U.S. at 678. The Court may also dismiss a claim where "the running of the statute [of limitations] is apparent on the face of the complaint." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

## ARGUMENT

### I. PLAINTIFFS LACK STANDING TO BRING THEIR HIGHLY CONVOLUTED AND SPECULATIVE CLAIMS.

In order to bring a claim under the Sherman Act, Plaintiffs must plead both Article III standing

---

[2] Plaintiffs allege that the "average selling price of iPhones has increased from $873 in December 2020 to $988 in March 2023." Compl. ¶ 207. But that alleged price change in fact represents a *decrease* in inflation-adjusted terms. *See* https://www.bls.gov/data/inflation_calculator.htm ($873 in December 2020 having the same buying power as $1,011 in March 2023).

Gibson, Dunn &
Crutcher LLP

and antitrust standing.  *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc*., 140 F.3d 1228, 1232 (9th Cir. 1998).  Plaintiffs fail to allege either.  First, Plaintiffs' theory of harm is far too indirect, speculative, and attenuated to give rise to a causal harm under Article III, much less the stricter statutory antitrust standard.  Second, Plaintiffs' claims independently fail because they allege a restraint occurring in a different market from the ones where they allege their injuries—a fatal defect in antitrust cases.  Third, as to their claim for injunctive relief, Plaintiffs fail to allege an injury redressable through an injunction as such redress would be entirely dependent on the actions of multiple independent third parties.

### A.    Plaintiffs fail to plead facts that establish Article III or antitrust standing.

Under Article III, a plaintiff must allege "causation" between the challenged conduct and claimed injury.  *In re Online DVD–Rental Antitrust Litig*., 779 F.3d 914, 921–22 (9th Cir. 2015).  But even where a plaintiff has Article III standing, "the court must then determine whether the plaintiff also meets the more demanding standard for *antitrust* standing."  *Lucas*, 140 F.3d at 1232 (internal quotation marks omitted) (emphasis in original).  Antitrust standing turns on five factors: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages."  *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021); *accord Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538–44 (1983) ("*AGC*").

This case falters at the threshold because Plaintiffs do not plausibly allege antitrust injury—a "necessary, but not always sufficient" prerequisite to standing, *Cargill v. Monfort of Colo. Inc.*, 479 U.S. 104, 110 n.5 (1986)—as the alleged conduct does not plausibly threaten an injury "the antitrust laws were intended to prevent."  *City of Oakland*, 20 F.4th at 456; *see infra* §§ II, III.  But even setting aside antitrust injury, Plaintiffs lack standing because their claims are too indirect and speculative, risk duplicative recoveries, and would lead to inexorable complexity in apportioning any damages.  *See, e.g.*, *City of Oakland*, 20 F.4th at 457–61 (no standing despite pleading antitrust injury); *Barton & Pittinos, Inc. v. SmithKline Beecham Corp*., 118 F.3d 178, 182 (3d Cir. 1997) (similar).

### i.    Plaintiffs' tortuous theory of harm is far too attenuated.

The "directness of the [alleged] injury" is measured through the traditional lens of proximate causation.  *See, e.g.*, *AGC*, 459 U.S. at 538–44; *United States v. LSL Biotech.*, 379 F.3d 672, 693 (9th Cir. 2004); *Assoc. of Wash. Public Hosp. Dist. v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001).  To possess antitrust standing, "[t]he chain of causation between the injury and the alleged restraint in the market should lead *directly* to the '*immediate* victims' of any alleged antitrust violation."  *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987) (emphasis added).  "The harm may not be derivative and indirect or secondary, consequential, or remote."  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1004 (9th Cir. 2008) (internal quotation marks omitted).  And while causation for Article III standing need not be direct, it too requires a "line of causation" that is not "attenuated," and remains plausible.  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011); *see also Allen v. Wright*, 468 U.S. 737, 757 (1984) (no Article III standing where "[t]he line of causation is attenuated at best.").  Plaintiffs fail to satisfy either standard.

At least eight separate steps stand between Apple's challenged conduct (conduct involving *developers* concerning *web browsers*) and Plaintiffs' asserted injury (*consumers* paying higher prices for *iPhones*).  Compl. ¶¶ 23, 107, 461, 473–80.

> ➤ First, according to Plaintiffs, if Apple did not require the use of WebKit, developers would have created browser apps for iOS running on non-WebKit browser engines, such as Google's Blink or Mozilla's Gecko, Compl. ¶¶ 174–75;

> ➤ Second, if such browser engines and browser apps based on such engines existed on iOS, a critical mass of app developers would write PWAs for such browser engines, rather than apps that run natively on iOS or Android, *id.* ¶¶ 104–07, 204;

> ➤ Third, a critical mass of consumers would coalesce around the non-WebKit, browser engine-based PWAs, even if this requires switching from default browser options, *id.* ¶ 404;

> ➤ Fourth, the new browser apps and non-WebKit browser engines would somehow "unify" the "disparate and incompatible" Android and iOS platforms because all PWAs theoretically could run seamlessly on either platform, *id.* ¶ 206;

> ➤ Fifth, the "unifying" force of the new browser apps would evolve into, or attract entry by, new

operating systems, *id.* ¶¶ 205–06;

➤ Sixth, the entry of new operating systems would attract entry by new smartphone OEMs, *id.* ¶¶ 211, 307, 405;

➤ Seventh, the new smartphone/operating system offerings would gain sufficient market acceptance to compete with the iPhone, *id.* ¶ 470;

➤ And eighth, Apple would respond to this new competition by lowering the prices of its iPhone-iOS offerings, *id.* ¶ 471.

