**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*p.h.v.* to be sought)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LUISA BAKAY, et al., | Case No. 3:24-cv-00476-RS |
| Plaintiffs, | **PLAINTIFFS' CORRECTED OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS** |
| v. | |
| APPLE INC., | Hon. Richard Seeborg |
| Defendant. | Hearing Date: June 13, 2024<br>Time: 1:30 p.m.<br>Courtroom 3, 17th Floor |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND .....................................................................................................................1

ARGUMENT .........................................................................................................................4

I.    PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT APPLE'S WEBKIT AGREEMENTS VIOLATE SECTION 1 OF THE SHERMAN ACT ..................4

    A.    APPLE'S WEBKIT AGREEMENT WITH GOOGLE IS *PER SE* UNLAWFUL ..........................................................................................5

    B.    APPLE'S WEBKIT AGREEMENTS VIOLATE THE RULE OF REASON ...........................................................................................12

II.    PLAINTIFFS HAVE PLAUSIBLY PLEADED A CONSPIRACY TO MONOPOLIZE..............................................................................................17

III.    PLAINTIFFS HAVE ANTITRUST AND CONSTITUTIONAL STANDING ...18

    A.    PLAINTIFFS HAVE SUFFERED ANTITRUST INJURY AND HAVE ANTITRUST STANDING.............................................................19

    B.    PLAINTIFFS HAVE CONSTITUTIONAL STANDING .......................23

IV.    PLAINTIFFS' CLAIMS ARE TIMELY .................................................24

    A.    PLAINTIFFS' DAMAGES CLAIMS ARE NOT TIME BARRED.........24

    B.    APPLE'S LACHES ARGUMENT IS FORECLOSED BY BINDING NINTH CIRCUIT LAW AND IN ANY EVENT, AN AFFIRMATIVE DEFENSE INAPPROPRIATELY ADJUDICATED ON A MOTION TO DISMISS..................................................................25

CONCLUSION....................................................................................................................25

# **TABLE OF AUTHORITIES**

## **CASES**

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
    92 F.3d 781 (9th Cir. 1996) ...................................................................................4

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ...............................................................4, 18, 19

*Apple Inc. v. Pepper*,
    139 S. Ct. 1514 (2019)...........................................................................................22

*Assoc. Gen. Contr. of California, Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983)...............................................................................................23

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    2018 WL 3032552 (S.D. Cal. June 19, 2018)....................................................12

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    9 F.4th 1102 (9th Cir. 2021) ....................................................................... *passim*

*Blackburn v. Sweeney*,
    53 F.3d 825 (7th Cir. 1995) ....................................................................................9

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ..............................................................................12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    420 U.S. 477 (1977)...............................................................................................18

*Business Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988)..................................................................................................5

*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) ..............................................................................10

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)...............................................................................................14

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473 (9th Cir. 1986), as modified, 810 F.2d 1517 (9th Cir. 1987)............5, 7, 11

*Danjaq LLC v. Sony Corp.*,
    263 F.3d 942 (9th Cir. 2001) ................................................................................25

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) .......................................................................7, 8, 15

ii

*Evergreen Safety Council v. RSA Network, Inc.*,
    697 F.3d 1221 (9th Cir. 2012) ...................................................................25

*Flaa v. Hollywood Foreign Press Ass'n*,
    55 F.4th 680 (9th Cir. 2022) ................................................................9, 16

*F.T.C. v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986) ...............................................................................17

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
    343 F.3d 1000 (9th Cir. 2003) ...............................................................19

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) ..................................................................8

*Harkins Amusement Enterprises, Inc. v. Gen. Cinema Corp.*,
    850 F.2d 477 (9th Cir. 1988) .................................................................18

*Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*,
    863 F.3d 1178 (9th Cir. 2017) ...............................................................18

*In re Cardizem CD Antitrust Litig.*,
    332 F.3d 896, 911 (6th Cir. 2003) .........................................................19

*In re Glumetza Antitrust Litig.*,
    611 F. Supp. 3d 848 (N.D. Cal. 2020) ...................................................24

*In re High-Tech Emp. Antitrust Litig.*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) .................................................12

*In re National Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ....................................................... *passim*

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 914 (9th Cir. 2015) .................................................................20

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
    630 F. Supp. 3d 968 (N.D. Ill. 2022) ......................................................9

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ...............................................................23

*Metro Indus., Inc. v. Sammi Corp.*,
    82 F.3d 839 (9th Cir. 1996) ...................................................................10

*N. Am. Soccer League, LLC, v. U.S. Soccer Fed'n Inc.*,
    883 F.3d 32 (2d Cir. 2018).....................................................................15

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ...............................................................16

*Novell, Inc. v. Microsoft Corp.*,
    505 F.3d 302 (4th Cir. 2007) ................................................................. 21-22

*O'Handley v. Weber*,
    62 F.4th 1145 (9th Cir. 2023) ....................................................................23

*Ohio v. Am Express Co.*,
    585 U.S. 529 (2018).......................................................................................5

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ....................................................................24

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ......................................................................7

*Pecover v. Elecs. Arts Inc.*,
    633 F. Supp. 2d 976 (N.D. Cal. 2009) .......................................................12

*Perez v. Discover Bank*,
    74 F.4th 1003 (9th Cir. 2023) ......................................................................8

*Samsung Elecs. Co. v. Panasonic Corp.*,
    747 F.3d 1199 (9th Cir. 2014) ....................................................................24

*Sherman v. Brit. Leyland Motors, Ltd.*,
    601 F.2d 429 (9th Cir. 1979) ........................................................................9

*Somers v. Apple Inc.*,
    729 F.3d 953 (9th Cir. 2013) ......................................................................19

*Tawfilis v. Allergan, Inc.*,
    157 F. Supp. 3d 853 (C.D. Cal. 2015) .......................................................22

*Teradata Corp. v. SAP SE*,
    2018 WL 6528009 (N.D. Cal. Dec. 12, 2018)............................................12

*Turner v. City & Cnty. Of San Francisco*,
    788 F.3d 1206 (9th Cir. 2015) ......................................................................1

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................15, 22

*United States v. Topco Associates*,
    405 U.S. 596 (1972)......................................................................................9

iv

## STATUTES

15 U.S.C. § 1 .................................................................................................... *passim*

15 U.S.C. § 15b ........................................................................................................25

## OTHER AUTHORITIES

P. AREEDA & H. HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST
    PRINCIPLES AND THEIR APPLICATION (CCH) ¶ 2030c (Aug. 2023 update) ........................9

P. AREEDA & H. HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST
    PRINCIPLES AND THEIR APPLICATION (CCH) ¶ 339d ........................................................22

**PRELIMINARY STATEMENT**

For more than a decade, Apple and Google have enjoyed a duopoly in the United States Smartphone Operating System Market, and Apple- and Google-powered smartphones have dominated the United States Smartphone Market. This duopoly—and Apple's dominant position in the Smartphone Market with its iPhone—has for many years seemed inevitable, the result of app-related network and lock-in effects characterizing the smartphone ecosystem. Large companies like Microsoft attempted to enter and break up Apple and Google's dominant position, and failed.

In the late 2010s, new technology relating to web applications allowed for the possibility of a cross-platform application ecosystem for smartphones. These new progressive web apps, built on HTML5 and Javascript, created a cross-platform middleware threat to the entrenched smartphone duopoly. Google is one of the leading companies developing this cross-platform technology, referred to as a browser engine. Google's Blink engine allows cross-platform web apps that run like native applications, including on smartphones.

