**Pages 1 - 50**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
LUISA BAKAY, et al.,          )
                              )
          Plaintiffs,         )
                              )
   VS.                        )      NO. 3:24-CV-00476-RS
                              )
APPLE, INC.,                  )
                              )
          Defendant.          )
_____)
```

San Francisco, California
Thursday, June 13, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

BATHAEE DUNNE, LLP
445 Park Avenue, 9th Floor
New York, NY 10022
**BY: YAVAR BATHAEE**
**ATTORNEY AT LAW**

BATHAEE DUNNE, LLP
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
**BY: EDWARD M. GRAUMAN**
**ATTORNEY AT LAW**

(Appearances Continued on Page 2.)

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter

**APPEARANCES (CONT.'D):**

For Defendants:

GIBSON, DUNN & CRUTCHER, LLP
333 South Grand Avenue
Los Angeles, CA 90071
BY: **DANIEL G. SWANSON**
**ATTORNEY AT LAW**

GIBSON, DUNN & CRUTCHER, LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
BY: **JULIAN W. KLEINBOLT**
**ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Thursday - June 13, 2024**                                    **2:40 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE COURTROOM DEPUTY:**  Calling case 24-CV-476, Bakay |
| 5 | versus Apple.  Counsel please come forward and state your |
| 6 | appearances. |
| 7 | **MR. SWANSON:**  Good afternoon, Your Honor.  Dan |
| 8 | Swanson, along with Julian Kleinbrodt, for defendant Apple, |
| 9 | Inc. |
| 10 | **THE COURT:**  Good afternoon. |
| 11 | **MR. BATHAEE:**  Good afternoon, Your Honor.  Yavar |
| 12 | Bathaee of Bathaee Dunne, LLP, with my partner, Edward Grauman |
| 13 | for plaintiffs. |
| 14 | **THE COURT:**  Good afternoon. |
| 15 | **MR. BATHAEE:**  Thank you. |
| 16 | **THE COURT:**  So this is also a motion to dismiss. |
| 17 | It's an antitrust action.  Why don't I look to the defense to |
| 18 | start, and obviously it seems the big battle is -- got another |
| 19 | standing, antitrust standing question, so that's what I'm |
| 20 | focused on here.  So, go ahead. |
| 21 | **MR. SWANSON:**  Today is standing day, Your Honor. |
| 22 | **THE COURT:**  Apparently. |
| 23 | **MR. SWANSON:**  So I've got three arguments.  One of |
| 24 | them is standing, one of them is on the merits, the plaintiffs' |
| 25 | failure to actually plead violations of Section 1 or Section 2. |

1          **THE COURT:**  Right.

2          **MR. SWANSON:**  Then there's a statute of limitations

3     issue.  I'm not going to --

4          **THE COURT:**  Right.  You can -- the 12(b)(6)

5     inadequacy from your perspective of Sherman I and Sherman II

6     and the statute of limitations, let's put that aside.  Focus on

7     the standing question.

8          **MR. SWANSON:**  And that's what I was intending to do,

9     because I think there's a lot of overlap in terms of the lack

10    of proper pleading on the merits between the standings and the

11    merits business.  So that all makes great sense, Your Honor.

12         So what is striking about this case is the enormously long

13    and convoluted chain of causation that it poses.  Obviously

14    it's a very long complaint, 500 or more paragraphs, lots of

15    facts, but, you know, it boils down to what we've counted as

16    eight links in the chain.  Now, one can, you know, argue about

17    numbers.  I think we've actually done a pretty fair count,

18    because it starts out with the notion that there's a restraint

19    on browser developers.  They are foreclosed from using their

20    own browser, and didn't.

21         So step one is, in the but-for world, browser developers

22    would enter with their own browser engines.  Then you move to

23    consumers.  Consumer's, now confronted with these options, they

24    would need, on this theory, to, in sufficient numbers, critical

25    mass would have to adopt these new browsers.  They'd have to

1    switch to them.  Then you've got developers, people who make

2    the software.  They'd have to make a decision, again, critical

3    mass of them, to stop distributing their apps through the app

4    store, native apps that are obtained through the app store, and

5    instead make their software in a way that it would be

6    distributed through these browsers as web apps.  There's a

7    reference to them as progressive web apps, that's one term.

8    I'm just going to use the generic term "web apps" for that.

9         **THE COURT:**  Yes.

10        **MR. SWANSON:**  And then that's, you know, I think

11   we're up to step three.  Step four is then consumers have got

12   these options now.  They can get apps through the browsers,

13   there's web apps, or they can stay with the app stores and get

14   them as native apps.  So in this theory you've got to have a

15   critical mass of consumers who then say, okay, we're going to

16   get our apps now as web apps through the browsers.

17        Then you need this unification phase to take place.  Some

18   browser's going to have to command such substantial

19   incomprehensive support, that it will bridge Apple iOS, that

20   platform, and the Android platform.  And if that happens, then

21   you have another step, I think it's step six now, where an

22   operating system --

23        **THE COURT:**  Let me jump ahead.  I read your

24   contention that there are eight links here.

25        **MR. SWANSON:**  Yes.

1    **THE COURT:** But, and I'm sure they dispute your

2 characterization. But eight, 12, however many links there may

3 be, for purposes of this point in the case, why haven't -- the

4 very fact that there may be many links in the causation chain

5 doesn't mean by definition it falls as a complaint, because it

6 could be you can satisfy all those links.

7    What is it that they -- where -- and we don't have to go

8 through every one of them.

9    **MR. SWANSON:** Yes.

10    **THE COURT:** We all know what the law is. It can't be

11 too attenuated. It's -- we all know the cases. What is the

12 principal defect? Where have they -- where does it fall apart

13 in your view?

14    **MR. SWANSON:** Okay. And I think it falls apart in

15 three different ways. I think the first issue, I mean, one of

16 the arguments is we don't have proximate causation here, and

17 they don't dispute they've gotta show proximate causation. I

18 mean, obviously they shouldn't, because it's a Supreme Court

19 principle on antitrust cases.

20    But if you look at *Associated General Contractors*, which

21 is kind of the fountainhead of this, the fountainhead of some

22 of the other statutory standing issues, like RICO and the like,

23 but it's certainly foundational for antitrust. And that was a

24 pleading case, and the Supreme Court there said the general

25 tendency of the law is not to go beyond the first step. So,

1  you know, how many steps there are, may not matter if there are

2  eight or seven or six, but if there are a lot more than one, it

3  does become important to the proximate causation --

4          **THE COURT:**  Okay.  So your position is that by -- if

5  I was to embrace your characterization that, indeed, there are

6  all of these hurdles that they have to go through, that the

7  very fact that there are that many mean you can't show

8  antitrust injury.

9          **MR. SWANSON:**  Yeah, well --

10          **THE COURT:**  Is that your position?

11          **MR. SWANSON:**  Yeah.  Well, I would say that's almost

12  the second argument I would make.  I mean, I would say clearly

13  it's kind of black letter standing law in antitrust cases, you

14  need to show directness.  Even if everything is in the same

15  market, you need to have enough directness there in order to

16  satisfy the test.

17      And I think in this case, you know, the point of the

18  number of steps is not so much that there are eight, but that

19  you are looking at something that really can't practically be

20  characterized as direct in any way.

21      But the first step starts out in restraining browser

22  developers.  They're not a browser developer.  They're not

23  complaining that they haven't been allowed --

24          **THE COURT:**  But they're saying they are impacted

25  because the browser developers aren't developing.

1          **MR. SWANSON:**  Yeah.  If you go through the other

2    seven steps.

3          I mean, if you look at their complaint, paragraph 485 of

4    their complaint says:  "Apple's aggrievements proximately

5    caused injury to plaintiffs' property.  Those plaintiffs have

6    paid supercompetitive prices for their iPhones."  So they're

7    embracing proximate causation at the other end of the chain.