This does not plead proximate causation. Courts routinely dismiss cases with far less attenuated theories in which the harm is only one or two steps removed from the conduct. For example, the Ninth Circuit in *Eagle v. Star-Kist Foods* affirmed the dismissal of an antitrust case because ship crewmembers lacked standing to claim depressed pay stemming from canneries' alleged price fixing of fish. 812 F.2d at 541–42. As the court explained, "[t]he chain of causation between the injury and alleged restraint in the market should lead *directly* to the '*immediate* victims' of any alleged violation," and the crewmembers' injury was derivative of that suffered by the vessel owners. *Id.* at 541 (emphasis added). Plaintiffs' allegations here are far more indirect than the two-step chain in *Eagle*: Plaintiffs' alleged injuries (paying too much for iPhones) are at least *eight steps* away from Apple's alleged conduct (requiring developers of browser apps to use WebKit). *See, e.g.*, *Schwab Short-Term Funds v. Lloyds Banking Group PLC*, 22 F.4th 103, 116–17 (2d Cir. 2021) (indirect bond purchasers lacked antitrust standing to sue banks for LIBOR manipulation because they failed to allege proximate cause); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 987, 912–13 (N.D. Cal. 2019) (purchasers of final products such as cell phones and computers lacked antitrust standing to sue manufacturers of chip components); *Lorenzo v. Qualcomm*, 603 F. Supp. 2d 1291, 1302–03 (S.D. Cal. 2009) (same).

That Plaintiffs are neither the "direct" nor "immediate" victims of the alleged conduct is further underscored by the presence of putative plaintiffs who, under Plaintiffs' theory, would have far more direct injuries. *See Eagle*, 812 F.3d at 542 (existence of vessel owners who were more directly harmed by canneries alleged price fixing supported crewmembers lack of standing). Here, for example, browser developers, PWA developers, and operating system developers—including sophisticated entities like Mozilla and Microsoft—are each connected to the alleged wrongful conduct by fewer links

in the chain of causation than these Plaintiff-purchasers.  *See, e.g.*, Compl. ¶¶ 199, 236.  If anyone suffered "immediate" or "direct" harm, it is not Plaintiffs.  *See Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1124 (9th Cir. 2008) ("There are clearly other motivated plaintiffs" more directly harmed who will be "efficient enforcers of antitrust laws."); *In re American Express Anti-Steering Litig.*, 19 F.4th 127, 144 (2d Cir. 2021) (merchants who did not accept American Express lacked standing because they were too indirectly harmed); *Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris Inc.*, 241 F.3d 696, 701–05 (9th Cir. 2001) (hospital districts could not establish antitrust standing against tobacco companies for unreimbursed costs of treating patients' smoking-related illnesses because hospitals' injuries were derivative of patients' injuries).

Indeed, the theory advanced here stands far outside the rare exception that finds standing where a plaintiff downstream from the alleged conduct claims an injury "'inextricably intertwined' with the injuries of market participants."  *Am. Ad Mgmt., Inc. v. General Tele. Co. of Cal.*, 190 F.3d 1051, 1057 n.5 (9th Cir. 1999).  To do so, the plaintiffs must be "a fulcrum, conduit or market force [used by the defendant] to injure competitors."  *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir. 1983).  But Plaintiffs sit at the end of a long causal chain—multiple steps (and markets) removed from the challenged conduct.  *See, e.g.*, *Eagle*, 812 F.2d at 541–42 (no antitrust standing despite plaintiff-crewmembers claiming their wages were "inextricably intertwined" with selling price of fish); *Fotobom Media, Inc., v. Google LLC*, 22-cv-00712, Dkt. 27 (D.D.C. Feb. 27, 2024) (finding no "inextricably intertwined" standing where the complaint contained no allegations that plaintiffs were harmed as a conduit in Google's alleged efforts to harm other markets); *In re DRAM Antitrust Litig.*, 536 F. Supp. 2d 1129, 1139–41 (N.D. Cal. 2008) (granting motion to dismiss because plaintiffs did not allege "they are direct victims of defendants' alleged conspiracy, or that they were the necessary means by which defendants' conspiracy was effectuated").  Plaintiffs' claims are simply too far removed to proceed under any theory of standing.

### ii.   Plaintiffs' theory of harm rests on implausible speculation.

Plaintiffs' theory of causation is also too speculative.  Where an alleged chain of causation "'involves numerous third parties'" whose "'independent decisions'" have a "'significant effect'" on plaintiffs' injuries, "the causal chain [is] too weak to support [Article III] standing at the pleading

stage." *Maya*, 658 F.3d at 1070 (quoting *Allen*, 468 U.S. at 759); *see also AGC*, 459 U.S. at 542 (no antitrust standing where theory of harm depends upon "independent factors"). Plaintiffs' theory in this case relies on just-so assumptions about how independent third parties would act—all without factual allegations that make their conjecture remotely plausible.

Start with one of Plaintiffs' foundational assumptions: that if *third-party* browser developers developed an iOS browser that does not run on WebKit, Compl. ¶¶ 174–75, then a critical mass of *third-party* app developers would opt to develop PWAs, rather than native iOS and Android apps, *id*. ¶¶ 104–07, 204. But this assumption is entirely speculative. Far from suggesting that third-party app developers would pivot to developing PWAs, the Complaint does not claim that on Android, where Mozilla's non-WebKit-based browser has long been available, developers have shifted to PWAs, or that Android users favor PWAs instead of native Android apps. *Id*. ¶¶ 179, 319.