However, Apple and Google have an agreement to keep this technology off iPhone, preventing any such cross-platform threat to the smartphone operating system stasis. Only WebKit can be used on iPhone, per an agreement between horizontal market leaders Apple and Google. In fact, Apple has mirroring agreements with other web engine developers, including Mozilla and Microsoft. These agreements have maintained Apple's smartphone and smartphone operating system dominance, and Americans pay more and get less as a result. This is an antitrust case brought by direct purchasers of iPhones, which are bundled with iOS, for damages and appropriate injunctive relief.

Apple's motion to dismiss challenges factual issues and is wrong on the law. Plaintiffs have standing and have adequately pleaded section 1 and 2 claims. Apple's motion should be denied.

**BACKGROUND**

In 2007, Apple introduced the iPhone. CAC ¶ 41. A short time later, it introduced the App Store—the sole means for installing, distributing, or running applications on iPhone. *Id.* ¶¶ 51-56 Around the same time Apple introduced iPhone, which runs on Apple's proprietary iOS operating system, Google released a smartphone operating system of its own: Android. *Id.* ¶¶ 57-75. By the

mid-2010s, Apple and Google enjoyed in a duopoly in the United States Smartphone Operating System ("SOS") Market, and Apple's iPhone had a more than 50% market share in the United States Smartphone Market. *Id.* ¶¶ 76-82. Google, like Apple, makes and sells smartphones, not just smartphone operating systems. *Id.* ¶ 72.

The entrenched positions of iOS- and Android-based smartphones in the U.S. Smartphone and SOS Markets are protected by a powerful Mobile Ecosystem Barrier to Entry ("MEBE"), which leverages a "chicken-or-the-egg" problem regarding mobile applications to prevent the emergence of a third-way operating system and attendant smartphones. CAC ¶¶ 81-102. In the mid-2010s, no less than Microsoft, and later Mozilla (maker of Firefox) impaled themselves on the MEBE, trying and failing to release smartphones that did not rely on the entrenched iOS or Android operating systems. *Id.* ¶¶ 126-36 (Microsoft), 160-84 (Mozilla).

In the past few years, developments in web technology, including advancements in HTML5 and Javascript, have led to the rise of so-called "progressive web apps" (PWAs), which provide native-like software experiences through a browser (often an in-app browser, such that PWAs are indistinguishable to a user from an installed app). CAC ¶¶ 103-07. PWAs provide the technological ability to break the iOS-Android duopoly, because they enable the creation and dissemination of cross-platform mobile applications that work just like native apps—but can run anywhere, including on both Android-based and iOS-based smartphones. *Id.* ¶¶ 108-25. PWAs run on technology called a "browser engine"—the baseline technology underlying a web browser, including an in-app browser. CAC ¶¶ 137-39. Several companies make mature, sophisticated browser engines that have the ability to facilitate cross-platform web apps that would run, native-like, on smartphones: most notably Google (Blink) and Mozilla (Gecko). *Id.* ¶¶ 151-94.

However, the technology behind PWAs poses a threat to the iOS-Android smartphone duopoly, and to Apple's supracompetitive profits that flow from it. CAC ¶¶ 108-25, 137-50. (Apple sells both iPhone and its proprietary operating system, iOS, directly to consumers.) That is, with the rise of PWAs, browser engine technology now poses a cross-platform middleware threat to the MEBE and to Apple's smartphone and SOS market power. *Id.* Apple has sealed off this competitive threat by maintaining a series of agreements—including one with its direct horizontal competitor Google,

maker of Android, of Nexus/Pixel smartphones, and of the Blink cross-platform browser engine—in which Apple and developers agree not to use any browser engine other than Apple's WebKit on iPhone. *Id.* ¶¶ 137-236. Besides Apple's WebKit agreement with Google, Apple also maintains WebKit agreements with Mozilla and Microsoft, among others—and requires that any other entity that would seek to bring a browser to iPhone use Apple's WebKit rather than some other cross-platform browser engine. *Id.* ¶¶ 137-50, 196-99.

Apple's web of mirroring WebKit agreements—including with horizontal smartphone and SOS competitor Google—have prevented any meaningful cross-platform app threat from emerging for smartphones, because no browser engine (no matter how well-developed) can reach more than 50% of U.S. smartphones and run on both Android-based and iOS-based smartphones. CAC ¶¶ 200-07. There is no legitimate justification—technical or otherwise—for the WebKit agreements, particularly with Google. *Id.* ¶¶ 208-36. Indeed, the WebKit agreement with Google functions as a naked restraint on trade, a market division in which the two dominant firms in the United States SOS Market agree to keep the principal threat to their shared dominance—a cross-platform application ecosystem for smartphones—out of Apple's 55% of U.S. smartphones. *Id.* ¶¶ 487-510 (Count Two); 314-98 (SOS Market). In recent years, despite the rise of an extant, technologically mature cross-platform threat in PWAs and browser engine technology, Apple has managed to monotonically raise prices, year after year, without sacrificing Smartphone or SOS Market share. CAC ¶ 207. Plaintiffs are direct purchasers who bought iPhones (bundled with Apple's iOS smartphone operating system) from Apple since January 25, 2020. *Id.* ¶¶ 20-22. They were anticompetitively overcharged, and face the threat of continued overcharges in the future (among other antitrust injury) if Apple's anticompetitive conduct is not enjoined. *Id.* ¶¶ 23-24.

On January 25, 2024, the day this suit was filed, the European Union finally had enough, and introduced regulations that required Apple to change its WebKit Agreements in Europe. Ex. B. Apple announced it would comply, and "w[ould] continue to deliver the best, most secure experience possible for EU users." Ex. C. Apple has made no such commitment for the United States Smartphone and SOS Markets, nor to the more than 100 million Americans who use and regularly purchase iPhones at anticompetitively inflated prices.

3

## ARGUMENT

"To survive a rule 12(b) motion to dismiss, a plaintiff must allege enough facts to state a claim to relief that is plausible on its face." *Turner v. City & Cnty. of San Francisc*o, 788 F.3d 1206, 1210 (9th Cir. 2015) (cleaned up). In doing so, the "court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *Id.* Plausibility requires more than a "sheer possibility," but is "not akin to a probability standard. *Id.*

## I. PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT APPLE'S WEBKIT AGREEMENTS VIOLATE SECTION 1 OF THE SHERMAN ACT

To prevail on a Sherman Act Section 1 claim, "a plaintiff must show (1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a *per se* or rule of reason analysis; and (3) the restraint affected interstate commerce." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).[1] Count One of the CAC alleges that Apple violated Section 1 of the Sherman Act by entering into agreements preventing the deployment of browser engines other than WebKit on Apple's iPhone, including by agreeing with its horizontal competitor in the Smartphone Market, Google. CAC ¶¶ 461-86. These agreements directly target an extant, technologically mature threat to Apple's iPhone business and the Mobile Ecosystem Barrier to Entry ("MEBE") protecting it from competition—the rise of a cross-platform app ecosystem for smartphones. *Id.*; *see also id.* ¶¶ 185-207. Count Two alleges that Apple's agreement with Google as to WebKit unlawfully divided the SOS Market, a *per se* violation of Section 1, or in the alternative, unreasonably restrained trade in that market in violation of the Rule of Reason. *Id.* ¶¶ 487-510. Apple does not contend that the third Section 1 element (nexus to interstate commerce) is absent. As to the first two elements, Apple's motion focuses on a series of factual disputes that are inappropriately resolved on a motion to dismiss.