8    That is not directness.  And directness, you know, is, in many

9    of these cases, in and of itself sufficient to convince a court

10   to exercise its, you know, weighing function to determine that

11   this really isn't a case that's, you know, properly before the

12   Court as an antitrust matter.  It's a case where there's no

13   standing.

14         I'll give examples of that which seem to me to be quite on

15   point.  There's the *Feitelson* case, which is the case against

16   Google.  Was a case where the claim was that Google had these

17   agreements with Android phone manufacturers to make Google the

18   default choice for search, and the argument was that that

19   worked its way through that chain, their chain of causation,

20   ultimately to impose an overcharge on the purchasers of Android

21   phones.  And that's what the -- that's who the class members

22   were.  They were the ones who bought the phones, much like

23   here.  They said, we've been overcharged.  And Judge Freeman

24   said, you know, that's not direct.  That doesn't suffice.

25         Now, there are other defects, and I'll get to those,

1    because I said I had three reasons, but that's the *Feitelson*

2    case.

3        *There's the Lorenzo* case, which is a little bit older.

4    That is also a case where the plaintiffs were complaining about

5    an overcharge on their phones.  It was a long time ago.  I

6    don't think there was an Apple phone then.  Might have been

7    blackberries and other phones.  But in any event, the principle

8    I think is the same in that there, the claimed step one

9    restraint was -- this was against Qualcomm.  They made chips,

10   they licensed technology with respect to chips, component of a

11   phone, and the argument was they made an anticompetitive

12   conduct back at the beginning of the chain with respect to

13   chips and chip technology vis-a-vis phone manufacturers, and

14   that that conduct ultimately led to injury to those who bought

15   the phones.  That, interestingly, was just an injunctive relief

16   case.

17       And the Court in that case, much like the *Feitelson* court

18   decision, said this is not direct injury, you do not have

19   standing.

20       Now, I want to get to the point which I think you were

21   alluding to earlier, yet it's an independent and sufficient

22   fatal ground for denying standing.  And that is sometimes a

23   chain of causation is so long, that you start out in one market

24   and you end up in another market.  And that you can call

25   different things.  I call it market mismatch.  But there's a

1    long line of Ninth Circuit cases, other cases, too, but that's

2    all that matters for us at the moment, that say that antitrust

3    injury, which is a necessary element of standing in antitrust

4    cases, requires the injury to be in the same market as the

5    restraint.  A bunch of cases say that.  *American Ad Management*,

6    the *Eagle* case.  There's the -- these are all cases we've

7    cited.

8        Association --

9        (Simultaneous crosstalk.)

10          **THE COURT:**  The Brunswick case.

11          **MR. SWANSON:**  And *Brunswick* or *Qualcomm*, more recent

12   Ninth Circuit decision.  They are legion.

13       And both *Feitelson* and *Lorenzo* pick up on this point as

14   well, you know, both from the perspective of a damage claim or

15   an injunctive relief claim.  You can't have the injury be in a

16   different market.  I mean, it is a species of indirectness, but

17   it is, as a, you know, hard-boiled matter of antitrust law,

18   just you're outside the relevant market, the proper market

19   where the restraint happens.

20       And that's true here, too.  This restraint, alleged

21   restraint, is imposed on browser developers in the browser

22   market.  The complaint in Paragraph 189 acknowledges there's a

23   U.S. mobile browser market.  That's, you know, step one.  And

24   then we move all the way to steps, you know, six, seven and

25   eight.  We get the operating system market.  We get to the

1    smartphone market.  So this is a very clear market mismatch,

2    and that, in and of itself, as a matter of failing to plead

3    antitrust injury, shows that they don't have standing.

4        The last point I'd make on standing is another dimension

5    of kind of the standing analysis, but I think it can be

6    independently dispositive, but it's also cumulative with the

7    directness issue or the indirectness issue, and that is

8    speculativeness.  This chain of causation depends critically on

9    decisions and the conduct and the behavior of a bunch, millions

10   of independent third parties, what they decide to do, what

11   consumers decide to do, what all these developers decide to do.

12       It's inherently predictive, at best.  It is certainly

13   conjectural.  Here, because of so many links, you're pancaking

14   kind of independent decision after independent decision, and

15   that ultimately adds up to excessive speculation.

16       And this is a factor that also plays a fairly significant

17   role in the Article III standing area.  And, you know, the

18   Supreme Court cases.  Obviously we cited them.  You're familiar

19   with them.  But, you know, it's an issue not just of causation,

20   but also of redressability.  Gonna issue an injunction.  You

21   say, Apple, stop doing this.  How is that going to lower the

22   price of iPhones, unless millions of people, thousands, tens of

23   thousands of developers, all change their conduct?

24   Manufacturers decide to enter a new -- you know, to produce new

25   phones, and so on and so forth.

1          **THE COURT:**  Well, how would you suggest, if you're

2    doing a -- you're advising me on the analytical tree in which I

3    should look at this motion?  Should I look at it first on the

4    antitrust statutory question, and then Article III standing

5    question, and then if you get past those hurtles, 12(b)(6)

6    issues, the Sherman Act, defects in the statute of limitations,

7    how would you recommend this -- the order in which this should

8    be analyzed?

9          **MR. SWANSON:**  I mean, I -- certainly the Article III

10   issues don't have to be determinative.  I mean, there's the

11   *City of Oakland* case where the majority --

12         **THE COURT:**  Standing has to be determined first.  I

13   mean, we all know we go to standing first.

14         **MR. SWANSON:**  We go to standing first.

15         **THE COURT:**  But you think we go to statutory standing

16   first?

17         **MR. SWANSON:**  I would say, I mean, from my standpoint

18   I've got layers of arguments, and I don't think any of them are

19   --

20         **THE COURT:**  But I'm just wondering if there's any

21   guidance in, just you, Judge, you should do it in this order

22   when you've got an argument of this kind, an antitrust injury.

23   I'm particularly interested, between the Article III standing

24   and the antitrust injury standing, which is first effectively?

25         **MR. SWANSON:**  I mean, if I'm a very busy judge and I

1    want to write a decision that lays out a dispositive ground,

2    antitrust injury is very, very direct and clean.

3        **THE COURT:**  And then if I were to agree with you on

4    that, on your view of antitrust injury in this case, is there a

5    leave to amend if they ask for it?

6        **MR. SWANSON:**  I think not.  I think that's perhaps

7    why even a very busy judge probably will get to the other

8    issues of standing, and I think between the combination of all

9    of them, I don't see how this is fixed.  I mean, this is not --

10    you know, again, the complaint, got a lot of words, and I don't

11    think more words or facts are going to solve this.  And let me,

12    you know, say why.

13        I mean, number one, there is this market mismatch

14    unavoidably.  It can't be bridged.  Secondly, unavoidably,

15    you've got all of these independent parties whose decisions are

16    involved in this chain of causation, and you can't make that go

17    away, and you can't make that, I think, less conjectural than

18    it already is.  So those are, you know, two reasons alone.

19        I think there are a bunch of substantive problems with

20    this, and, you know, I can touch on those fairly briefly,

21    because I think they do partake of the -- something of an echo

22    of the arguments I've already made, but there are some

23    additional aspects of that, too.

24        **THE COURT:**  Go ahead.

25        **MR. SWANSON:**  Okay.  All right.  Thank you.

1       So, well, and just so I don't forget.  They say this is

2   not a speculative case, look at *Microsoft*.  *Microsoft* was a

3   case about browsers and the like.

4       First of all, *Microsoft* was a government case.  The

5   government doesn't have to establish standing.  The Ninth

6   Circuit pointed that out recently about the *Microsoft* case in

7   the *City of Oakland* decision.  Secondly, this is an entirely

8   different case than *Microsoft*.  *Microsoft* had a near hundred

9   percent operating system through Windows, market share

10  monopoly.  It was a unilateral conduct case, it wasn't a

11  convoluted conspiracy case, Microsoft engaging in a bunch of

12  stuff that was recognized anticompetitive conduct, like

13  exclusive dealing tying.  I'll get to that in one second.  But

14  that's not the story here.