Next, Plaintiffs' theory relies on the assumption that a critical mass of iPhone owners would switch from Chrome and Safari (or other browsers) to new hypothetical browser apps, and then use such browsers to identify and download PWAs based on non-WebKit browser engines, and then switch from apps that run directly on iOS or Android to PWAs. Compl. ¶ 404. No facts support those conjectures. As to the browsers, Plaintiffs allege that "browser market-leading Google" dominates the alleged browser market with Chrome notwithstanding that non-WebKit based browsers are readily available on Android. *Id*. ¶¶ 13, 15, 183, 195. And Plaintiffs do not allege that PWAs are superior to operating system-based apps, or benefit from the discoverability of native apps offered in the App Store. *See id*. ¶¶ 29, 404. In short, nothing in the Complaint indicates that consumers would make either, much less both, of the sweeping behavioral changes Plaintiffs imagine they will.

And even if each of those suppositions occurred—that is, developers made a well-functioning, non-WebKit-based browser for iOS, developers then opted to produce PWAs rather than native applications, and iPhone users switched *en masse* to new browsers *and* to PWAs—Plaintiffs' theory still assumes that "a unifying application platform" would arise. Compl. ¶ 189. But the Complaint is bereft of supporting factual allegations and actually pleads the contrary, suggesting that not all browser apps would become interoperable: on Android devices, where there is no WebKit requirement, there are "incompatibilities between [Mozilla's] Gecko and [Google's] own Blink engine." *Id*. ¶ 183.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT
CASE NO. 3:24-CV-00476-RS

Plaintiffs' next leaps are more speculative still. Their theory requires that one or more third-parties enter the smartphone operating system market supported only or largely by PWAs. Compl. ¶¶ 205–06. Plaintiffs identify failed OS entrants from the past, but do not explain how the hypothetical new entrants would surmount the alleged barriers that Plaintiffs denominate as "powerful," *id.* ¶¶ 300, 386, which would make such entry *unlikely* on Plaintiffs' view of the world. Plaintiffs offer no factual explanation of how a hypothetical PWA-based entrant would overcome alleged hurdles listed in their Complaint such as developing system-specific APIs and an operating system "kernel," procuring engineering personnel with the requisite technical knowledge, complying with extensive regulations, developing compatible hardware, and expending large resources for research, development, testing, marketing, and distribution. *Id.* ¶¶ 386–98. And even if such an operating system were developed, Plaintiffs' theory further requires: (i) that one or more third-party OEMs would use it to enter the smartphone market—again despite pleading a litany of high entry barriers, *id.* ¶¶ 300–13; (ii) that this new entrant's phones would be competitive with Apple's; and (iii) that this would drive prices lower even though Apple has long faced robust competition from Samsung, Huawei, LG, and others, who have been able to freely license the open-source Android operating system. *Id.* ¶¶ 211, 307, 405, 470. In short, Plaintiffs rely on assumptions about what numerous sets of third parties would do without any plausible allegations explaining why these independent actors would behave as Plaintiffs imagine. That is far too speculative. *See, e.g.*, *Allen*, 468 U.S. at 759 ("[L]inks in the chain of causation . . . [we]re far too weak for the chain as whole to sustain [parent's Article III] standing," particularly as the chain "involve[d] numerous third parties[.]"); *Abulhawa v. United States Dep't of Treas.*, 239 F. Supp. 3d 24, 34 (D.D.C. 2017) (no standing where "chain of causation" "relies on a series of speculative inferences about the independent actions of some third parties not before the Court" (cleaned up)); *Toscana v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1114 (E.D. Cal. 2002) (no antitrust standing where harm relied on speculation regarding actions of intervening third parties). As one court put it: "It would be entirely speculative and beyond the competence of a judicial proceeding to create in hindsight a technological universe that never came into existence . . . . It would be even more speculative to determine the relevant benefits and detriments that non-[Apple] products would have brought to the market and the relative monetary value . . . to a diffuse population of end users." *Kloth v. Microsoft*

*Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (internal quotation marks omitted).

Any possible measure of harm would be speculative too. *See City of Oakland*, 20 F.4th at 460–61. Plaintiffs' alleged damages are predicated on each of their implausible assumptions: non-WebKit-based browsers launching on iOS, developers favoring PWAs, consumers switching over to these browsers *and* to these PWAs, new operating systems launching, and new smartphone OEMs entering *and* competing successfully with Apple, thereby resulting in lower iPhone prices. *See supra* § I.A.i. If even one of these links in the causal chain does not unfold *exactly* as Plaintiffs predict, their entire theory of harm unwinds. With so many contingencies and counterfactuals, determining the amount each iPhone purchaser would have paid absent the alleged anticompetitive restraint will be pure guesswork. *See, e.g.*, *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 67 (2d Cir. 2019) (no standing where damages required the "creation of an 'alternative universe'" to determine how various agreements would have affected downstream purchases by the plaintiffs); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 335c5 (4th and 5th eds. 2013–2023) (dismissal is appropriate "[o]nce it becomes clear—especially early in the litigation—that damage measurements will be unduly speculative").

Courts recognize that these "hypothetical or tenuous" theories also do not suffice for Article III standing. *Maya*, 658 F.3d at 1070; *see also Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) ("[W]hat matters is . . . the plausibility of the links that comprise the chain [of causation]." (internal quotation marks omitted)). Making matters worse, Plaintiffs offer allegations contradicting or calling into question many of the steps necessary to their theory of the case. *See supra* §§ I.A.i–ii. Courts have dismissed cases, like this one, where the connection between the alleged conduct and harm rests on "sheer speculation" about the conduct of third parties. *See Pritikin v. Department of Energy*, 254 F.3d 791, 799 (9th Cir. 2001) (no standing for plaintiff claiming DOE's budgeting prevented monitoring by sub-agency where theory of causation was "both highly speculative and dependent on uncertain actions by [a third party]" (internal quotation marks omitted)); *Maya*, 658 F.3d at 1072 (no Article III standing where plaintiffs did "not establish[] how defendants' actions *necessarily* result[ed]" in the alleged pecuniary harm they claimed). The limited resources of federal courts—and the massive costs imposed on parties in antitrust cases—cannot be squandered at the behest of plaintiffs who hang

1  their case on such serpentine and speculative theories of harm.