---

[1] Antitrust standing is frequently cited as a fourth element of a section 1 claim. *See, e.g., In re National Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) ("*In re NFL*"). Since Apple has separately challenged antitrust standing, Plaintiffs devote a separate section to this element later in this brief after sections addressing "the precise conduct being challenged" and the "structure of the markets and agreements involved," *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999)—issues logically precedent to the antitrust standing analysis.

### A. Apple's WebKit Agreement with Google Is *Per Se* Unlawful

"A small group of restraints are unreasonable *per se* because they 'always or almost always tend to restrict competition and decrease output.'" *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quoting *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)). "Typically only 'horizontal restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*." *Id.* Here, Apple and Google are indisputably horizontally aligned in both the SOS and Smartphone Markets, and none of the exceptions to the *per se* rule apply.

### 1. Apple and Google Are Horizontal Competitors in the SOS and Smartphone Markets

"A horizontal restraint is an agreement among competitors on the way in which they will compete with one another." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (cleaned up). By contrast, "[v]ertical restraints are restraints imposed by agreement between firms at different levels of distribution." *Id.* (cleaned up). A court "determine[s] the economic impact of the alleged conspiracy largely by examining the economic relationship between the parties. If the relationship between [the two agreeing parties] could be characterized as purely 'horizontal' (between competitors at the same level of distribution), the alleged agreement would fit squarely within the *per se* pattern. On the other hand, if the relationship is purely 'vertical' (between entities at different levels of the same distribution chain), we would apply the rule of reason." *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1480 (9th Cir. 1986), as modified, 810 F.2d 1517 (9th Cir. 1987).

To begin with, Apple and Google are horizontal competitors at the same level of distribution in the Smartphone Market. Apple produces and sells the iPhone, and Google produces and sells the Nexus and Pixel smartphones, which have rivaled or currently rival Apple's iPhone. *See* CAC ¶¶ 72, 80, 283-4, 290-91, 474. With respect to the SOS Market, there is no question that Apple and Google are direct competitors, as the two companies make and distribute virtually every smartphone operating system installed on smartphones in the United States, with Apple's iOS having 54% of the SOS Market and Google's Android 45.8% as of Q3 2023—together 99.8% of the SOS Market. *See* CAC ¶¶ 319, 377-78. Apple distributes iOS as part of every iPhone it sells, though it distinctly markets its

operating system. *Id.* ¶¶ 362-64. Google directly distributes Android as part of its Nexus and Pixel phones, but also distributes Android through other handset-makers, such as Samsung. *Id.* ¶ 371-72.

The WebKit agreement is also directly relevant to the horizontal relationship between Apple and Google. This is because the WebKit agreement concerns a core piece of software implemented by both Apple and Google as an integrated part of their smartphones and smartphone operating systems. As the CAC alleges, the browser engine is not only "a core software component of every web browser," *id.* ¶ 137, but also a "core component of other computer programs, including apps that use in-app browsers or rely on web-based functionality." *Id.* at 138. WebKit, Apple's browser engine, is deployed as part of Apple's iOS operating system, *id.* ¶ 140. Google also deploys its own web engine, called Blink, on all of its own smartphones and the smartphones that run Google's Android operating system. *Id.* ¶ 151-59. Apple's entire App Store business model relies on preventing apps that are not sold and/or distributed through the Apple App Store from running on iPhones with near-native functionality, *id.* ¶¶ 84-89, but web engines can provide precisely that sort of near-native functionality by running Progressive Web Apps ("PWAs"), *id.* ¶¶ 103-07. Apple and Google made an agreement not to deploy any rival web engine on iOS, *id.* ¶¶ 108-25, 137-236, and, as the CAC explains, the sole non-pretextual reason either company would enter into such an agreement is to preserve their stranglehold on smartphones and smartphone operating systems. *Id.* ¶¶ 208-36.

Without the Webkit agreement between Google and Apple, the MEBE would immediately erode, allowing new smartphone entrants. Indeed, Google and Mozilla, among others, have web engines that can immediately be deployed on Apple's smartphones and iOS operating system, CAC ¶¶ 160-82 (Mozilla), ¶ 194 (Google), and the very moment these engines are deployed on iPhones, PWAs would become cross-platform across virtually all smartphones in the U.S., thereby permitting meaningful smartphone competition by new hardware not locked into the present SOS duopoly. Indeed, the lack of apps at launch is what caused Microsoft to fail in its attempt the Smartphone and SOS Markets, and Apple's web of agreements with Google and other developers directly prevent Mozilla from building its own smartphone with a cross-platform web engine. Put simply, Apple and Google are direct horizontal competitors, and the WebKit Agreement is an agreement "on the way in

which they will compete with one another," *Aya Healthcare Servs., Inc.*, 9 F.4th at 1108, and as such, fits "squarely within the *per se* pattern." *Dimidowich v. Bell & Howell*, 803 F.2d at 1480.

2.      **Apple's Agreements, Including with Google, Are Express and Contractually Enforced by Apple, and Apple Has Repeatedly Said So to Courts in this District**

An express agreement is "direct evidence of 'concerted activity.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 n.13 (9th Cir. 2023) (citing *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1153 (9th Cir. 2003)). This is true even for contracts of adhesion or those where one party only "reluctantly accepted" its terms. *Epic Games, Inc.*, 67 F.4th at 982; see also *United States v. Paramount Pictures*, 334 U.S. 131, 160 (1948) (agreement, even if "forced" on a co-conspirator is within Section 1 because it is "acquiescence in an illegal scheme"). Here, Plaintiffs allege the existence of an express agreement between Apple and Google, as well as between Apple and other developers, such as Mozilla. CAC ¶¶ 141-45, 190-99. Specifically, the CAC alleges that Apple's contractual agreements with developers, including Google, require compliance with the Apple App Store Review Guidelines, which in turn state in Section 2.5.6 that: "Apps that browse the web must use the appropriate WebKit framework and WebKit Javascript." *Id.* ¶¶ 142-43. This express agreement falls squarely within Section 1 of the Sherman Act.

Apple's only response is to argue by *ipse dixit* that its express agreements with Google and other developers are in fact a "unilateral requirement." Apple Mot. at 17-8. Setting aside that this argument contradicts the facts as pleaded, Apple's assertion is directly at odds with what Apple's own lawyers have said in other antitrust litigation within this District. For example, here is what Apple's lawyers recently told Judge Chhabria about the App Store Guidelines at oral argument on a motion to dismiss, which was granted in Apple's favor: "We're not saying that there aren't obligations, that this isn't a contract. ***The App Store Review Guidelines are a contract***. They impose obligations on developers." Transcript of Oral Argument at 33:4-7, *Pierre v. Apple Inc.*, No. 3:23-cv-05981 (N.D. Cal. Mar. 21, 2024) (emphasis added), attached as Ex. A. Moreover, Apple sought to enforce the terms of its developer agreements—including the App Store Guidelines—against developer Epic as part of affirmative counterclaims for indemnification brought by Apple. *See, e.g.*, APPLE INC.'S

MOTION FOR ENTRY OF JUDGMENT ON ITS INDEMNIFICATION COUNTERCLAIM, *Epic Games Inc. v. Apple Inc.*, No. 4:20-cv-05640, Dkt. No. 876, at 7 (N.D. Cal. Jan. 16, 2024); *see also id.* at 3-4 (explaining that "[t]o develop and distribute iOS apps, developers must also sign and agree to the terms of the DLPA," and describing restrictions within Section 3 of the App Store Review Guidelines as "core Apple policies for developers," enforceable as contractual obligations); DEFENDANT AND COUNTER-CLAIMANT APPLE INC.'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN REPLY TO EPIC GAMES, INC.'S COMPLAINT FOR INJUNCTIVE RELIEF, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR, Dkt. No. 66, at p. 4 (N.D. Cal. Sep. 8, 2020). Apple's factual assertion to this Court that the WebKit Agreement is a "unilateral requirement," Mot. at 17, is not credible—and not creditable on a motion to dismiss. In any event, Apple is estopped from contending that its express agreements are unilateral, as it is not permitted to take a "clearly inconsistent" position other courts, "succeed in persuading" the other courts to accept its position, and then "derive an unfair advantage" by taking the opposite position here. *Perez v. Discover Bank*, 74 F.4th 1003, 1008 (9th Cir. 2023). Estoppel is "even more appropriate here" given that Apple has taken inconsistent positions in different suits. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001).