15      But even if you think this is like the *Microsoft* case, the

16  Fourth Circuit dealt with the consumer analog to this case, a

17  consumer class action where consumers said, hey, we paid too

18  much for our PCs as a result of Microsoft's monopolistic

19  conduct, and the Fourth Circuit said, you don't have standing.

20      Now, part of it was a particular version of the

21  indirectness doctrine because they were indirect purchasers,

22  but the Fourth Circuit also walked through the more general

23  AGC, *Associated General Contractor* analysis, as well, and found

24  the claim to be, again, indirect in that sense, as well as

25  highly speculative.  So I just throw that out there, as well.

1    In terms of the merits, there has to be a conspiracy here,

2    and all of their claims require there to be an agreement or

3    conspiracy with Google.  You know, they do talk about other

4    browser developers, but even there, that they say is only a

5    violation when wrapped together with the Google, so-called

6    Google agreement.

7    Now, I think the complaint is not a marvel of clarity on

8    this point.  We'll hear otherwise I'm sure in a moment.  But I

9    interpret them to be saying there is, you know, we're alleging

10   there's one agreement here with Google, we're just gonna

11   characterize it in certain different or alternative ways.  But

12   they do characterize it as a market division; market division

13   between Apple and Google, it's market division in the

14   smartphone market and a market division and a joint conspiracy

15   to jointly monopolize the operating system market.  Then they

16   say, you know, that's per se unlawful, that market division.

17   So let me start with that.

18   Have they pled a market division here?  I think clearly

19   not.  I think the market division allegation is comprehensively

20   conclusory.  There is not a word or whisper in that complaint

21   in a *Twombly* sense of who sat down between Google and Apple,

22   where they did it, when they did it, what they said, you know,

23   who proposed this, who accepted it.  That's just not there.

24   And the notion of market division is --

25            **THE COURT:**  Does that meet -- that's sort of a Rule 9

1    pleading obligation, but are you saying does Rule 9 apply, or

2    Rule 8 pleading?

3            **MR. SWANSON:**  I mean, I think it's --

4            **THE COURT:**  Because *Twombly* is more a Rule 8 case,

5    but ...

6            **MR. SWANSON:**  Yeah, I think it's a Rule 8 issue.

7    *Twombly* was kind of a market division case.  *Twombly* was a --

8            **THE COURT:**  It arose in the antitrust context, but

9    it's separate and apart from a Rule 9 obligation.  You were

10   saying who, what, where and when --

11           **MR. SWANSON:**  Yes.

12           **THE COURT:**  -- or I was hearing you say that.  That's

13   the standard, as you know, Rule 9 pleadings.  And I think

14   Rule 8, even with *Twombly* and *Iqbal*, is not requiring a Rule 9

15   level of specificity, and that's what I was just asking you.

16           **MR. SWANSON:**  I would say many cases that's -- and

17   I'm not arguing Rule 9, that's not fraud or something like

18   that.  But *Twombly* is very much a market division case.  It was

19   all the Bell Operating Systems, legacy Bell Operating Systems,

20   agreed not to compete with each other.

21           **THE COURT:**  Right.  And --

22           **MR. SWANSON:**  One of the things --

23           **THE COURT:**  Right.  And, but if I remember the

24   language they use, I've cited it so many times, you know, you

25   have to come up with a plausible -- effectively enough facts

1    that you've got a plausible presentation.

2              **MR. SWANSON:**  Right.

3              **THE COURT:**  But I don't think that, in my mind,

4    necessarily translates into an obligation to say when the

5    meeting, when the alleged meeting between Google and Apple

6    occurred, and who was present, and all -- which was what you

7    were sort of suggesting, and I don't think you need that level

8    of specificity in the complaint.

9              **MR. SWANSON:**  I mean, I hear what you're saying.  I

10   think the thrust of what you're saying is correct in most

11   cases.  But *Twombly* itself does actually note in this context

12   of market division, which actually is a criminal violation of

13   the antitrust laws, a serious allegation, that you can't just

14   make it a conclusion.  In other words, there has to be

15   something.  There has to be some substantiation for it.

16             **THE COURT:**  You can't say, from all these facts we

17   assume there must have been meetings, and they must have gotten

18   together, and they must have concocted the scheme.

19             **MR. SWANSON:**  Yeah, you can't do that.

20        And I think here, I mean, I have more arguments than that,

21   but I think that's a fair point here.

22        And especially market division is a cessation of

23   competition.  I mean, it's, you know, where you are now is

24   where you stay.  Where we are now is where we stay.  We're not

25   going to take your side.  You're not going to take ours.  Not

1    remotely anything like that in here.  In fact, the complaint

2    pleads, during this period when there's a supposed agreement

3    not to compete and divide the market, that Apple increased its

4    market share in smartphones.  That's at paragraphs 289 to 290

5    of the complaint.  They say during this same period, Apple

6    overtook Android as the primary platform.  That's at

7    paragraphs 377 and 378.  That is comprehensively at odds with

8    the notion that there was a cessation of competition by way of

9    a market division.

10       I think it's pretty clear -- we'll hear otherwise if I'm

11   wrong -- that what they are really talking about here is just a

12   guideline, a guideline in the Apple app store, review

13   guidelines.  Apple has guidelines.  They say, here is how we're

14   going to evaluate your app to decide whether or not we, in our

15   discretion, want to let you go into the app store.  And one of

16   the guidelines, 2.5.6, says that apps that browse the web must

17   use the appropriate WebKit framework, and this is what they're

18   saying is the agreement with Google in this case.

19       That is not -- didn't say anything about dividing markets.

20   Doesn't say anything about smartphones.  Doesn't say anything

21   about operating systems.  It does say something about apps that

22   browse the web.  It actually says you can have an app that

23   browsed the web, you just use this particular software.  And it

24   doesn't say anything about Google.  Doesn't say anything about

25   any other co-conspirator who's alleged here.

1    So we think, you know, with all of that, including, you

2    know, no claim that Apple and Google got together to make Apple

3    promulgate that guideline, shows that there is -- there's no

4    market division agreement here.  There's a guideline.  Is a

5    guideline sufficient to bring a conspiracy claim?  We think

6    not.  Under Section 1 and Section 2, conspiracy claims, you

7    need to show a concerted action.  You need to show that two

8    parties joined their forces together.

9    Now, sometimes it could be involuntary joining.  That was

10   the way the Ninth Circuit looked at it in the *Epic v. Apple*

11   case.  But according to the plaintiffs, Google here doesn't

12   want to introduce an app, a browser app on iOS, that has its

13   linked engine, because they don't want a cross-platform

14   browser, the whole premise of this case.  So Apple's guideline

15   being there or not is not going to lead Google to introduce

16   that particular browser.  This is not a case of coercing Google

17   to do something that it otherwise would do, and that means it's

18   not a case of conspiracy within the meaning of Section 2 or

19   Section 1 of the Sherman Act.

20   Now, they have what they think is a gotcha here.  They

21   say, well, there was an Apple lawyer in Judge Chhabria's

22   courtroom was arguing a motion to dismiss, another case

23   alleging conspiracy based on another guideline, and that lawyer

24   said, well, we're not contending that it can't be a contract.

25   Not standing here to say you can't have a contract that arises

1    out of a guideline either, but we're not arguing here and they

2    weren't arguing there that it doesn't mean that a guideline is

3    always a Section 1 or Section 2 conspiracy.  And Judge

4    Chhabria, in fact, agreed.  He dismissed that case saying he

5    did not see an adequate allegation of antitrust collusion,

6    conspiracy, agreement based on the guideline in that case.

7        So we think another reason this case should be dismissed,

8    there's no agreement, and all three of their counts depend on

9    an agreement with Google.