2      **iii.**    **Plaintiffs' theory creates inexorable risks of duplicative recoveries and**

3                **complex apportionment problems.**

4         The final antitrust standing factors, the risk of duplicative recovery and difficulties apportioning

5  damages, also militate against standing.  Plaintiffs allege that at "the heart of the [Mobile Ecosystem

6  Barrier to Entry] and Apple's supracompetitive profits," is the "simple (and longstanding) fact" that

7  "every app that runs on the iPhone must be approved by Apple and deployed through Apple's App

8  Store."  Compl. ¶ 6.  Accordingly, Plaintiffs allege that the "absence of Apple's anticompetitive

9  [browser] agreement would unwind Apple's stranglehold over third-party apps through its App Store."

10  *Id*. ¶ 470.  But Apple is already litigating consumer claims over its centralized app distribution model—

11  the exact same model that Plaintiffs seek to unwind.  *See, e.g.*, *Pepper v. Apple Inc.*, No. 11-cv-6714

12  (N.D. Cal.).  And Apple has settled similar claims with a class of developers of all kinds.  *Cameron v.*

13  *Apple Inc*., No. 19-cv-03074 (N.D. Cal.).  This alone creates a significant risk of duplicative damages

14  and complex apportionment.  *See Eagle*, 812 F.2d at 542–43 (finding existence of related suit to pose

15  danger of duplicative recoveries).[3]

16         That Plaintiffs seek to recover an iPhone (or iOS) "overcharge" does not resolve these risks.

17  Plaintiffs' lengthy daisy chain of causation means that numerous (supposedly) aggrieved plaintiffs exist

18  at every link in the sequence, all potentially jostling to recover alleged overcharges or other overlapping

19  sets of damages.  Either complex apportionment issues will need to be settled or else "potential

20  plaintiffs may be in a 'position to assert conflicting claims to a common fund . . . thereby creating the

21  danger of multiple liability for the fund.'"  *Eagle*, 812 F.2d at 542 (quoting *AGC*, 459 U.S. at 544).

22  That task will only be made more complex by the fact that many putative class members prefer Apple's

23  approach to device security and user privacy, *Epic Games*, 67 F.4th at 986, and therefore are not harmed

24  under Plaintiffs' theory, which is predicated on eroding or circumventing the Guidelines that protect

25  those safeguards for iOS users.  *See, e.g.*, Compl. ¶¶ 114, 470.  In sum, each relevant factor cuts against

26  antitrust standing here, and Plaintiffs fail to plead facts sufficient to demonstrate the causation required

---

27
28  [3] Apple maintains that no damages will be appropriate because there will be no liability—as courts, including the Ninth Circuit, have found in other cases.  *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 994 (9th Cir. 2023).

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT
CASE NO. 3:24-CV-00476-RS

1    for Article III standing.

2        **B.      Plaintiffs also lack antitrust standing because their alleged injury does not occur**
3        **in the market where competition is allegedly restrained.**

4        Antitrust standing also requires a plaintiff to plead antitrust injury "in the market where

5    competition is allegedly being restrained." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).

6    Here, Plaintiffs allege harm in the form of supracompetitive iPhone (and/or iOS) prices. Compl. ¶ 19.

7    But the alleged anticompetitive conduct relates to the development and distribution of browser apps in

8    a "U.S. mobile browser market." *Id.* ¶ 189. Whatever the exact contours of such a browser market

9    may be, it is not the market for smartphones or smartphone operating systems, the markets that

10   Plaintiffs allege to be relevant and where they claim to suffer injury. *Id.* ¶¶ 237–398. This mismatch

11   is fatal to Plaintiffs' claims.

12       In *Feitelson v. Google*, 80 F. Supp. 3d 1019, 1023–28 (N.D. Cal. 2015), the court was presented

13   with a nearly identical mismatch in which plaintiffs alleged supracompetitive pricing of Android

14   phones attributable to Google's allegedly unlawful licensing agreements with smartphone OEMs. The

15   court found plaintiffs lacked antitrust standing because the alleged "antitrust injury in the form of

16   supracompetitive pricing in Android phones" was "not the market in which the alleged anticompetitive

17   conduct occurred." *Id.* Just so here.[4]

18       **C.      Plaintiffs fail to allege redressability as to their claim for injunctive relief.**

19       Because their theory of harm depends on the speculative actions of third parties, Plaintiffs fail

20   to plausibly plead redressability as to their claim for injunctive relief. *See Davis v. Federal Election*

21   *Com'n*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross. Rather, a plaintiff must

22   demonstrate standing for each claim he seeks to press and for each form of relief that is sought."

23   (cleaned up)). "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed

24   by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

25   Accordingly, redressability is lacking where, as here, remedying the alleged harm depends crucially on

26   the actions of independent third parties. *See, e.g.*, *Fernandez v. Brock*, 840 F.2d 622, 628 (9th Cir.

27   _____

28   [4] Nor are Plaintiffs' alleged injuries "inextricably intertwined" with those of market participants. *See*
     *supra* § I.A.i.

1988).