### 3. Apple's WebKit Agreement with Google Is a Naked Restraint in Both the Smartphone and SOS Markets, Not an Ancillary Restraint or a Dual Distribution Subject to the Rule of Reason

As explained above, Apple's WebKit agreement with Google is a horizontal restraint "among competitors on the way in which they will compete with one another," meaning that the agreement is *per se* unlawful. Courts have recognized specific situations in which the *per se* rule does not apply, but Apple has not demonstrated the applicability of any exception to the challenged conduct here.

For example, Apple has not—and on this record cannot—show that its challenged conduct fits within the ancillary restraint exception. *See Aya Healthcare Servs.*, 9 F.4th at 1108 ("To be deemed an ancillary restraint, the restraint must be (1) 'subordinate and collateral to a separate, legitimate transaction,' and (2) 'reasonably necessary' to achieving that transaction's pro-competitive purpose." (citations omitted)). This is the case at least because "naked restraints are categorically not

ancillary restraints," *Aya Healthcare Servs., Inc.*, 9 F.4th at 1109, and Apple's WebKit agreement represents a "naked" restraint, in at least two respects.

*First*, the CAC alleges that the agreement is a market division between Apple and Google in the SOS Market. The CAC alleges that Apple and Google together control 99% of the SOS Market, and that both of their operating systems are protected by the MEBE. CAC ¶¶ 376-81, 386-98. The WebKit Agreement prevents the emergence of a middleware layer, such as Mozilla's cross-platform web engine, Gecko, or a rival smartphone OS running such a cross-platform web engine, which insulates both companies from competition. Moreover, Apple and Google compete on OS functionality in a concentrated market exclusively occupied by the two of them, but pursuant to an express agreement restricting the distribution of a competing web engine on iOS, neither will compete across the iPhone/Android boundary. These are facts that plausibly allege *per se* unlawful market division. *See Sherman v. Brit. Leyland Motors, Ltd.*, 601 F.2d 429, 448-49 (9th Cir. 1979) (agreement between competitors allocating geographic distribution rights was *per se* unlawful market division sufficient "to withstand summary judgment"); P. AREEDA & H. HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (CCH) ¶ 2030c (Aug. 2023 update) ("Although the word 'division' may not always capture the nature of the agreement in these cases, the important element is that the agreements at issue are arrangements among competitors that give one firm the right to restrict the way that a rival expands or innovates.").

Apple argues that its WebKit Agreement with Google cannot be a market division because it does not "prohibit anyone from producing or selling competing smartphones" or "operating systems." Mot. at 20. This argument has been repeatedly rejected by courts throughout the United States. *See United States v. Topco Associates*, 405 U.S. 596, 600 (1972) (contractual restriction on only 10% of total goods sold by rivals was *per se* unlawful market division); *Blackburn v. Sweeney*, 53 F.3d 825, 827 (7th Cir. 1995) (rejecting the argument that restraint among law firms was not per se unlawful because lawyers could "still practice law"); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 988 (N.D. Ill. 2022). Moreover, none of the cases Apple cites in favor of rule of reason treatment resemble the express restriction on competition at issue here. *See, e.g., Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 692 (9th Cir. 2022) (plaintiffs pleaded themselves out of court

with "statements in the complaint that the HFPA's members do not participate in the same product market"); *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1123, 1137 (9th Cir. 2011) (revenue sharing provision was not a market allocation agreement because there were no restrictions on competition whatsoever); *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 843 (9th Cir. 1996) (Korean trade association run by competitors and members of Korean government organizations did not divide market by providing three-year exclusive export rights for mixing bowl patterns and designs to registrants).

*Second*, the CAC alleges that the WebKit agreement with Google is a restriction on the output of a core smartphone and smartphone OS component—the web engine in iOS. Apple and Google have expressly agreed not to deploy a competitive web engine on iOS, restricting the supply of web engines as well as apps, including web browsers, that run on Apple's iOS (and therefore on iPhones). Indeed, Google has already ported Blink to iOS, but does not release or deploy it on iPhones pursuant to its express agreement. CAC ¶¶ 190-94. Apple's agreement with Google restricts cross-platform web engines and PWAs that can be deployed on iPhones, which not only degrades the economic value of the iPhone, but allows Apple to charge supercompetitive prices for its smartphones (and the OS it integrates with it) by preventing and impeding competitive entry. The agreement also restricts in the SOS Market as to web-engine and browser features, which goes to the core of the smartphone OS's functionality. All of this is done "with no regard to the actual consumer demand" for smartphone and smartphone OS features. *In re NFL*, 933 F.3d at 1155. Put simply, Apple and Google have agreed not to compete on web engine functionality in their operating systems—an agreement not to compete on the merits, which is a naked restraint.

Moreover, Apple's horizontal agreement with Google cannot meet the two required elements for the Ancillary Restraints Doctrine given the well-pleaded facts in the CAC. The CAC alleges that the WebKit agreement is not "subordinate and collateral to a separate, legitimate transaction," nor is it "'reasonably necessary' to achieving that transaction's pro-competitive purpose." *Aya Healthcare Servs., Inc.*, 9 F.4th at 1108. The WebKit Agreement leaves iPhone users vulnerable to cyber-attacks, including from remote, "zero-day" exploits of WebKit itself, CAC ¶¶ 214-217, 222-224; prevents iPhone users from changing web engines when exploits exist and Apple does not mitigate or patch

them, *id.* ¶ 224-25; and is not necessary for the functionality or security of the iPhone, as "Apple permits any browser engine to run on its Macintosh computers, but does not allow it on its iPhones and other iOS devices," *id.* ¶ 227. Indeed, the EU recently barred Apple from continuing its WebKit agreement in Europe, and Apple promptly changed its iOS operating system for European users as a result. *See* Ex. B (Jan. 25, 2024 *The Verge* article: "in order to comply with new regulations in the EU . . . for the first time, Apple is going to allow alternative browser engines to run on iOS—but only for users in the EU"), Ex. C (Jan. 25, 2024 Apple press release on EU changes: "With these steps, Apple will continue to deliver the best, most secure experience possible for EU users"). Google's part of the agreement fares no better. *See* CAC ¶¶ 230-36. Apple offers only general arguments about the supposed procompetitive effects of its App Store Review Guidelines, which not only fail to address the specific WebKit-related restraint at issue here, Mot. at 20, but are also not a permissible basis for dismissal given the contrary allegations in the CAC.