10       The last point I want to make other than a point about

11   conspiracy to monopolize, is all of their claims require that

12   they plead properly substantial anticompetitive effect.  They

13   don't dispute that, nor could they.  But they try to get around

14   that, glide around that, by saying it's a per se case.  Per se

15   case is presumed that there is a substantial anticompetitive

16   effect.  But I think I've already addressed the fact it's a per

17   se case only if it's a market division.  There's no remote

18   possibility that they pled a market division here.  They

19   haven't alleged any other recognized category of per se

20   conduct.

21       Even if you take it as an agreement, this is a case of an

22   agreement, but imposed by a platform operator on developers who

23   operate on this platform.  There are lots of cases like that.

24   The *Epic v. Apple* case, the *Frame-Wilson versus Amazon* case,

25   the *Sambreel versus Facebook* case.  We have the big platforms,

and all of them reject the per se rule's application against platform operators.  So even if you think it's an agreement, you know, you can't get to per se because there's just no basis for it.  So that means they need to go through the rule of reason.  They can't presume substantial anticompetitive effect. They gotta prove it; they gotta to plead it.  They have to plead it first.

And then, you know, we go back to where we started, which is:  What is their argument about substantial anticompetitive effect?  It's a supercompetitive price for phones.  But that is wholly speculative, and that speculativeness counts for *Twombly*, as well.  The Ninth Circuit in the *Qualcomm* case, which was a government case where there's no standing issue, said that, you know, this market mismatch issue, which exists here as well, is sufficient for the FTC to lose that case against Qualcomm, because, you know, once again, the chain started at one place, the injury started at another place.

So their attempt to plead anticompetitive effect based on things that happened in the smartphone market or the operating system market can't suffice to show the restraint in the browser market is anticompetitive.

I would say the *Feitelson* case is again instructive, because there, there was an alternative theory of competitive harm.  The main theory was Google's conduct has caused the price of the phone to be supercompetitive.  That got rejected,

1    as we've already discussed.  But there was an alternative

2    theory that, well, focusing just on the search market in

3    relation to the first step, consumers were deprived of choice

4    because of this default designation.  And Judge Freeman said

5    you can't go there.  We're again talking about something that

6    is speculative.

7         The *Qualcomm* case is also relevant on that.  The *Brantley*

8    case is a case I haven't mentioned, but they all say, you know,

9    more consumer choice, less consumer choice, that's not a

10   necessary consequence of anticompetitive conduct.  You have

11   plenty of competitive markets where you have fewer choices,

12   where there's some standardization of a product or the like.

13   That doesn't suffice.  And so the *Feitelson* case I think is

14   relevant there.

15        So is the *Kloth versus Microsoft* case, where, again, the

16   plaintiff had a fallback.  They said, okay, we can't prove

17   the -- we can't claim that the overcharge on the PC or the

18   operating system suffices to show competition, but, you know,

19   there's less, because of Microsoft's conduct, there are fewer

20   technological options.  And the Fourth Circuit again said, you

21   know, this is just a diffuse claim, and anyone could assert

22   that and it does not -- it's speculative, and it doesn't

23   suffice to show anticompetitive harm.

24        So for all of those reasons, they can't plead -- and this

25   applies to all their counts -- they can't plead substantial

1   anticompetitive effect.

2       Last point, and then I'll sit down unless you have

3   questions.  And that is specifically on the conspiracy to

4   monopolize claim.  That fails for yet another reason.  They do

5   not have any authority that they cite for the proposition that

6   a conspiracy to monopolize can arise from a conspiracy to share

7   a monopoly.  It's a somewhat esoteric subject, but the cases

8   that have touched on that have all been quite, quite uniform,

9   quite strong majority on the view that a conspiracy to

10  monopolize should be a conspiracy for one party to have a

11  monopoly, not to have a duopoly, not to have a shared monopoly,

12  not to have a combined monopoly.

13      They don't cite a case that says you can't have a shared

14  monopoly under Section 2.  They do cite a 2017 Ninth Circuit

15  decisions, the *International Longshore* case, where the Ninth

16  Circuit said, well, we don't need to reach that issue in this

17  case.  That's cold comfort, because the district court below,

18  being very diligent, had reached the issue and had followed the

19  strong majority view that shared monopoly does not plead a

20  violation.

21          THE COURT:  Your principal argument, principal case

22  on this one is the *Optronic*.

23          MR. SWANSON:  The *Optronic Technologies* case.  So a

24  more recent case from the Ninth Circuit, taking a jury trial

25  that went up that Judge Davila had presided over, and the

challenge to the jury instruction that was given on the ground

that it was articulating a shared monopoly theory of liability

under Section 2.  The Ninth Circuit said, no, look at the jury

instruction that said the parties had to intend that one party

would end up holding the monopoly.

Now, plaintiffs now say, well, okay, that's really our

theory now.  But they used the term -- I mean, if you look at

their complaint, they say it's a combined monopoly multiple

times; Paragraphs 414, 415, 417, 520, 521.  They use the term

"duopoly" 50 times in the complaint.  So the notion that now

it's actually only a unitary monopoly, that Google, in its, you

know, the goodness and charity of its heart has decided to hand

over to Apple is just not tenable.  You cannot discern that

from this complaint.

    **THE COURT:**  Okay.  I think it's time to hear from the

other side.

    **MR. SWANSON:**  Thank you.

    **THE COURT:**  Go ahead.

    **MR. BATHAEE:**  Your Honor, may it please the Court.  I

can begin with the standing issue --

    **THE COURT:**  Go ahead.

    **MR. BATHAEE:**  -- but there is a logical order to it,

and the Ninth Circuit isn't silent on the issue as to what

order things have to be in.  Judge Tashima admonished, at 1099

of the *American Ad Management* case, that the question of the

1   restraint itself has to come first.  What harm does the

2   restraint cause?  And then --

3             **THE COURT:**  Standing always has to come first.

4             **MR. BATHAEE:**  Article III does, but --

5             **THE COURT:**  Correct.  If you don't have Article III

6   standing, you end the story.

7             **MR. BATHAEE:**  That's correct, Your Honor.  But

8   Article III standing is considerably narrower than the

9   requirements of antitrust standing and antitrust injury.  So if

10  Your Honor does find antitrust standing and antitrust injury,

11  it will be very difficult to see how there would be no Article

12  III standing, either on traceability --

13            **THE COURT:**  Well, so you also think you start with

14  antitrust standing.

15            **MR. BATHAEE:**  That's correct, Your Honor.

16            **THE COURT:**  Yeah, okay.

17            **MR. BATHAEE:**  And the antitrust standing inquiry, of

18  course, and you can see my friend return back to the question

19  of antitrust standing when he got to the merits, really depends

20  on what the restraint being alleged is.  And if I may, if Your

21  Honor will indulge me, I'd like to describe what we contend the

22  restraint is.

23       There are express agreements, in particular with Google,

24  but including Mozilla and Microsoft.  They're express in

25  written contracts that bar the deployment of a web engine on

```
1   Apple's iOS operating system.  Now, a web engine isn't a web
2   browser.  It's an operating system feature.  It's embedded in
3   web browsers.  It can be placed in a web browser.  It can be
4   built into an operating system.
5        Apple chooses to put it in his operating system and does
6   not allow competitors to put that functionality in any apps
7   that are deployed on Apple.
8            THE COURT:  So that's your restraint, but where is
9   the causal path that gets to injure for your clients?
10           MR. BATHAEE:  That's right, Your Honor.
11       So it all turns on the mobile ecosystem barrier to entry,
12  which we plead with particularity, as a characteristic of both
13  of the relevant markets.  It is part of those markets.  It's an
14  inherent part of them.  They are -- the sole argument here --
15  and there are other effects, but the sole argument of
16  anticompetitive effect here is that this restriction
17  strengthens the MEBE directly.  It strengthens the MEBE because
18  of how the MEBE works.  It arises from the lack of critical
19  mass of apps and a lack of critical mass of users, which
20  prevents entry of a rival smartphone or smartphone OS.  And
21  I'll get into U.S. v. Microsoft and Novell v. Microsoft, which
22  they didn't address, in a bit.