As explained above, Plaintiffs rely at every turn on speculation about what third parties would do.  *See supra* § I.A.ii.  Among other conjectures, they rely on a host of third-parties to create new browsers, develop new PWAs, create new operating systems, and make new phones, while relying on customers to adopt these novelties *en masse*.  *Id.*  As a result, it is "speculative at best" whether enjoining Apple's WebKit requirement would deliver relief to Plaintiffs through lower iPhone prices— particularly when the alleged "co-conspirator" is not before the Court.  *Fernandez*, 840 F.2d at 627; *see also Levine v. Vilsack*, 587 F.3d 986, 993–94 (9th Cir. 2009) (no standing for declaratory and injunctive relief because redress would depend on actions of independent actors, and "any pleading directed at the likely actions of third parties . . . would almost necessarily be conclusory and speculative"); *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008) (no redressability for particular injunctive relief because the claim hinged on "discretionary efforts" by third-party agencies); *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1232 (N.D. Cal. 2022) (no redressability because court "could not compel the [third-party] hackers or Noblr to return the [personal information] to Plaintiffs").

## II.    PLAINTIFFS DO NOT PLAUSIBLY PLEAD ANY VIOLATION OF SECTION 1.

Plaintiffs allege that Google's alleged "agreement" to offer its Chrome browser on iOS using WebKit was a *per se* unlawful division of the market for smartphones (Count One) and for smartphone OSes (Count Two)—or, alternatively, a violation of the rule of reason.  *See* Compl. ¶¶ 474–505. Plaintiffs further allege (also in Count One) that Apple's "agreements" with all browser or browser engine developers, including Google, Mozilla, and Microsoft, to use WebKit on iOS collectively violate the rule of reason.  *Id.* ¶¶ 479–82.  In reality, all of these Section 1 claims boil down to the same deficient theory: that Apple's unilateral software design decision reflected in Guideline 2.5.6 is somehow an unlawful agreement under Section 1.  That theory is deficient because the only supposed "agreements" actually alleged in the Complaint are the unilateral decisions of Google, Mozilla, Microsoft and other developers to compete with Safari by offering iOS browser apps in compliance with Apple's App Review Guidelines.  These are not unlawful agreements under Section 1.  *Kendall*, 518 F.3d at 1048.  And even if subject to Section 1, they would at most reflect a vertical, intrabrand

1     restraint subject to the rule of reason—not the *per se* rule as Plaintiffs claim—and they have no

2     plausible anticompetitive effects.

3     **A.     Plaintiffs' conclusory allegations fail to allege an unlawful agreement.**

4     Under Section 1, "[t]he crucial question is whether the challenged anticompetitive conduct

5     stem[s] from independent decision or from an agreement." *Twombly*, 550 U.S. at 553 (alterations in

6     original) (internal quotation marks omitted).  To allege a "contract, combination, or conspiracy," there

7     must be "concerted" action.  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010)

8     (cleaned up); *accord The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988).  The

9     distinction between concerted and unilateral behavior turns on a "functional analysis"—whether an

10    "agreement . . . joins together separate decisionmakers" and thereby eliminates an "independent

11    center[] of decisionmaking."  *Am. Needle*, 560 U.S. at 199; *accord Copperweld Corp. v. Independence

12    Tube Corp.*, 467 U.S. 752, 768–69 (1984).

13    Although the Complaint is liberal in its use of the word "agreement," "stating such a claim

14    requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."

15    *Twombly*, 550 U.S. at 556.  The only alleged "factual matter" in the Complaint is the "express"

16    language supplied by Guideline 2.5.6, which requires browser apps to employ WebKit.  *See* Compl.

17    ¶ 143; RJN Ex. 1, § 2.5.6 ("Apps that browse the web must use the appropriate WebKit framework and

18    WebKit JavaScript.").  That unilateral requirement is not an unlawful agreement, and the independent

19    decision of Google, Mozilla, Microsoft, or any other developer to offer a *competing* iOS browser app

20    is not a *restraint*.  Nothing in the Complaint suggests that by deciding to offer a browser app, such

21    developers are foreswearing some other competitive path that is open to them.  Indeed, Plaintiffs

22    denominate every iOS browser developer (save for Google) as a "nonconspirator."  Compl. ¶ 199.  And

23    the Complaint alleges that all iOS app developers, Google included, must develop and distribute their

24    iOS apps through Apple's App Store.  *See* Compl. ¶ 111 ("Apple makes it virtually impossible to load

25    apps onto an iPhone outside of the App Store.").  Accordingly, these companies' decisions to produce

26    an iOS version of their browsers (with WebKit) is not concerted action that "deprives the marketplace

27    of independent centers of decisionmaking."  *Am. Needle*, 560 U.S. at 199; *see also, e.g.*, *Kendall*, 518

28    F.3d at 1048 ("Regarding the allegation that the Banks conspired to fix the interchange fee, merely

charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act.").[5]

To be sure, the Complaint at times appears to gesture at broader, ill-defined conspiracies. For example, Plaintiffs allege that "by express agreement, Google and Apple have agreed not to allow any potential cross-platform threat onto the iPhone platform in the form of a non-Apple browser engine." Compl. ¶ 197; *see also id*. ¶ 476 ("Google agrees not to deploy its cross-platform web browser and engine on iPhones[.]"). But these are fact-free assertions and conclusions insofar as they try to implicate anything beyond Guideline 2.5.6, the sole "express" language tied to the restraint alleged in the Complaint. The Complaint comprehensively lacks any factual matter about the "time, place, or person involved" in any separate and distinct Google-Apple "agreement." *Kendall*, 518 F.3d at 1047–48; *see also Arcell v. Google LLC*, 2023 WL 5336865, *3–4 (N.D. Cal. Aug. 18, 2023) (complaint failed to plausibly plead agreement between Apple and Google regarding search market competition). Plaintiffs' unsubstantiated window dressing—an attempt to attach the label of "conspiracy" to Apple's Guidelines—is no more than a "naked assertion of conspiracy" that fails to supply any "further factual enhancement" and "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 546.