Finally, Apple makes an additional argument for exemption from the *per se* rule—that its conduct constitutes a "dual distribution" under *Dimidowich*, requiring the evaluation of Apple's agreement with Google under the Rule of Reason. 803 F.2d at 1480. Nothing about Apple's conduct here resembles a dual distribution, and *Dimidowich* by its terms makes this clear. There, the Ninth Circuit interpreted California's Cartwright Act to apply the Rule of Reason to situations in which a manufacturer distributes its products both directly and through a distributor. *Id.* at 1480-81. The Court explained that the relationship was "quite complex," as one of the defendants distributed goods throughout the country, except in one region, where it exclusively distributed products through a third-party distributor. *Id.* The Court was clear that it was addressing "arrangements, in which a manufacturer operates at two distinct levels of the distribution chain in the same market by acting as both a supplier and a distributor of its own products," which it referred to as "dual distributorships." *Id.* at 1480. In the *Dimidowich* case, the producer also competed in the downstream repair market, which meant that the "alleged conspirators [were] in a 'hybrid' arrangement composed of both a dual distributorship and a horizontal relationship." *Id.* at 1480-81. Apple's agreement with Google on WebKit is neither a dual distribution, nor a hybrid agreement comprising a dual distribution. Apple does not distribute its WebKit engine separate from its operating system, and it does not distribute

WebKit through Google. Apple requires its horizontal competitor, Google, to use WebKit as part of its products. That arrangement does not have a vertical element, such as in a downstream repair market, that provides "benefits in the interbrand market"; to the contrary, Google gives up its product and brand differentiation as a direct consequence of the WebKit Agreement. CAC ¶¶ 233-34.

Finally, even if Apple's factual assertions about the WebKit Agreement could be credited at this juncture—and they cannot in the face of well-pleaded and contrary allegations in the CAC—they would at best present questions of fact inappropriately resolved on a motion to dismiss. *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *16 (N.D. Cal. Dec. 12, 2018) ("I do not need to decide whether the per se or rule of reason analysis applies; that is more appropriate on a motion for summary judgment."); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2018 WL 3032552, at *15–16 (S.D. Cal. June 19, 2018) ("As a result, the Court is unable to determine at this stage in the litigation the level of analysis to apply. The court must instead make that determination based on factual evidence relating to the agreement's formation and character. The parties do not have the benefit of discovery or factual evidence to support their contentions. The decision about which rule to apply is more appropriate on a motion for summary judgment." (cleaned up)); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) ("Defendants' argument relies on the false assumption that the Court should apply a rule of reason analysis, but as the parties agree, the Court need not decide now whether per se or rule of reason analysis applies. Indeed, that decision is more appropriate on a motion for summary judgment." (internal citation omitted)); *Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d 976, 983 (N.D. Cal. 2009) (deferring market analysis under the rule of reason for Cartwright Act claim until after motion to dismiss).

## B. Apple's WebKit Agreements Violate the Rule of Reason

Even if judged under the Rule of Reason, the CAC plainly states a claim under Section 1 of the Sherman Act as to Counts One and Two. In addition to antitrust standing (addressed *infra*, § III), Plaintiffs must plead the following to state a rule of reason claim: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *In re NFL*, 933 F.3d at 1150 (quoting *Brantley v.*

12

*NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012)). As explained above, the first two elements are met—Plaintiffs allege that Apple's WebKit restraint is expressly part of its contracts with Google and other developers. *See id.* ("The defendants do not dispute that the complaint adequately alleges that defendants have contracts for the purpose of restraining trade, the first and second elements.").

Apple only disputes the third substantive element of the rule of reason claim—whether its conduct "injures competition." On that point, the CAC's allegations are more than sufficient to state a claim under Section 1 as to both Counts One and Two. A Rule of Reason claim is established by showing harm to competition, including because the conduct increases a barrier to entry, involves horizontal agreements that limit competitors' freedom to compete, vests defendant with market power, restrains supply and output or raises prices, or facilitates horizontal collusion. *See In re NFL*, 933 F.3d at 1150 (cleaned up). Notably, Apple does not challenge Plaintiffs' market definition as to the Smartphone or SOS Markets, which must be defined under the rule of reason, nor could it, as the CAC alleges facts for each of the *Brown Shoe* factors with exacting detail. CAC ¶¶ 237-398. As explained below, however, many of the arguments Apple does raise, such as whether Plaintiffs adequately plead market power, cannot be decided without regard to the relevant markets—and certainly not as a matter of law.

### 1. Horizontal Restrictions on Competitors

As explained above, the agreement between Apple and Google is a horizontal restraint about how the companies compete with each other in both the Smartphone and SOS Markets. *See*, *supra*, § I.A. Specifically, the WebKit Agreement prevents Google from releasing a cross-platform web engine—or any web engine—on iOS, including as part of its Google Chrome browser. The direct effect of this restriction is that Apple remains gatekeeper of any app that runs on iPhones in the United States, and the restriction fragments the universe of apps that run on both Android and iOS, requiring separate development of apps to run on each operating system. Without a cross-platform threat, both Apple and Google control their halves of the SOS Market, and Apple can maintain its supracompetitive prices without facing market entrants that can run iPhone apps. As explained above, these restraints impose (a) an output restriction on smartphone OS features, namely web engines that can act as cross-platform middleware, and (b) an output constraint on cross-platform smartphones, as

neither Google nor Apple can deploy a middleware lawyer that will allow iPhone and Android apps to run on both platforms. As the Ninth Circuit has explained, restraints among horizontal competitors that limit competition between them violate the Rule of Reason. *In re NFL*, 933 F.3d at 1152 ("In our case, the complaint likewise alleges that the interlocking agreements restrain the production and sale of telecasts in a manner that constitutes 'a naked restriction' on the number of telecasts available for broadcasters and consumers.").

### 2. Aggregate Effect of Apple's WebKit Agreements with Developers and the Facilitation of Horizontal Collusion with Google

In addition, the Rule of Reason analysis must take into account not only the agreement between Apple and Google on WebKit, but also the mirroring agreements between Apple and other developers. As the Ninth Circuit has held, the Court must "take a holistic look at how the interlocking agreements actually impact competition." *In re NFL*, 933 F.3d at 1152–53 (citation omitted). "Indeed, the essential inquiry is whether or not the challenged restraint enhances competition, which is assessed by considering the totality of the nature or character of the contracts." *Id.* (cleaned up). "Thus, the law requires that the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962)). Here, Apple has entered into mirroring agreements with every developer that distributes apps on Apple's iOS operating system and iPhone hardware preventing them from using any other web engine than WebKit. This means that even web browser maker, Mozilla, which makes the Firefox browser and the Gecko web engine, must use Safari and WebKit to perform the core functionality of its product. These mirroring agreements, particularly with Mozilla, directly facilitate horizontal collusion between Apple and Google. Indeed, without mirroring agreements with developers, Mozilla could deploy a cross-platform web engine on iOS, collapsing the segmentation between Android and iOS apps. In addition, Mozilla itself sought to enter the U.S. Smartphone market with its own smartphone powered by its cross-platform web engine. The mirroring agreements with iOS developers, including Mozilla, ensure that no such hardware can enter the market with a full array of apps, which in turn reduces user adoption, which then in turn reduces development for that platform. In other words, Apple's

14

agreement with Google on WebKit is made more effective—and pernicious—by the mirroring agreements with other iOS developers, including cross-platform browser engine developer Mozilla.