23       But the theory here is simple, that this restraint
24  strengthens the MEBE, which is part of the market in which we
25  participate, in which we purchase.  And there's no dispute.
```

1       THE COURT:  Yeah, down the line you do.  But the

2   effect of this operation, if I understand you correctly, is

3   impacting, at least initially, others.  Not your client.  It's

4   impacting those who might enter the marketplace and develop who

5   otherwise won't under your theory.

6       MR. BATHAEE:  Right.

7       Your Honor, this is the point from *Apple v. Pepper*.  The

8   same conduct can injure people in different markets

9   simultaneously.  Now, yes, there -- this does restrain Google,

10  I guess.  I mean, Google arguably is its coconspirator, so put

11  them aside.  But maybe it restrains people who want to deploy

12  interoperable apps that will run on Android and the Apple iOS.

13  Fine.  So that's --

14      THE COURT:  Tell me why that just in the way you just

15  phrased it doesn't get you into some trouble.  It's, well,

16  maybe it's restraining other people out there, too.  Well,

17  aren't we then in kind of a amorphous world?  We don't -- I

18  mean, before we ultimately get to your clients, you're already

19  saying, well, we're -- maybe this is having an impact on people

20  who otherwise would come in and be competitive and develop are

21  not going to develop because of these restraints.  But it's all

22  kind of -- at that point isn't it falling apart as kind of

23  speculative, and who knows exactly what's going on here?

24      MR. BATHAEE:  Well, Your Honor, you know, it's

25  interesting.  I had to squint at the reply brief for a while

1   before it hit me what's actually going on here with this

2   argument about speculative and attenuation.  There's sort of a

3   fake burden being imposed on us here.  Right?  The prima facie

4   case we have to show --

5           **THE COURT:**  Well, I assume, just as a matter of

6   principle that you have to satisfy, it can't be too attenuated.

7           **MR. BATHAEE:**  You're absolutely right.

8           **THE COURT:**  It can't be too attenuated.

9       And so it is your problem in the sense that you have to

10  satisfy me that you -- that there -- it is more direct than

11  these cases who have found problems with it being too

12  attenuated, that we're in a different case.  And that is your

13  burden.

14          **MR. BATHAEE:**  That's absolutely my burden.

15          **THE COURT:**  Right.

16          **MR. BATHAEE:**  And Your Honor can think of it this

17  way.  There are two injuries occurring, different injuries.

18  There's a developer restraining what he can develop, and

19  there's an overcharge in my market.  Developer can't sue for my

20  overcharge, and my overcharge directly results from

21  strengthening the MEBE.  There's only one step there.  There's

22  nothing required here.  These apps already exist.  That's

23  pleaded in the complaint.  The engines already exist.  Google

24  has even imported it for iOS, and it's sitting there.  All that

25  keeps them from being deployed on iPhone is this strengthening

1   of the MEBE through an express agreement amongst horizontal

2   competitors.

3       And there's nothing attenuated.  No one needs to rely on

4   someone to make these apps.  We don't need anything of the

5   sort.  The strengthening of --

6         **THE COURT:**  Well, maybe "attenuated" is the wrong

7   word, but isn't it -- why is it not very speculative at a

8   certain point in your construct as to whether or not people are

9   going to enter the market or not enter the market, and then

10  provide the, what you want them to provide so that ultimately

11  the -- your clients have the opportunity to buy into it at a

12  cheaper place?  Why -- isn't it assuming a lot of things are

13  going to go -- and you can tell me, no, that's not what it's

14  doing, but that's kinda what it sounds like.

15       **MR. BATHAEE:**  It very much sounds like that, because

16  I think the injury and the theory of harm here is being

17  mischaracterized, right?  *Epic Games*, which they mentioned a

18  few times -- and I'll get back to a big problem with *Epic*

19  *Games*.

20       **THE COURT:**  The Gonzalez Rogers case?

21       **MR. BATHAEE:**  That's right.

22       And the Ninth Circuit, which did, in part, reverse Judge

23  Gonzalez Rogers and affirm, the Ninth Circuit says this about

24  strengthening a barrier to entry.  Here's what it says.  It

25  says at 67 F.4th, I believe it's 946, but I'll double-check

1   that:  "A plaintiff must present some evidence the defendant

2   uses the market power to harm competition."  And I'm just going

3   to skip ahead a little bit here.  "The inquiry need not always

4   be extensive or highly technical.  It is sufficient that the

5   plaintiff prove the defendant's conduct as a matter of economic

6   theory, harms competition, for example, that it increases

7   barriers to entry or reduces consumer choice by excluding

8   would-be competitors that would offer differentiated products."

9        That is the precise theory here, which is if you

10  strengthen the MEBE, Microsoft's not entering, Mozilla, which

11  also tried, is not entering.  No one's entering, because you

12  need a critical mass of apps, app developers and users for

13  successful entry to scale.  That lack of entry, being that

14  impeding with entry, increased our price.  That's a very direct

15  theory as a matter of ...

16       And, you know, I read it directly from the case.  It's a

17  matter of economic theory, that strengthening barrier of entry

18  causes price increases.  That's not speculation.

19           THE COURT:  What's our -- what do you point to to

20  demonstrate that there are these players that want to enter the

21  market, but otherwise -- but won't do it because of this?

22           MR. BATHAEE:  Well, Your Honor, for one, Microsoft

23  attempted to enter and failed.  And you don't have to wonder

24  why.  Joe Belfiore, the head of Microsoft's mobile division,

25  said so.  I think we have a tweet from him which I need to find

1    for Your Honor, but there's a tweet from him where he says, we

2    tried to get developers, we couldn't do it.  We tried to get

3    apps, we couldn't do it.

4        Here it is.  It's at page -- Paragraphs 132 and 133 of the

5    complaint.  I'll read Your Honor what he says:  "We have tried

6    very hard to incept app devs, paid money, wrote apps 4 them,

7    but volume of users is too low for most companies to invest."

8    They ran into the precise chicken and the egg problem we're

9    describing that gives rise to the MEBE.

10        The PWA restriction and the WebKit restriction on the MEBE

11    is precisely, but through Microsoft, a powerful operating

12    system developer itself, out of the market with its massive

13    resources.

14        Then Mozilla, Your Honor, paragraphs 160 to '84, tried to

15    enter, and they failed, too, because their cross-platform

16    engine can't be deployed.  If Mozilla comes up with hardware

17    and you can run PWAs on it, you now have to develop anew

18    anyway, because your iPhone apps won't work on it.  Why?  Here

19    we are again, Your Honor, the WebKit restriction.

20        So the WebKit restriction directly strengthens this

21    barrier to entry, and it's a matter of economic theory that

22    strengthening a barrier to entry is anticompetitive.  It

23    results in less product differentiation, less competition,

24    higher prices.  And the Ninth Circuit very much lets us assume

25    that.  In fact, the Supreme Court does, too.

1    And there's nothing attenuated.  There's nothing -- this

2  doesn't require anyone to do anything.  When you strengthen a

3  barrier to entry, when you strengthen a barrier to entry, the

4  economic effect is reduced competition, a lack of product

5  differentiation, increased prices.

6         **THE COURT:**  Why don't you just deconstruct for me why

7  your counterpart had the eight -- I'm not suggesting that this

8  is -- that this is the law that you must respond to, but their

9  argument that I would like you to respond to is there are eight

10  levels of the chain.

11         **MR. BATHAEE:**  Yeah.

12         **THE COURT:**  Why is -- is it either we satisfy it, or

13  it's not eight levels, or what's the problem there?

14         **MR. BATHAEE:**  It's actually all of those things, but

15  let me start with the part that I squinted at that I was going

16  to get at.  They're actually describing the eight, or whatever

17  number, of things required for competition to enhance absent

18  the restriction.  So, I mean, I can give Your Honor some

19  examples of what they say.  They're not talking about harming

20  the competition.  They've actually sort of imposed this strange

21  fake burden.