## B.    Plaintiffs do not plead a plausible *per se* claim.

Plaintiffs do not state a plausible *per se* claim. To be clear, Plaintiffs allege only that Guideline 2.5.6 is "horizontal" and "per se" unlawful as to Google, Compl. ¶¶ 18, 455(3), 474, 487; they do not contend that the *per se* rule applies to any other "agreements with browser and browser engine developers." *id*. ¶ 479. But despite Plaintiffs' attempts to paint Guideline 2.5.6 as "horizontal" as it relates to Google, *see, e.g.*, *id.* ¶¶ 413, 474, 488, the Guideline (which applies generally) is at most a vertical, intrabrand restraint subject to the rule of reason. *See In re Musical Instrs. and Equip. Anti. Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) ("Vertical agreements," particularly those focused on intrabrand competition, fall "under the rule of reason"); *Leegin*, 551 U.S. at 907 (same). Antitrust law

---

[5] This case is unlike *Epic*, in which the plaintiff-developer alleged that various aspects of Apple's Developer Program Licensing Agreement coerced it into agreeing not to compete at all. 67 F.4th at 982. Here, Plaintiffs complain about browser developers' unilateral decisions to offer competing browser apps, and about Apple's unilateral App Store Guidelines.

imposes "a presumption in favor of [the] rule-of-reason." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726 (1988).  The *per se* rule, by contrast, is reserved for a narrow class of "conduct that is manifestly anticompetitive," *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1091 (9th Cir. 2000), "after courts have had considerable experience with the type of restraint at issue," and "can predict with confidence that the restraint would be invalidated in all or almost all instances under the rule of reason." *Id.* at 887–88.  Plaintiffs have not pled such a claim.

Restraints "imposed by agreement between firms at different levels of distribution [are] vertical restraints." *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 484 U.S. 717, 730 (1988).  Here, Apple and Google stand in a vertical platform-developer relationship:  Apple offers an app transaction platform, the App Store, for developers to distribute apps developed using Apple's iOS software.  Compl. ¶ 51. As a platform operator, Apple is not competing with Google "but rather setting requirements as a condition for platform access." *Frame-Wilson v. Amazon. com, Inc.*, 591 F. Supp. 3d 975, 987 (W.D. Wash. 2022) (vertical platform-seller relationship); *see also, e.g.*, *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1077 (S.D. Cal. 2012) (vertical platform-developer relationship).  This calls for application of the rule of reason, not the *per se* standard.  *Id.*

That Apple also distributes its own iOS apps (such as Safari) or otherwise competes with Google (*e.g.*, in the sale of smartphones and for app transactions) does not change the analysis.  Ninth Circuit precedent holds that the rule of reason—not the *per se* standard—applies in the context of "dual distribution" and "hybrid" vertical-horizontal arrangements. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986), *opinion modified on denial of reh'g*, 810 F.2d 1517 (9th Cir. 1987); *Frame-Wilson*, 591 F. Supp. 3d at 986; *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1355–56 (9th Cir. 1982); *accord PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F. 3d 412, 421 n.8 (5th Cir. 2010) (noting that "eight other circuits have applied the traditional rule of reason to dual distribution systems"); *United States v. Brewbaker*, 87 F.4th 563, 573–83 & n.14 (4th Cir. 2023) ("[T]his Court and nearly all other lower courts have adjudged hybrid restraints with vertical and horizontal aspects under the rule of reason[.]").

Guideline 2.5.6 imposes only *intrabrand* limitations (with respect to apps developed using Apple's iOS brand of software), not interbrand restrictions (with respect to apps that developers make

with other brands of software such as Android). Apple's App Store Review Guidelines ensure that iOS is a secure, private, and technically sound platform. *Epic*, 67 F.4th at 994. But they reach no further—the Guidelines apply *only* on Apple's platform and to Apple's App Store. *See* RJN Ex. 1. By ensuring that the apps available on iOS meet these standards, Apple's restraints affect *intra*brand competition to "tap[] into consumer demand and different[e] its products from those of its [interbrand] competitors." *Epic Games*, 67 F.4th at 987; *see also Leegin*, 551 U.S. at 907. This "create[s] a heterogenous market for app-transaction platforms which, as a result, increases interbrand competition." *Epic Games*, 67 F.4th at 989. In other words, Apple's Guidelines serve to differentiate Apple's brand from those of competitors like Android—"the primary goal of antitrust law." *Id.*; *accord Leegin*, 551 U.S. at 886, 891. The *per se* rule has no application in such cases.

Plaintiffs cannot contort economic realities through the conclusory incantation that Guideline 2.5.6 is a "market division." Compl. ¶¶ 312, 504. Labels do not control. *See, e.g.*, *Cal. Ex Rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) (*per se* treatment inappropriate where allegation of market allocation is not supported by facts); *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1341–43 (11th Cir. 2010). Nothing in Section 2.5.6 "expressly" or impliedly prohibits anyone from producing or selling competing smartphones (such as those made by Google, Samsung, and others), or operating systems (such as Android). *See, e.g.*, *id.* ¶¶ 183, 190, 192. This is simply not a market division, "classic" or otherwise. *See also Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 844 (9th Cir. 1996) (per se treatment not appropriate "[w]here the conduct at issue is not a garden-variety horizontal division of a market"); *California Ex Rel. Harris*, 651 F.3d at 1137 (same). And while Plaintiffs also posit that "Google and Apple do not compete on the merits by agreement, maintaining their shares of the U.S. Smartphone Market," Compl. ¶ 476, that purely conclusory assertion is belied by the Complaint's depiction of Apple as *increasing* its share at Google's expense, *id.* ¶¶ 289–90. *See California Ex Rel. Harris*, 651 F.3d at 1137 (agreement allegedly dividing market by relative market share not subject to *per se* rule because, *inter alia*, it "did not prevent any Defendant from actually making sales to consumers" (internal quotation marks omitted)); *Flaa v. Hollywood Foreign Press Assoc.*, 55 F.4th 680, 692 (9th Cir. 2022) ("[A] plaintiff can plead itself out of court by alleging facts that are inconsistent with its [market division] claim[.]").