### 3. Strengthening Barriers to Entry

The CAC pleads the existence of the Mobile Ecosystem Barrier to Entry ("MEBE"), which protects both Apple and Google's smartphone and smartphone OS businesses. CAC ¶¶ 83-136. Apple ignores the MEBE by avoiding any discussion in its brief about the extensively pleaded relevant markets in the CAC, *id*. ¶¶ 300-13 (MEBE and the Smartphone Market), 386-98 (MEBE and the SOS Market), as well as the failed entries by Microsoft and Mozilla into the U.S. Smartphone Market as a direct result of the MEBE, *id*. ¶¶ 126-36. The CAC alleges that the MEBE arises from the "chicken-or-the-egg problem for a new entrant," CAC ¶ 310, which is that a new smartphone cannot gain traction with users without a critical mass of apps, and developers will not make apps for a new smartphone without a critical mass of users. *Id.* ¶ 86. As a result, a new entrant would have to traverse the MEBE by acquiring a critical mass of users, apps, or both upon entry—otherwise, users would not adopt the new entrant's smartphone or smartphone OS over the incumbent Apple- and Google-based products. *See id.* ¶ 89; *see also* ¶¶ 404-405. The CAC is clear that Microsoft and Mozilla failed to enter the Smartphone and Smartphone OS Markets precisely because of the MEBE protecting Apple and Google. *Id.* ¶¶ 126-36. Indeed, Microsoft's executive in charge of its smartphone and smartphone OS businesses, Joe Belfiore, stated as much. *Id.* ¶ 132 ("We have tried VERY HARD to incent app devs. Paid money .. [sic] wrote apps 4 them .. [sic] but volume of users is too low for most companies to invest."). These allegations resemble the theory at issue in the seminal antitrust case against Microsoft. *United States v. Microsoft Corp.*, 253 F.3d 34, 55, 77-78 (D.C. Cir. 2001) (conduct directed at eliminating "middleware" strengthened "applications barrier to entry"); *see also Epic Games Inc.*, 67 F.4th at 983-84 ("It is sufficient that the plaintiff prove the defendant's conduct, as a matter of economic theory, harms competition—for example that it increases barriers to entry or reduces consumer choice by excluding would-be competitors that would offer differentiated products." (citing *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n Inc.*, 883 F.3d 32, 42 (2d Cir. 2018)).

### 4.    Excluding Rivals

As explained above, the WebKit agreements have directly excluded rivals—namely, Microsoft and Mozilla. CAC ¶¶ 127-28; *id.* 160-84. As to Mozilla, the WebKit agreement directly prevented—and continues to prevent—Mozilla's entry into the Smartphone and SOS Markets, as Mozilla was prevented from deploying its cross-platform Gecko web engine on iOS. *Id.* ¶¶ 181-82. Moreover, the CAC is clear that the WebKit agreements prevent entry by a new smartphone or SOS rival by ensuring that no middleware layer—*i.e.*, cross-platform web engine—can allow a new entrant's smartphone to run iOS and Android apps upon entry. *Id.* ¶¶ 182, 412-21. By excluding rivals and impeding entry, Apple can maintain supracompetitive prices for the iPhone and the iOS operating system that is integrated with it. *Id.* ¶ 421. In addition, because of the WebKit agreements, a new smartphone entrant could not obtain a foothold with a new smartphone OS, but would have to enter into an agreement with Google for Android as a condition of entry, maintaining the Apple-Google SOS duopoly and preventing a non-Android-based smartphone competitor to iPhone. *See Id.* ¶ 467.

### 5.    Market Power and Prices

The CAC alleges that the WebKit agreement provides Apple with market power in both the Smartphone and SOS Markets, which has allowed Apple to consistently increase prices for iPhones since December 2020 without giving up significant market share. CAC ¶ 421; *see also id.* ¶ 207 (average iPhone price increased from $873 to $988 from Dec. 2020 until March 2023). Apple cites to inflation statistics to argue that prices did not increase in "inflation-adjusted terms." Mot. at 6 n. 2. Setting aside the speciousness of bluntly adjusting a high-end product with general inflation statistics, Apple's argument is purely factual, as is the market power inquiry generally, making the issue inappropriate for resolution on a motion to dismiss. *See Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008) ("market power is in this case a factual question" not appropriately resolved in a 12(b)(6) motion); *see also Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 693 (9th Cir. 2022) (rule of reason requires "fact-specific assessment of market power and market structure" (cleaned up)).

### 6. No Economic or Technical Sense But For Anticompetitive Effect

The CAC not only alleges that the WebKit agreements are anticompetitive, but that there are no procompetitive justifications for them, including a technical one. As explained *supra*, § I.A., the WebKit requirement leaves iPhone users less secure, eliminates their ability to opt out of WebKit in the face of dangerous cybersecurity exploits, and has prevented Apple from shoring up security flaws in its iPhones that it was able to mitigate in Apple PCs and laptops not restricted by the WebKit agreements. It makes no sense for Apple to restrict its ability to secure its iPhones, particularly given the emphasis it places on security in its marketing, but for the anticompetitive effect of excluding a cross-platform threat. As for Google, the CAC alleges that Google forgoes all of its product differentiation and agrees not to deploy its Chrome browser with its own web engine, Blink— relegating its brand and reputation to Apple and its engineers. CAC ¶¶ 230-36. This too lacks any procompetitive or technical justification.

### 7. Harm to Consumer Choice

The CAC alleges that the WebKit agreement harms consumer choice by preventing users from installing apps that use a cross-platform web engine, such as Blink or Gecko. CAC ¶¶ 23-24, 407, 419. This reduces the number of apps available for iPhone, including web browsers, degrades the economic value of the iPhone, and prevents users from securing their iPhones in the face of direct security threats caused by vulnerabilities in WebKit. *See id.* These allegations that the WebKit agreements limit consumer choice plead a rule of reason violation. *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) ("Absent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services—such an agreement limiting consumer choice by impeding the ordinary give and take of the market place, cannot be sustained under the Rule of Reason." (cleaned up)).

## II. PLAINTIFFS HAVE PLAUSIBLY PLEADED A CONSPIRACY TO MONOPOLIZE

Count Three of the CAC asserts a claim for conspiracy to monopolize under Section 2, alleging the express WebKit agreement between Apple and Google allowed Apple to maintain its 54% share in the SOS Market, and Apple and Google to maintain their combined 99.8% of that market—namely, by strengthening the MEBE and agreeing not to compete with each other on core

operating system functionality. Apple argues that the CAC fails to allege a conspiracy to monopolize because a monopoly shared by Apple and Google is not cognizable. Apple is wrong on both facts and law. To begin with, the facts alleged in the CAC are consistent with an agreement to imbue Apple with market power in the Smartphone and SOS Markets. The WebKit agreement allows Apple to maintain its control over apps installed on iPhones, prevent the emergence of a cross-platform threat to the MEBE protecting its business, and charge supracompetitive prices. This conduct plausibly alleges that the companies agreed to vest Apple with monopoly power, which Apple repeatedly exercised by increasing prices. Indeed, Apple's 54% market share in a market comprising of only one other competitor—with a staggering Herfindahl-Hirschman Index ("HHI") of 5,013.64, *id.* ¶ 379— plausibly alleges monopoly power. See *Optronic Techs., Inc.*, 20 F.4th at 482 (no legal error in conspiracy to monopolize verdict where one conspirator was dangerously close to acquiring monopoly power). And on the law, Apple is incorrect that the Ninth Circuit has foreclosed shared monopoly claims in concentrated markets such as the ones at issue here. The Ninth Circuit has held that in cases "involving a small market with numerous sellers," there is no viable conspiracy to monopolize claim under Section 2, *Harkins Amusement Enterprises, Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 490 (9th Cir. 1988), but has not decided the shared-monopoly question under the facts here. *See Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1195 n. 14 (9th Cir. 2017) ("We also need not, and do not, reach the question of whether the district court erred by concluding that shared monopoly claims are not actionable under § 2").