22    Here's some of the things they said, page 5 of the reply:

23  "This argument assumes Google would launch a Blink-powered

24  version of Chrome for iOS but for Apple's WebKit requirement."

25    Here's another one, same page:  "Plaintiffs' allegations

1   that PWAs are native-like does not mean users would switch to

2   them."

3       Here's another one:  "That Microsoft and Mozilla allegedly

4   tried to enter the alleged smartphone market years ago does not

5   make it plausible that they will do so again in the future."

6       Again, these -- they're asking this question.  They're

7   asking a different question than the one our burden asks, which

8   is:  What would happen?  Would competition get better if you

9   took the restraint away?  Well, that's not our burden, and I

10  think that's an impossible burden that the -- particularly at

11  the pleading stage.  But it's not our burden.  Our burden is to

12  show competition has decreased, that competition is harmed.

13      And the Ninth Circuit in *Epic Games* is very clear on how

14  you do that.  If you show a barrier to entry has been

15  strengthened, it's a matter of logic and economic theory that

16  competition has been harmed.  What they're describing are

17  preconditions for competition existing and becoming better.

18      For example, Microsoft successfully entering, Mozilla

19  successfully entering, people developing apps.  All of these

20  are now permitted if you take away elected restriction, but I

21  don't have to prove a hypothetical but-for world.  That's not

22  my burden.  My burden is to prove harm to competition in this

23  world, and that's what we've pleaded.  We've pleaded the

24  existence of a barrier to entry that is attached, that is

25  embedded, that is inherently part of these two markets we've

1    pleaded, and that they have been directly strengthened by this

2    express agreement amongst direct competitors, including on

3    features of operating systems in the market they compete in, an

4    output restriction amongst horizontal competitors.  It's having

5    a direct price effect, and it's directly increasing the

6    barriers to entry.  My burden is done.

7         Now, all of what they described may well happen if Your

8    Honor enjoins the conduct.  Maybe.  Maybe if they stop, like

9    they did in the UK the very day we filed the complaint, they

10   stopped the WebKit requirement there.  They ended up having it

11   in the U.S.  Maybe it will get better in the UK.  But that's

12   not my burden of the antitrust laws.  My burden is to show

13   direct harm to competition.  And if the agreement strengthens

14   the barrier to entry, that's one step, Your Honor.  And that

15   is, by the way, the one step thing is not the law.  That's a

16   quote from Justice Holmes on proximate cause, which is

17   embedded, of course, in the Sherman Act.

18        But the idea is, Your Honor, that there are no eight steps

19   here.  Those were eight steps that would enhance competition.

20   Now, are there even eight?  And I think we made this point with

21   the toothbrush.  Maybe it was a bit cheeky, but, you know, you

22   could take anything and convert it into a million steps.

23        As Your Honor put it, what's the point where this all

24   breaks down?  I didn't hear a straight answer.  Right?  Someone

25   would have to develop apps that are cross plat' -- they're

1    already developed.  It's alleged in the complaint.  Someone

2    needs to create the actual engine.  Well, no, no.  Google has

3    one.  Mozilla has one.  Google even imported it to iOS but has

4    not deployed it.

5         Now, Your Honor, by the way, I'll get to this in the

6    market division section.  The *Optronic* case, the Ninth Circuit

7    says when you have a product that you could deploy in the

8    market and don't, it's a pretty good sign of a market division

9    or an allocation agreement.  But I'll get to that in a second.

10        But, Your Honor, the point I want to make about standing

11   is this, that there's sort of been an artificial strawman

12   erected here.  And then, of course, they have pummeled the

13   strawman, this eight-step octopi of standing required.  But

14   frankly, Your Honor, that's not the theory of the case.  The

15   theory of the case is very much like the one in the government

16   case in *U.S. v. Microsoft*.

17        There, the center of the case was that Netscape Navigator

18   was going to expose application programming interfaces that

19   would create a cross-platform threat to the applications

20   barrier to entry protecting Microsoft's PC operating system's

21   market monopoly.  Now, what gave rise to that application's

22   barrier to entry?  The same force here, which is not enough

23   developers to make a new operating system, to make apps for a

24   new operating system, so you just don't go to the operating

25   system.  No users.  Well, then there are no developers that

1    want to develop for your operating system.  And so you get no

2    entry, and the feedback loop goes around and around.  And a lot

3    of that case was whether or not Microsoft acted to exclude

4    rivals or to enter into agreements with OEMs that strengthened

5    that barrier to entry.

6        Now, the response is the government did not need to show

7    standing in that case, so ... but first of all, Your Honor,

8    that's besides the point.  The point is it's not an implausible

9    way to strengthen your monop' -- it's frankly in your market

10   power or your monopoly power in the market to get rid of a

11   cross-platform theft.  Judge Jackson's findings of fact in that

12   case were never set aside by the D.C. Circuit.  They were

13   affirmed in full.

14       And, Your Honor, a case that's really important, near and

15   dear to my heart because I was counsel for Microsoft in it,

16   *Novell versus Microsoft*, same exact theory which, from the

17   government case, that Novell's applications exposed application

18   programming interfaces that posed a cross-platform threat.  So

19   you could use -- if you installed Word Perfect, for example,

20   Word Perfect's, you know, suite on Linux and Windows, the

21   theory was that you run it once, you can deploy it everywhere.

22   It wouldn't matter, right?  You could now start building the

23   middleware layer, and that's precisely what Apple's trying to

24   get rid of here.  The Fourth Circuit was abundantly clear, that

25   theory of standing was perfectly fine.

1      Now, obviously the case lost for refusal to deal reasons

2  when it was remanded for the Tenth Circuit for the District of

3  Utah for trial.  I was there for that, too.  But the point was

4  simply that this is not some novel or attenuated or speculative

5  theory.  This is precisely what a powerful hardware operating

6  system dominant firm will do to get rid of the possibility that

7  they're going to be mooted by a piece of middleware.  And

8  that's precisely the theory here.  There's nothing implausible

9  or speculative about it.  It's nothing new.  We're not breaking

10  any ground here.  This is what operating system, dominant

11  operating system players will do.  Because if you have a piece

12  that runs on the operating system and you can run your apps on

13  top of it, then what do you care what operating system you're

14  running on?  And, in fact, that's what they were afraid of with

15  Netscape, and that's what Apple's afraid of here.

16      Now, Your Honor heard my friend say these are web apps,

17  and I don't think that's a fair thing to call them.  They're

18  progressive web apps we're talking about.  These look native.

19  They feel native.  They look like just any other app on your

20  phone.

21      Web apps are like, you know, you go to Uber.com, or

22  whatever, eBay.com.  That's a web apt.  We're not talking about

23  barring web apps.  We're talking about barring the ability to

24  run an app on any operating system you want, on any phone you

25  want out of the box, which you could do but for the WebKit

1    agreement.  And why does that matter to my clients?  Because

2    that strengthens the barrier to entry.  It increase its.  Which

3    means that I don't get a new smartphone intrant, the lower the

4    price is to competition to product differentiation.

5        Your Honor, I mean, the Sixth Circuit I think says it best

6    in *In Re Cardizem*, at 332 F.3d at 911.  It says:  "Unlike in

7    Brunswick, there is no question that the alleged injury, paying

8    higher prices for a product due to a lack of competition in the

9    market, is a type of injury that can, and the plaintiffs have

10   alleged did, flow from the anticompetitive effects of the

11   agreement."

12       And so, Your Honor, I -- it is all of the things Your

13   Honor mentioned.  It is not an eight-step octopus multi-

14   tentacle thing.  It's not speculative, because we've seen this

15   conduct from similar platforms before.  And frankly, Your

16   Honor, there are no steps in between.

17           **THE COURT:**  Okay.  Why don't you just touch on it --

18   I don't want an extended discussion -- on the substantive

19   issues on Sherman I and Sherman II, the question that the

20   defense has about, well, where is -- where is the conspiracy,

21   you know, it's Apple and Google, where do we find any averment

22   that's specific about why we should assume they got together

23   and conspired?