### C.    Plaintiffs do not plead a plausible rule of reason claim.

Acknowledging the vulnerability of their *per se* theory, Plaintiffs purport to assert an "alternative" rule of reason claim.  Compl. ¶¶ 478, 505.  It too fails.  To state a Section 1 claim under the rule of reason, a plaintiff has the initial burden to plausibly allege that the challenged restraint has a substantial anticompetitive effect that harms competition in the relevant market.  *Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018).  As a threshold matter, Plaintiffs contend that the alleged smartphone and smartphone OS markets are "relevant" to their supposed injuries, but the conduct they challenge falls in another alleged market—the "U.S. market for mobile browsers."  Compl. ¶ 189.  "[C]ourts must focus on anticompetitive effects in the market where competition is [allegedly] being restrained."  *Qualcomm*, 969 F.3d at 992 (internal quotation marks omitted).  Plaintiffs have not done so and therefore "even if [Apple's] practices are interrelated, actual or alleged harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law."  *Id.* at 992–93 ("[H]igher prices to consumers . . . are not 'anticompetitive' in the antitrust sense—at least not directly—because they do not involve restraints on trade or exclusionary conduct in the area of effective competition." (internal quotation marks omitted)).  Even disregarding this fatal flaw, Plaintiffs do not allege facts showing a substantial anticompetitive effect in any market.

First, Plaintiffs make no claim that any individual decision to introduce an iOS browser by any developer other than Google is anticompetitive.  Plaintiffs claim only that these acts "considered as a whole" violate the rule of reason, but that concedes that Guideline 2.5.6 has not unreasonably restrained the individual acts of competition by Microsoft, Mozilla and all other "nonconspirator" developers.  Compl. ¶¶ 199, 480.

Second, Plaintiffs' theory of anticompetitive effects—whether flowing from the alleged restraint as to Google individually or as to all iOS browser developers "as a whole"—is conclusory and implausible.  Merely labeling the prices for Apple's iPhones or iOS as "supracompetitive," Compl. ¶¶ 17, 485, 509, 528, is not enough.  *See, e.g.*, *In re McCormick & Co., Inc. Pepper Prod. Litig.*, 275 F. Supp. 3d 218, 225 (D.D.C. 2017).  Nor is it enough to allege that prices for "Apple's smartphones have monotonically increased year over year."  Compl. ¶ 207.  That prices increased does not mean they were "higher than the price one would expect to find in a competitive market."  *Am. Express*, 585

U.S. at 547–48. As the Supreme Court has explained, price must be inflated above the competitive level because "output was restricted.'" *Id.* at 549; *see also Brooke Group*, 509 U.S. at 233 ("Supracompetitive pricing entails a restriction in output."). There are no allegations that Apple could or has restricted output of smartphones—a necessary predicate to alleged supracompetitive pricing.

Plaintiffs' allegations of reduced consumer choice and diminished product quality are similarly implausible and conclusory. *See* Compl. ¶¶ 23, 407, 419. "Businesses may choose the manner in which they do business absent an injury to competition" and a reduction in consumer choice is "fully consistent with a free, competitive market." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012); *Qualcomm*, 969 F.3d at 990 (same). But here, Plaintiffs admit that Apple invented modern mobile web browsing, Compl. ¶¶ 46–49, and allowed other developers to launch competing iOS web browsers with "add[ed] functionality," *id.* ¶ 223. These allegations collectively admit the obvious: Apple created the modern smartphone experience using the highly innovative WebKit browser engine, and then made it available to developers to create their own browser apps. *Cf. Blix Inc. v. Apple Inc.*, 2021 WL 2895654, at *4 (D. Del. July 9, 2021) (conduct is not anticompetitive where "Apple actually expands consumer choice" (emphasis added)). To the extent Plaintiffs complain about fewer iOS browser engines, Compl. ¶ 419, they do not allege facts "to indicate that Defendant's conduct has prevented consumers from freely choosing among [other] products or prevented competitors from innovating" (such as on Android, *id.* ¶ 179). *Feitelson*, 80 F. Supp. 3d at 1029 (rejecting "allegations of hypothetical loss of consumer choice and innovation" as "too conclusory and speculative"); *see also Epic Games*, 67 F.4th at 989 (holding Apple's *intra*brand restrictions promote *inter*brand competition). Any claim that there are fewer options, Compl. ¶¶ 407, 419, rests on the implausible, attenuated, and speculative chain of causation discussed above. Nor do Plaintiffs allege facts to show how product quality has been "diminished."[6] *Id.* ¶ 23.

## III.    PLAINTIFFS FAIL TO PLEAD A SECTION 2 CONSPIRACY CLAIM

A conspiracy to monopolize claim, as its name implies, requires an actual "conspiracy to *monopolize*." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003)

---

[6] To the extent that this allegation refers to the unavailability of non-WebKit engines on iOS, this allegation is redundant of Plaintiffs' consumer choice argument. *See* Compl. ¶ 419.