### III.    PLAINTIFFS HAVE ANTITRUST AND CONSTITUTIONAL STANDING

Apple's brief attempts to shoehorn factual disputes into the antitrust and constitutional standing inquiry, and does so at the beginning of its brief without first addressing the harm to competition from its WebKit agreement. The antitrust injury and standing inquiry, however, is focused not merely on the injury suffered by Plaintiffs in a vacuum, but on whether the injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 420 U.S. 477, 489 (1977); *see also Am. Ad Mgmt., Inc.*, 190 F.3d at 1055 ("[T]he antitrust injury analysis must begin with the identification of the defendant's specific unlawful conduct."). Given the unlawful, anticompetitive conduct

18

described *supra*, §§ I & II, Plaintiffs' injuries flow directly from it, and there are no better-suited plaintiffs to sue for those injuries. As to Article III standing, the question is not a close one, as antitrust injury and standing is narrower than the constitutional standing under Article III.

### A. Plaintiffs Have Suffered Antitrust Injury and Have Antitrust Standing

"[A]ntitrust injury consists of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting *Am. Ad Mgmt., Inc.*, 190 F.3d at 1055). In addition, there is a "fifth element—that 'the injured party be a participant in the same market as the alleged malefactors,' meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor in the alleged violator in the restrained market.'" *Id.* (quoting *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003)). As explained above, Plaintiffs have pleaded that Apple's conduct violates Sections 1 and 2 of the Sherman Act. As to the second through fourth elements, Plaintiffs allege an overcharge injury that directly flows from the WebKit agreements and the harm they cause to competition in the Smartphone and SOS Market.

Specifically, the CAC alleges that the WebKit agreements strengthen the MEBE by preventing the installation of cross-platform middleware on iPhones, which prevents competitive entry in both the SOS Market and the Smartphone Market. Indeed, absent the WebKit agreements, companies such as Mozilla and Microsoft could enter with new smartphones and smartphone OSs without having to overcome the chicken-or-the-egg problem giving rise to the MEBE—*i.e.*, the lack of a critical mass of apps results in a lack of users, and the lack of a critical mass of users results in a lack of incentives for developers to create apps for the new entrant's smartphone and smartphone OS. The WebKit Agreement also directly forecloses competition between horizontal competitors Apple and Google on core components of smartphones, preventing direct competition on price and quality of their products. The overcharge injury flows from the WebKit agreements' insulation of Apple from competition, including with direct rival, Google. This is paradigmatic antitrust injury. *See In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 911 (6th Cir. 2003) ("Unlike in *Brunswick*, here there is no question that the alleged injury—paying higher prices for a product due to a lack of competition

in the market—is the type of injury that can, and the plaintiffs have alleged did, flow from the anticompetitive effects of the Agreement (a horizontal market allocation agreement).”); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015) (antitrust injury “can be established by showing that consumers paid higher prices for a product due to anticompetitive actions of a defendant, such as a horizontal market allocation scheme.” (citation omitted)).

Apple argues that the alleged antitrust injury fails as a matter of “proximate cause.” Mot. at 9-10. As part of its argument, Apple risibly manufactures a series of attenuated steps between the WebKit agreement and the overcharge injuries alleged. Of course, Apple’s inflation of each aspect of the agreement into micro-events can be done for virtually anything. For example, brushing one’s teeth can be described as (1) lifting the toothpaste tube; (2) removing the cap from the toothpaste; (3) squeezing the toothpaste with precisely the amount of pressure required to deploy it; (4) simultaneously lifting the toothbrush to precisely the correct position to absorb the toothpaste; (5) turning on the water; (6) moving the tooth brush to one’s mouth; (7) targeting each tooth for various brushing motions; (8) ensuring that the brushing clears plaque and debris, including between each tooth; (9) rinsing the toothbrush when complete; (10) successfully putting away the toothpaste; and (11) successfully putting away the toothbrush. These steps can be expanded *ad infinitum*. No one, however, can plausibly contend that brushing one’s teeth successfully is a speculative task, nor does anyone describe brushing one’s teeth as the series of intermediate steps described above.

The proximate cause question before the Court is not an exercise in abstraction (or lack of abstraction). Instead, the question is a factual one that assesses the directness of injury, and Apple ignores the alleged facts. For example, Apple argues that Plaintiffs’ alleged harm requires developers to opt to develop PWAs instead of native apps. Mot. at 11. Not so. The CAC alleges that a cross-platform web engine running on iOS would allow PWAs to run on Android, iOS, and on any new entrant’s smartphone that also runs that web engine. And indeed, PWAs running on Google’s Blink—including extensions *currently* running on Chrome—would immediately run on iPhones if they were permitted to install Google’s Chrome with its Blink web engine instead of WebKit. Apple argues that the consumers would have to regard cross-platform apps that run on web engines as superior and then switch to those apps from native apps deployed on Apple’s app store. This argument also contradicts

the facts as pleaded. The CAC alleges that PWAs are "native-like" and "run through browser engines using JavaScript and other common web technologies . . . ." *Id.* ¶ 118. The CAC is also clear that "[b]y 2019, apps that ran on browser engines and in web browsers had become incredibly powerful—in many cases indistinguishable in look, feel, and function from native apps distributed through Apple's App Store." *Id.* ¶ 8.

Apple also argues that Plaintiffs' injury assumes that a cross-platform web engine will emerge, but the CAC is clear that web engines that could run cross-platform apps *already exist*—and have even been ported to iOS but are not permitted to be deployed. Specifically, the CAC alleges the existence of two cross-platform web engines that serve as middleware, Google's Blink and Mozilla's Gecko. The CAC also alleges that Google has "even developed versions of its Chrome browser that could run on iOS if Google and Apple had not agreed to distribute only WebKit-based Chrome through the Apple App Store." *Id.* ¶ 194. Finally, Apple argues that the notion that "one or more third-parties enter the smartphone operating system market supported only or largely by PWAs" is speculative. Mot. at 12. The CAC, however, alleges that Mozilla did in fact enter the Smartphone and SOS Markets supported by PWAs running on its Gecko web engine—and was excluded by the WebKit requirement's reinforcement of the MEBE. *Id.* ¶¶ 160-84. Even today, Mozilla's Gecko web engine can serve as a cross-platform mobile operating system, and Mozilla's entry is prevented primarily by the WebKit agreements. The CAC also alleges that Google forgoes its PWA ecosystem, deployed through Chrome browser extensions, directly as a result of its WebKit agreement with Apple. *Id.* ¶ 234. None of Apple's factual arguments defeat proximate cause here, particularly given that each factual assertion by Apple is directly contradicted by allegations in the CAC.

Moreover, Plaintiffs' allegations—that the destruction of a middleware threat strengthens an application-based barrier to entry—is far from speculative. It is not even a new pattern of anticompetitive conduct among dominant operating system makers. Indeed, in *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007), Microsoft sought to destroy Novell's competing office productivity applications to eliminate a cross-platform threat to the "applications barrier to entry" protecting Microsoft's business, arising from the same chicken-or-the-egg problem giving rise to the MEBE—developers will develop applications if there are sufficient users, and users will only use an

operating system with sufficient apps. *See id.* at 305-06. The notion that Novell's software applications "posed a potential threat to Microsoft's Windows monopoly by offering competing PC operating systems a bridge across the applications barrier to entry" was not speculative, but rather a sufficient basis for antitrust injury and standing. *Id.* at 318-19; *see also U.S. v. Microsoft*, 253 F.3d at 55 (affirming findings of anticompetitive conduct to preclude cross-platform middleware).