24           **MR. BATHAEE:**  Well, Your Honor, this is not a tacit

25   case.  The allegations here is that there's an express

1  contract.  It's written.  It's specific as to WebKit.  It

2  appears in the contract.

3          **THE COURT:**  Apple and Google entering into the --

4  utilizing WebKit is the agreement, is the conspiracy?

5          **MR. BATHAEE:**  That's absolute~--- the agreement not to

6  deploy Blink essentially --

7          **THE COURT:**  Okay.

8          **MR. BATHAEE:**  -- on iOS can be also -- you can

9  characterize it that way.  You can characterize it as the

10  express terms.  The point is that there is an express deal.  It

11  may have some other elements to it, through their conduct, that

12  are added to it.  Right?  It may not be as narrow as the

13  express term.

14          **THE COURT:**  But that's what you're resting your --

15          **MR. BATHAEE:**  Right.

16          **THE COURT:**  You're resting on that.

17          **MR. BATHAEE:**  Right.  I am not coming here to say

18  they have dinner one night, the two CEOs, and ... that's not my

19  argument.  There's a contract.  And, in fact, there are several

20  contracts that *In Re: NFL* says you have to look at as a whole;

21  you can't dismember that.  And I'll get to that for the rule of

22  reason point.  But predominantly there's this Google express

23  agreement.

24      Now, I do want to address something that kinda troubles

25  me.  Maybe it doesn't trouble the Court as much as it did me,

1    but if I may, Your Honor, if you'll indulge me, can I read a

2    provision from the *Epic v. Apple* case which they cited, but not

3    on this point?

4              **THE COURT:**  Go ahead.

5              **MR. BATHAEE:**  The district -- this is at *Epic v.*

6    *Apple*, 67 F.4th at 982.  This says:  "The district court erred

7    when it held that a nonnegotiated contract of adhesion, like

8    the DPLA" -- that's our agreement here -- "falls outside of the

9    scope of Section 1.  That holding plainly contradicts Section

10   1's text, which reaches, quote, every contract, combination, or

11   conspiracy that unreasonably restrains trade.  To hold that a

12   contract is exempt from antitrust scrutiny simply because one

13   party, quote, reluctantly accepted its terms, would be to read

14   the word "contract" out of the statute."

15        Your Honor will find this quote nowhere in the briefs from

16   the other side.  And, in fact, they doubled down in the reply

17   and they call it unilateral conduct.  But Apple hasn't just lot

18   this argument implicitly in some case, it lost this argument on

19   this contract in the Ninth Circuit in April of 2023 and says

20   nothing to this Court.  Comes back and makes the argument anew,

21   as if none of it ever happened.  This argument's foreclosed by

22   the Ninth Circuit that this is somehow unilateral because of

23   some asymmetry in bargaining power or because developers have

24   to do it on a take-it-or-leave-it basis.

25        And, you know, to be frank, Your Honor, I was surprised to

1    hear the argument made again here at oral argument, given that

2    this very company lost on this very agreement in the Ninth

3    Circuit on this.  And, in fact, Judge Gonzalez Rogers was

4    reversed on this point.

5         And so, Your Honor, I don't -- I think it's pretty clear

6    that we have a contract in restraint of trade, if Your Honor

7    buys that it harms competition directly enough, of course.  But

8    we have a contract, an express agreement.  Not a tacit one, not

9    one that required --

10             **THE COURT:**  In the form of the WebKit agreement.

11             **MR. BATHAEE:**  Right.  And this very agreement that

12   imports the WebKit requirement has been held by the Ninth

13   Circuit to be within Section 1 and to be bilateral conduct, not

14   unilateral conduct.

15        So the argument's been rejected.  I'm not sure how they

16   get up and make the argument to the contrary.

17        But what about the per se rule?  Why is it per se?  Well,

18   there are two reasons.  One, when you have two people in the

19   entire market and you create a barrier to entry that excludes

20   anyone from coming into the operating system market, well,

21   you've divided the market.  Google is staying on its side of

22   the fence.  Apple is staying on its side of the fence.  Market

23   allocation agreements, Your Honor, are per se unlawful.

24        And the Court in *Optronic* made this point.  The Ninth

25   Circuit, not Judge Davila's decision, but the Ninth Circuit

1    made this point.  There was testimony at trial that the direct

2    horizontal competitor could have deployed a product in the

3    market, but didn't.  And, Your Honor, that, the Court said, was

4    quote, "quintessential evidence of a market allocation."

5          And in fact, I've gone out of order and hopelessly

6    scrambled my notes, but I can refer the Court to it as soon as

7    I find it.  The point, Your Honor, simply is this, that -- ah,

8    here it is.  Hmm.  The point, Your Honor, is that when you have

9    high barriers to entry, a highly concentrated market, and then

10   you have an agreement that keeps competitors out, that's a

11   market allocation agreement.  And this is from the *Optronic*, at

12   484 of that opinion in the Ninth Circuit.  I can read you the

13   full cite if you prefer for the record, 20 F.4th 466, at 484.

14         And here's the Court talking about some of the testimony

15   that was sufficient for the jury verdict:  "Dr. Zona testified

16   that there are high barriers to entry in the telescope

17   manufacturing market.  This market is highly concentrated.

18   Orion also presented evidence that there had been no new

19   entrants in the telescope manufacturing market for 10 years,

20   corroborating Dr. Zona's conclusion that there are high

21   barriers to entry" --

22             **THE COURT:**  You're going awful fast for the court

23   reporter.

24             **MR. BATHAEE:**  Oh, I'm extremely sorry, Your Honor.  I

25   get a little too excited.

1    The point, Your Honor, in *Optronics* was this, that you

2    can, through circumstantial evidence, show a division of

3    markets, and that's precisely what we've done here.  And if

4    Your Honor compares our facts, it's pretty close.  No new

5    entrants for years and years; high barriers to entry, which we

6    plead with particularity even though we have to.  And this

7    isn't a Rule 9 issue here.  High barriers to entry; Herfindahl

8    concentration over 5000, Your Honor.  If these two --

9    paragraph 379 of the complaint, 5013.  I have in my entire

10   career as an antitrust lawyer never seen this concentrated of a

11   market absent a complete monopoly.

12   And, Your Honor, if these two companies decided to merge

13   or even a joint venture, they would be blocked by the

14   regulators.  That's how concentrated this market is.  And when

15   you put all that together and you have an agreement that raises

16   the barrier to entry, you've essentially allocated half the

17   market to Android, the other half to Apple, and that's per se

18   unlawful.

19   Now, why is it also per se unlawful?  The operating system

20   market.  They took a core feature of Apple's operating system

21   and refused to compete on it.

22   And the Supreme Court -- I mean, Your Honor, *Indiana*

23   *Federation of Dentists* makes this point about the x-rays.  And,

24   you know, I won't get into the facts of that case in too of

25   detail, but you can't restrict output in a market, even on a

1    particular feature, without a direct horizontal competitor.

2    And you heard not one argument that Google is not their

3    horizontal competitor in the operating system market for mobile

4    platforms.  They can't make that argument; it's implausible.

5        And, Your Honor, the point I really want to hammer home

6    here is *In Re: NFL*, an output restriction, Your Honor, on

7    bundles amongst horizontal competitors was also per se

8    unlawful.  It would have been per se unlawful if the Supreme

9    Court hadn't decided the NCAA decision on football.  The Court

10   did not that in the NFL.  But again, the Court said you don't

11   need much economic theory or much analysis to reach the

12   conclusion that an output restriction on the -- there a

13   feature, which would be the number of telecast bundles -- is

14   amongst horizontal competitors isn't permissible per se.