Gibson, Dunn & Crutcher LLP

(emphasis added); *see also United Food & Com. Workers Local 1776, et al. v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1076 (N.D. Cal. 2014) ("A monopoly, by definition, consists of a single firm, and both monopolization and attempted monopolization are single-firm violations[.]" (citation omitted)).  But Plaintiffs not only fail to plead any conspiratorial agreement for the reasons discussed above, they do not even purport to allege the type of agreement that is required under Section 2 for a conspiracy to monopolize.  Instead, they pursue a theory in which Google and Apple would *share* a supposed "combined monopoly," by "ensur[ing] the maintenance of their own halves of the U.S. SOS Market."  Compl. ¶¶ 380, 414, 415, 417, 420.  But half monopolies are no monopolies at all, and such shared monopolization theories do not support a violation under Section 2.  *See, e.g.*, *Optronic Tech., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021) (upholding conspiracy to monopolize verdict because jury instructions required that defendant "specifically intended that *one of the parties* to the agreement would obtain or maintain monopoly power" in the relevant market (emphasis in original)); *Standfacts Credit Services, Inc. v. Experian Information Solutions, Inc.*, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005), *aff'd* 294 F. Appx. 271 (9th Cir. 2008) ("Since Section 2 prohibits only monopolization by a single entity, as opposed to shared monopolization, . . . an allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under Section 2."); *Oxbow Carbon & Mons. v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 45–46 (D.D.C. 2013) (agreeing with the "vast majority of other courts" that a "shared monopoly" cannot support a Section 2 claim).  Plaintiffs' Section 2 claim therefore fails.

## IV.     ALL OF PLAINTIFFS' CLAIMS ARE UNTIMELY

Federal antitrust claims are subject to a four-year statute of limitations.  *See* 15 U.S.C. § 15b.  "A cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act."  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987).  In other words, "a Sherman Act claim accrues at the time of the anticompetitive conduct."  *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1066 (N.D. Cal. 2016).  Plaintiffs filed this lawsuit on January 25, 2024, but the conduct at issue far predates January 25, 2020.

### A.     Plaintiffs' damages claim accrued outside of the statute of limitations period.

The operative conduct in this case occurred well outside the four-year statute of limitations.

Indeed, browser developers, such as Google and Mozilla, launched iOS-compatible versions of their products employing WebKit long ago.  *See* RJN Exs. 2 & 3 (Chrome for iOS launched in June 2012, and Mozilla for iOS launched in November 2015); *see also In re Animation Workers Antitrust Litigation*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015) (observing a "rather conspicuous absence of specific dates for many of Plaintiffs' factual allegations" in finding antitrust claims to be time-barred).  Apple thus implemented its challenged policy well outside the statute of limitation, and there is no allegation that it has changed course—or even that any third-party browser developer has changed course—within the last four years.

### B.    The continuing violations exception does not save Plaintiffs' damages claims.

An exception to the statute of limitations exists for continuing violations, "in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured." *Pace Indus., Inc.*, 813 F.2d at 237.  This requires a timely "overt act by the defendant," *id.*, that is both (i) a "new and independent" act, and that (ii) "inflict[s] new and accumulating injury on the plaintiff," *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (alteration in original).  But conduct that is "merely a reaffirmation of a previous act" does not give restart the clock.  *Id.  See also SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200, *1 (9th Cir. Dec. 28, 2023) (dismissing Sherman Act claim as time-barred because Apple's made the key business decisions in 2008 and its agreements had not "changed since").

The Complaint alleges no continuing violation.  All of the challenged conduct was in place outside the statute of limitations: Apple's WebKit requirement is over a decade old, and third-party browsers launched their iOS browsers (and, therefore, under Plaintiffs' theory "agreed" with Apple) well over four years ago.  While Plaintiffs point to Google's decision to release Chrome updates, *id.* ¶ 193, that cannot save Plaintiffs' claims: Setting aside that these updates are not an overt act by Apple, the relevant "practices have been in place" since iOS first accepted third-party browsers, any updates are merely "'reaffirmation[s] of a previous act' insufficient to restart the statute of limitations." *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1107 (N.D. Cal. 2012) (quoting *Pace Indus.*, 813 F.2d at 237); *see also In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 72 (9th Cir. 1979).

C.      **Plaintiffs' claims for injunctive relief are barred by the doctrine of laches.**

For the same reasons, Plaintiffs' claim for injunctive relief is time-barred too.  Where a damages claim is untimely, injunctive relief is presumptively barred under the doctrine of laches.  *See, e.g.*, *New York v. Meta Platforms, Inc*. 66 F.4th 288, 295–96 (D.C. Cir. 2023); *Oliver*, 751 F.3d at 1086; *Aurora Enters., Inc. v. Nat'l Broad. Co*., 688 F.2d 689, 694 (9th Cir. 1982); *Reveal Chat Holdco, LLC v. Facebook, Inc*., 471 F. Supp. 3d 981, 991–92 (N.D. Cal. 2020).  There are no reasons sounding in equity to depart from that presumption here as Plaintiffs' alleged harms all redound to the same, "unabated inertial consequences of [] pre-limitations actions."  *In re Multidistrict Vehicle Air Pollution*, 591 F.2d at 72 (internal quotation marks omitted).

## CONCLUSION

Plaintiffs' claims are deficient at every turn.  They lack antitrust and Article III standing, they fail to allege a claim under Sections 1 or 2 of the Sherman Act, and they are untimely.  The Complaint should be dismissed with prejudice.

DATED: March 14, 2024                    GIBSON, DUNN & CRUTCHER LLP
                                         CYNTHIA E. RICHMAN
                                         DANIEL G. SWANSON
                                         JULIAN W. KLEINBRODT


                                         By: */s/ Cynthia E. Richman*
                                             Cynthia E. Richman

                                         *Attorneys for Defendant APPLE INC.*