Finally, as to the fifth element—whether Plaintiffs are market participants (*i.e.*, consumers in the market in which the restraints occur), Apple's arguments do not withstand scrutiny. To begin with, Plaintiffs are direct purchasers of Apple iPhones from Apple. They did not purchase iPhones through an intermediary or a reseller, and they are the only possible plaintiffs to recover for the supracompetitive prices they paid for iPhones. Likewise, Plaintiffs are direct purchasers of iOS, as they purchase Apple's smartphone operating system as part of their iPhones. Apple distinctly markets its iOS operating system, and does not allow any other operating system on its iPhones. Put simply, Plaintiffs directly purchased both iPhones and iOS from Apple. Plaintiffs are canonical direct purchasers under the antitrust laws and are plainly participants in both relevant markets. *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 864–65 (C.D. Cal. 2015) ("Finally, by asserting that they are direct purchasers of Botox, Plaintiffs have alleged adequately that they are participants in the same market as Allergan." (citation omitted)).

Given that Plaintiffs are direct purchasers in the SOS and Smartphone Markets, Apple pretends that the challenged WebKit agreements are a restraint in some supposed upstream market. Specifically, Apple argues that "browser developers, PWA developers, and operating system developers" are the direct victims of the restraint, not Plaintiffs. Mot. at 9-10. Apple advances the same logical fallacy it unsuccessfully presented to the United States Supreme Court in *Apple v. Pepper*, 139 S. Ct. 1514 (2019). There, Apple argued that injury to consumers from its App Store overcharge was "upstream" at the developer level, not at the level where consumers paid for apps. The Court rejected the argument, holding that the fact that "Apple's alleged anticompetitive conduct may leave Apple subject to multiple suits by different plaintiffs" did not mean that the restraint was exclusively in some supposed upstream market. *Id.* at 1525. As the Court explained, "[b]asic antitrust law tells us that the 'mere fact than an antitrust violation produces two different classes of victims

hardly entails that their injuries are duplicative of one another.'" *Id.* (quoting 2A AREEDA & HOVENKAMP ¶ 339d, at 136). As the Supreme Court explained, an antitrust defendant "may be liable to different classes of plaintiffs—both to downstream consumers and to upstream suppliers—when the [defendant's] unlawful conduct affects both the downstream and upstream markets." *Id.* Here, iPhone purchasers are the only class of plaintiffs that can possibly recover for an iPhone overcharge. That the WebKit agreements may well also anticompetitively injure app developers or PWA developers does not deprive Plaintiffs here of antitrust standing. Moreover, Apple's argument that a recovery here for an iPhone overcharge somehow creates overlapping damages with claims asserted against it for app overcharges or developer restrictions, Mot. at 14-15, makes no sense. None of the plaintiffs in the other lawsuits against Apple are seeking to recover for the alleged conduct or resulting overcharge injury at issue here.

**B.     Plaintiffs Have Constitutional Standing**

Article III standing requires (1) injury in fact, (2) traceability, and (3) redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs seek to recover the amount they overpaid for their iPhones, which is an injury to business or property that necessarily also meets the constitutional minimum for injury in fact. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact . . . ."). As to traceability, that requirement is not a means for Apple to constitutionalize its fact-bound causation arguments, as "the traceability requirement is less demanding than proximate causation . . . ." *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023). Thus, even if correct as to the causal chain at issue here—and Apple is not—"the 'causation chain does not fail solely because there are several links'"; rather, the question is whether "[i]t is possible to draw a causal line from" the anticompetitive conduct to the alleged monetary injury. *Id.* (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011)). Plaintiffs clearly allege that the WebKit agreements strengthen barriers to entry, reduce and restrain competition, and prevent a price check on iPhones, allowing Apple to maintain supercompetitive prices. This direct line from conduct to injury is sufficient for Article III traceability. Finally, Apple argues that Plaintiffs' claims are not redressable through injunctive relief (but does not challenge the

element as to damages). The CAC, however, alleges that the cessation of the WebKit requirement would result in apps running on Google's Blink and Mozilla's Gecko web engines to run on iOS, eroding the MEBE; that Google has a version of Blink ready for iOS that it does not deploy because of the WebKit Agreement; and the EU issued regulations to halt Apple's anticompetitive WebKit agreements in Europe, Exs. B-C, and there is no evidence that Apple could not also cease those agreements in the United States pursuant to an injunction.

## IV.    PLAINTIFFS' CLAIMS ARE TIMELY

### A.    Plaintiffs' Damages Claims Are Not Time Barred

"Private plaintiffs must file an antitrust claim within four years." *In re Glumetza Antitrust Litig.*, 611 F. Supp. 3d 848, 860 (N.D. Cal. 2020) (citing 15 U.S.C. § 15b). "A cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act." *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (citation omitted). Thus, each time Apple sold its price-inflated product, "the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act." *Id*. Here, Plaintiffs and members of the putative class purchased iPhones directly from Apple from January 25, 2020 until the present. CAC ¶ 427. Plaintiffs' antitrust claims could not therefore have accrued until they purchased their iPhones within the four-year limitations period, and when they made their purchases, the overcharge constituted an overt act causing the statute of limitations to run within the four-year limitations period. In addition, even if accrual was somehow possible, Apple's argument that the statute of limitations bars the claims here because it began its WebKit conduct before January 2020, is meritless under the Ninth Circuit's decision in *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014), which recognizes that where "a continuing violation is ongoing" rather than causing harm entirely before the limitations period, "an antitrust suit can therefore be maintained" where "the defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract." *Id.* at 1202-03. Here, Apple could have stopped the WebKit Agreements, and Google released multiple versions of Chrome adopting Apple's WebKit during the limitations period pursuant to the alleged anticompetitive agreement here. CAC ¶ 193. Put simply, nothing is time barred here.

**B.** **Apple's Laches Argument Is Foreclosed by Binding Ninth Circuit Law and in any Event, an Affirmative Defense Inappropriately Adjudicated on a Motion to Dismiss**

Plaintiffs seek injunctive relief, including to preclude Apple from continuing its WebKit agreements—a restraint that it currently maintains in the United States. As explained above, Plaintiffs' claims did not accrue before the four-year statute of limitations period. Thus, as the Ninth Circuit has made clear, laches will almost never bar a claim for injunctive relief within the limitations period except in "extraordinary circumstances" not remotely at issue here—such as when there has been a previous lawsuit on "identical" conduct. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001) (previous lawsuit as to same film barred because subsequent suit was about an identical re-release). In any event, laches is an affirmative defense that Apple cannot factually establish on a motion to dismiss, particularly as to prejudice. *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012) ("To establish that laches bars a claim, ***a defendant must 'prove*** both an unreasonable delay by the plaintiff and prejudice to itself.'" (emphasis added)). On this point, Apple recently halted the WebKit requirement in Europe, undermining any conceivable factual basis Apple could offer to show prejudice under laches.

## CONCLUSION

For the foregoing reasons, the Court should deny Apple's motion to dismiss. Should the Court dismiss any portion of the CAC, Plaintiffs respectfully request leave to amend their complaint, as any deficiencies can be cured, including based on facts gleaned from discovery. *See Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 960 (9th Cir. 2020).

Dated: April 29, 2024

Respectfully submitted,

**BATHAEE DUNNE LLP**

By: *Yavar Bathaee*
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*p.h.v.* to be sought)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Attorneys for Plaintiffs and the Proposed Class*

Plaintiffs' Opposition to Apple's Motion to Dismiss