15       Now, Your Honor doesn't have to decide the question of per

16   se or rule of reason.  We don't have discovery yet.  It may

17   well be that there are reasons not to apply the per se rule in

18   this case.  We may not know them for a while.  But, you know, I

19   think the argument we hear from the defense on~-- the argument

20   we hear from the defense on *Minowich* (phonetic), which is the

21   dual distribution case, kinda makes my point.  There, the

22   question in (sic) dual distributions -- which this is not; I'll

23   get to that in a second -- it may promote inter-brand

24   competition to have a dual distribution.

25       Here, Google, who works very hard for its brand, it

creates one of the cutting edge web engines in the world, it

deploys them to 90 percent of the browsers used in the entire

world, has decided to give up its web engine and use Apple

Safari.  Why would it kill inter-brand competition?

It may well be that we get evidence, there will be

testimony at trial that shows that this does not help

inter-brand competition.  The same -- another factual question

that may need to be punted for later, is it an ancillary

restraint.  Now, we plead it's not.  Right?  The *Aya Healthcare*

decision, for example, that asks is it necessary to the

product; is it at least restrictive.  I mean, is this part of

something else that has a legitimate basis.  And we go through

and we explain, it makes the phones less secure, doesn't let

people opt out.  Even when there's an open problem with

security, you can't opt out while Apple decides not to patch

your security flaw.  Why is Google doing it?  Makes no sense

for them.  They're giving up their own inter-brand competition.

But for the price increases they enjoy, it doesn't make any

sense.  Right?  Again, another sign that we don't have an

ancillary restraint.

And so these questions would take it out of a rule of

reason analysis.  We may not have what we need to get there.

On the rule of reason we do have what we need, pleaded I

think with more particularity than most cases.  We have a

horizontal output restrike, like in *NFL*, 933 F.3d at 1152, for

1    the record.

2        If you look at the holistic view, *In Re: NFL* says you

3    can't dismember the conduct, which they do of course in their

4    arguments on the rule of reason.  You can't dismember the

5    conduct and you can't dismember the agreements.  You have to

6    look at them as a whole.  There, you had a virtual agreement

7    with DirecTV; you have the horizontal agreements amongst the

8    teams.

9        Here you not only have the horizontal agreement with

10   Google, you have the agreements with Mozilla, Microsoft, both

11   who are failed entrants, not to deploy a web engine, a cross-

12   platform web engine on iOS.  Again, what does this mean?  It

13   means that if you are a new operating system entrant you must

14   deal with Google, because Apple doesn't license its operating

15   system.  And so when you holistically view the agreements

16   together, the entire web, without dismembering them, again,

17   another rule of reason problem under *In Re NFL*.

18       It strengthens the barrier to entry, which we spoke about

19   already, Your Honor.  It excluded rivals, two at least,

20   pleading with particularity.  Prices went up.

21       And I do want to briefly point out they're arguing for the

22   price and market power arguments.

23           **THE COURT:**  Okay.  But you've got to wrap it up.  I

24   think you have about two more minutes.

25           **MR. BATHAEE:**  Okay.  I understand.

1       The bulk of it is there's extensive allegations on harm to

2   competition.  For the rule of reasons purposes, there's no

3   dispute as to market definition.  So that has not been disputed

4   in the motion to dismiss.  Very tough.

5       On statute of limitations, if I may?

6           THE COURT:  I don't -- actually, I got enough on

7   statute of limitations.  I don't need any more discussion on

8   that.

9           MR. BATHAEE:  Okay.  Thank you, Your Honor.

10          THE COURT:  Okay.  You get two minutes, and that's

11  it.

12          MR. SWANSON:  Okay.  I will not -- I'll use less than

13  two minutes.

14      One -- two points.  One on the barriers to entry.  You

15  can't turn this into a one-step causation case by just using

16  the terms "barriers to entry" over and over again.  This case,

17  that theory requires entry by new browsers, it requires entry

18  by new web apps, it requires entry by new operating system, it

19  requires entry by new smartphones.  These are markets that they

20  say have tons of independent barriers to entry, which, in fact,

21  it is an explanation of why others have not, who are as

22  powerful as Microsoft, have not succeeded in the past.

23      So the whole barrier to entry story doesn't dissolve the

24  fact that they've got a chain of causation here.  It's got a

25  whole bunch of steps.  Very indirect case.

1      Second point --

2           **THE COURT:**  I mean, I don't want to prolong this, but

3      what do you say to their point that some tried and failed?

4      Mozilla.  I mean, doesn't that sort of kind of answer that

5      question?  I mean, you're talking about, well, they have all

6      these paths along the way that you'd have to show, but in a

7      sense, they have some historical information about efforts and

8      failure.

9           **MR. SWANSON:**  Yeah.  And they also have an allegation

10     that separate and apart from the engine of the browser, there

11     are an enormous number of barriers to entry into those markets.

12     So when you look at how is deleting this requirement as a

13     guideline going to change the world, how is it going to make

14     the world more competitive, you still need to go through all

15     those pancaking decision points which involve millions of

16     consumers --

17          **THE COURT:**  The last barrier?  In other words, if

18     there are any barriers out there in addition to the one that

19     they're identifying, then they fail on their causation point?

20          **MR. SWANSON:**  If this were the case, you know, with

21     two steps and two barriers or something like that, I would

22     concede it's a much more arguable case.  It's not that case.

23          And by the way, if this argument were *Feitelson* was

24     wrongly decided, *Lorenzo* was wrongly decided, *Kloth*, which is

25     the consumer version of *Microsoft* was wrongly decided, I mean,

1    these barrier to entry arguments were rolled outed there, as

2    whether, and they did not succeed in controverting the fact

3    that these were indirect theories, speculative theories,

4    theories that involve the wrong markets, you know, between the

5    beginning and the end.

6         On the issue of agreement, *Epic v. Apple* case I remember.

7    I was there.  I tried it with my best friends.  And by all

8    means, look at the Ninth Circuit's decision on that and don't

9    just stop where my friend stopped.

10        The developer program license agreement was at issue in

11   that particular case, in that it was being discussed there.

12   It's not what they're saying.  That's not where the WebKit

13   guideline is they're pointing to.  This is a guideline.

14   Guideline was at issue on the case before Judge Chhabria, as

15   well.  In order to have an agreement in a contract of adhesion,

16   an actual contract, which was the developer program license

17   agreement, not the guideline here, as the Ninth Circuit pointed

18   out in the *Epic* decision, you need the other party to be

19   involuntarily forced to abide.  That's the act of agreement.

20   That's the concert of action.  They don't want to lend their

21   support, but they are compelled to.

22        Here, a different premise of their case is Google doesn't

23   want to do this.  Google doesn't want to enter with its Blink

24   engine, because that would immediately create a cross-platform

25   browser, which would lead to all these consequences.

1    So I think I even heard my friend say, you know, maybe

2   Google was or was not involved in this.  I was astonished,

3   because that is their case.  You know, they say it's a

4   conspiracy with Google, but they also say Google doesn't want

5   to do this.  So that's not an agreement.  Google hasn't --

6   Google made an independent decision for its reasons not to have

7   a browser with those capabilities.  Apple made an independent

8   decision to say, if you submit this, we're not gonna put it in

9   our app store.  Those are two independent decisions.  They

10  don't add up, under the *Epic* decision, into a contract or an

11  agreement.

12        **THE COURT:**  Thank you very much.  Very helpful

13  argument.  Very thoughtful on both sides.  I will take the

14  matter under submission and work on getting you an order.

15        (Proceedings concluded at 3:51 p.m.)

16                      ---o0o---

17              <u>**CERTIFICATE OF REPORTER**</u>

18        I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20  DATE:  Tuesday, July 8, 2024

21

22

23  _____

24  Stephen W. Franklin, RMR, CRR, CPE
    Official Reporter, U.S. District Court

25