UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUISA BAKAY, et al., <br>             Plaintiffs, <br> v. <br> APPLE INC., <br>             Defendant. | Case No. 24-cv-00476-RS <br><br> **ORDER GRANTING MOTION TO DISMISS** |

## I. INTRODUCTION

This is an antitrust putative class action against Apple, Inc ("Apple"), a technology company that designs and manufactures a variety of technology products including, as is pertinent here, the iPhone. Plaintiffs are Luisa Bakay, Elisa Jones, and Leticia Shaw, direct purchasers of the iPhone who reside in California or Illinois ("Plaintiffs"). Plaintiffs bring a class action complaint averring that Apple engages in anticompetitive conduct through agreements with browsers that prevent third-party apps from entering the market. Apple moves to dismiss based on four grounds: Plaintiffs lack Article III and antitrust standing to bring this suit; Plaintiffs have failed to plead a violation of Section 1 or Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; and Plaintiffs' claims are time-barred. For the reasons set forth below, Apple's motion to dismiss is granted with leave to amend.

## II. BACKGROUND

**A. Smartphone Operating Systems and App Stores**

Today, virtually every smartphone sold in the United States is either an Apple iPhone

running the iPhone Operating System ("iOS") or a non-Apple device running Google's Android operating system. Whichever operating system a device is running, the ability to download third-party apps from a centralized store is an essential feature of all modern smartphones. A year after its introduction of the iPhone, Apple launched the App Store for iOS to enable users to download pre-approved third-party apps and greatly expand the utility of their devices. Within a few years, the App Store offered hundreds of thousands of third-party apps and was a hub for a billion-dollar app industry. Shortly after the rise of Apple's App Store for iOS, Google launched its own third-party app store, Android Market (later renamed Google Play Store).

The Apple App Store and Google Play Store are central to the two companies' dominance of the smartphone operating system ("SOS") market. Developers of third-party apps must build these apps specifically for distribution on either Apple's App Store or Google's Play Store. Even if a developer lists an app on both (such as Instagram, which like many apps, is available for both iOS and Android), that app's availability in both stores is typically the result of two separate development processes where a team of iOS app developers built the iOS version and a team of Android developers built the Android version. Apple and Google provide and require the use of proprietary tools to build and maintain apps for their respective stores, so an app cannot simply be coded once for distribution on either platform. Accordingly, to access the vast collections of third-party apps that make a smartphone such a versatile tool, users need to opt into one of the two dominate mobile ecosystems, iOS or Android. Plaintiffs assert that a Mobile Ecosystem Barrier to Entry ("MEBE") renders a chicken-or-egg problem because users will not choose an SOS unless it offers access to a critical mass of third-party apps, and developers will not build apps for an SOS unless it already attracts a critical mass of users.

**B. Browser Engines and Progressive Web Apps**

Another essential feature of modern smartphones could theoretically serve as an alternative to the App Store and Play Store to afford users access to third-party apps: web browsers. A web browser is a program used to access websites. The two most popular mobile web browsers in the United States are Apple's Safari (iOS's default browser) and Google's Chrome (Android's default browser). Prior to the launch of the iPhone, mobile web browsers offered only limited, text-based

browsing far inferior to typical desktop web browsing of the time, but have since evolved to offer generally full access to the web in a format that resembles a desktop web browsing experience. All browsers and apps that present information sourced from the web rely on a software component known as a browser engine to transform a website's raw information into a visual representation on a user's device.

Modern browser engines are powerful enough to run apps themselves using the infrastructure of a browser via a process that is distinct from the usual manner of running apps natively (i.e., running an app downloaded from the App Store or Play Store). An app designed to run through a browser is often called a Progressive Web App ("PWA"). PWAs are typically indistinguishable from the natively-run versions of those apps, providing a user experience comparable to apps downloaded from app stores without requiring users to download from their SOS's proprietary marketplace. Unlike those apps that are built specifically for iOS or Android, PWAs can be coded once to run on any SOS that supports a compatible browser engine. Plaintiffs suggest that, in this sense, a modern browser engine is a potential cross-platform app store in itself and could theoretically open the door for a new entrant into the SOS market by offering access to a critical mass of third-party apps outside of the two dominate mobile ecosystems.

However, cross-platform PWAs, i.e. those that are able to run on more than one SOS, have not taken off. Plaintiffs suggest that this is in part because of Apple's long-standing requirement, evinced in Apple's App Store Guidelines, that all browsers distributed through the iOS App Store use Apple's own browser engine, WebKit. The WebKit requirement means that every browser available to iPhone users is actually running on the same browser engine as Safari, even if that browser is available to Android users running on a different engine. For example, Google's Chrome browser (the most common browser in the United States) employs Apple's WebKit browser engine to power its iOS version and employs Google's Blink browser engine to power its Android version. Apple's WebKit does not fully support PWAs and follows bespoke standards. As iOS users have no alternative to WebKit, PWAs are not cross-platform compatible. Plaintiffs suggest that the inability to market a given PWA to both iOS and Android users precludes developers from investing their resources into building PWAs and instead incentivizes them to

ORDER GRANTING MOTION TO DISMISS
CASE NO. 24-cv-00476-RS
3

build solely natively-run apps.

## C. Alleged Misconduct

Plaintiffs aver that Apple entered into agreements with competing browser and browser engine developers not to release their own browser engines on iOS but instead to deploy their browsers on iOS exclusively using WebKit. Plaintiffs particularly scrutinize Apple and Google's so-called "WebKit Agreement," which purportedly prohibits the deployment of Google Blink onto the iPhone and requires Google to deploy Chrome on iOS using WebKit. Plaintiffs argue that Apple's agreements with not only Google but other companies like Microsoft (which makes the Edge browser) and Mozilla (which makes the Firefox browser) constitute misconduct because, but for their anticompetitive effects, they would not be in Apple's best interest. Specifically, Plaintiffs suggest that the agreements are irrational for Apple because requiring universal adoption of a single browser engine makes iOS more vulnerable to cyberattacks even though Apple specifically markets iOS based on its superior security relative to Android. For its part, Apple insists that the longstanding requirement for all iOS browsers to employ WebKit protects the integrity of iPhones and contributes to user safety. Plaintiffs theorize that Apple's WebKit Agreement prevents additional SOS competitors from entering the market, reducing competition and resulting in Plaintiffs being charged supracompetitive prices for their iPhones.

## III. LEGAL STANDARD

Article III of the U.S. Constitution authorizes the judiciary to adjudicate only "cases" and "controversies." The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have Article III standing, a plaintiff must have an actual, concrete injury, fairly traceable to the defendant, which is redressable by a favorable decision. *See id.* at 560–61. "Because standing…pertain[s] to a federal court's subject-matter jurisdiction under Article III, [it is] properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A 12(b)(1) motion to dismiss a complaint challenges the court's subject matter jurisdiction over the asserted claims. Fed. R. Civ.

P. 12(b)(1). It is the plaintiff's burden to prove jurisdiction at the time the action is commenced. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Antitrust standing, by contrast, "affects the plaintiffs' ability to recover, but does not implicate the subject matter jurisdiction of the court." *Gerlinger v. Amazon Inc., Borders Grp. Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008). A 12(b)(6) motion to dismiss for failure to state a claim may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

## IV. DISCUSSION

Apple argues that Plaintiffs lack both Article III and antitrust standing to bring their claims. Article III standing is "a jurisdictional prerequisite to the consideration of any federal claim." *Gerlinger v. Amazon.com, Inc., Borders Grp., Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008) (citing *Lujan*, 504 U.S. at 560-61). Jurisdictional standing requires injury-in-fact, causation, and redressability, which, in antitrust cases, asks "whether the plaintiff has suffered an injury which bears a causal connection to the alleged antitrust violation." *Lucas Auto. Eng'g., Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998) (internal citation omitted); *see Gerlinger*, 504 U.S. at 560-6. Once the requirements for standing are met under Article III, "the court must…determine whether the plaintiff also meets the more demanding standard for antitrust standing." *Lucas Auto. Eng'g.*, 140 F.3d at 1232 (quoting *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1997)). The factors to consider in determining whether antitrust standing has been established are:

> (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.

*Amarel*, 102 F.3d at 1507 (internal citation omitted). No one factor is individually dispositive, however the Ninth Circuit has held that the nature of the alleged injury is of "tremendous significance" in evaluating whether a plaintiff has antitrust standing. *See id.* (citations omitted).

1   Antitrust injury, in turn, entails "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3)

2   that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust

3   laws were intended to prevent." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting

4   *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,* 190 F.3d 1051, 1055 (9th Cir.1999)). The injury must

5   occur in the same market as the restraint. *See Am. Ad Mgmt.*, 190 F.3d at 1057.

Apple insists that Plaintiffs have failed to establish antitrust injury because the conduct complained of does not cause the type of injury the antitrust laws were intended to prevent. Regardless of whether antitrust injury is plausibly plead, however, Apple argues that Plaintiffs lack standing for three additional reasons: first, Plaintiffs advance a theory of causation that is too speculative and attenuated; second, Plaintiffs allege a market restraint that is actually occurring in a market distinct from where their injuries occur; and third, as to their claim for injunctive relief, Plaintiffs fail to allege an injury redressable by an injunction, because redress would be dependent on the conduct of independent third parties.

**A. Antitrust Injury[1]**

Plaintiffs insist that they have adequately plead antitrust injury to withstand dismissal. In Counts 1 and 2 of the Complaint, Plaintiffs aver that Apple violates Section 1 of the Sherman Act. A Section 1 claim requires "a plaintiff [to] show (1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a *per se* or rule of reason analysis; and (3) the restraint affected interstate commerce." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).

In Count 1, Plaintiffs aver that Apple violates Section 1 by entering into the so-called WebKit Agreement, i.e., preventing the deployment of browser engines other than WebKit on the iPhone, with its "horizontal competitor" in the smartphone market: Google. In Count 2, Plaintiffs

---

[1] Plaintiffs point out that the antitrust standing analysis first inquires whether an antitrust injury has been alleged. This includes a consideration of Plaintiffs' Sherman Act claims brought under Sections 1 and 2. By finding that no antitrust injury has been alleged for the purposes of satisfying antitrust standing, the separate issue of the substantive sufficiency of the Sherman Act claims need not be reached.

similarly challenge the WebKit Agreement as unlawfully dividing the SOS market, a per se violation of Section 1, or, alternatively, a violation under the Rule of Reason. Apple argues that both counts must be dismissed because Plaintiffs' averments show neither an agreement between Apple and another entity, nor that the agreement was an unreasonable restraint of trade.

### i. Section 1

Under Section 1, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (cleaned up). For there to be a "contract, combination, or conspiracy," an agreement must be a "concerted" action. *Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 191 (2010). Whether a contract, combination, or conspiracy is a concerted action turns on whether it "joins together separate decisionmakers" and thereby eliminates "independent centers of decisionmaking" in the marketplace. *Am. Needle*, 560 U.S. at 199 (internal citations omitted).

Plaintiffs claim that Google and Apple entered into an unlawful agreement not to deploy a browser engine on iOS that rivals WebKit in order to maintain each of their strongholds in the smartphone and SOS markets. In support, Plaintiffs point to Apple's App Store Guideline 2.5.6., which requires any browser app developed on iOS to run on WebKit. Plaintiffs argue Guideline 2.5.6. is an express contract, citing *Epic Games, Inc. v. Apple, Inc*, 67 F.4th 946 (9th Cir. 2023). In that case, the Ninth Circuit held that the Developer Program Licensing Agreement (DPLA) is a contract of adhesion between Apple and millions of iOS app developers, through which Apple licenses its IP to developers for a fee and percent commission on revenue. Plaintiffs argue that the App Store Guidelines similarly bind developers by placing obligations on them.

Even accepting Plaintiffs insistence that Guideline 2.5.6. is an express agreement between Apple and browser app developers (including Google), it is unclear how this agreement constitutes an unlawful concerted action. Plaintiffs have provided no facts to suggest that a developer's decision to create a WebKit-based browser pursuant to Guideline 2.5.6. constitutes an unlawful agreement. *See Twombly*, 550 U.S. at 556; *see also Pierre v. Apple Inc.*, No. 23-cv-05981-VC, Dkt. 49 at 1 (N.D. Cal. Mar. 26, 2024) ("[I]t is not clear how companies agreeing to a guideline outlining the Apple Store requirements for apps … constitutes an unlawful agreement under

Section 1 of the Sherman Act."). Indeed, the decision of a browser app developer to produce an iOS version of their browser with WebKit does not deprive the marketplace of an independent center of decisionmaking—rather, those developers independently choose to create a WebKit-based browser for iOS and compete with other iOS browsers. In any event, Plaintiffs have presented no facts beyond the existence of Guideline 2.5.6. and speculation to support the conclusory assertion that Apple and Google (or other browser developers) have entered into a purported WebKit Agreement not to allow cross-platform browser engines onto the iOS platform. For this reason, the question of whether the per se rule or the Rule of Reason is applicable need not be reached.

### ii. Section 2

In Count 3, Plaintiffs aver that Apple and Google have conspired to monopolize the SOS market jointly in violation of Section 2 of the Sherman Act. Section 2 "targets independent anticompetitive conduct," making it unlawful to "monopolize" or "conspire" to "monopolize." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 481 (9th Cir. 2021) (quoting 15 U.S.C. § 2). As discussed above, Plaintiffs have failed to plead the existence of a so-called WebKit Agreement between Apple and Google. Regardless, Plaintiffs' Section 2 claim fails for the independent reason that a conspiracy jointly to monopolize trade is not cognizable under Section 2. *See Optronic Techs.*, 20 F.4th at 482 (discussing, in dicta, that a jury instruction did not follow a "joint monopoly theory" and was therefore proper); *see also Oxbow Carbon & Minerals LLC v. Union Pac. R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013) ("In enacting the prohibitions on monopolies, Congress was concerned about the complete domination of a market by a single economic entity, and therefore did not include shared monopolies or oligopolies within the purview of Section 2") (internal citations omitted).

### B. Causation

Plaintiffs lack antitrust standing for the independent reason that their injuries and the misconduct are too indirect. Article III standing requires Plaintiffs "to establish a 'line of causation' between [Apple's] action and their alleged harm that is more than 'attenuated,'" but does not require Plaintiffs to demonstrate that Apple's actions are the proximate cause of

Plaintiffs' injuries. *Mara v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011). The Ninth Circuit has further advised that "[a] causation chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].'" *Id.* (citations omitted). Antitrust standing is distinct from Article III standing, however, and the "directness of the injury" factor under the antitrust standing inquiry "incorporates traditional limitations of proximate causation." *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 901 (C. D. Cal. 2012) (citing *Ass'n. of Wash. Publ. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir.2001)). "[A] plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [] generally [has been] said to stand at too remote a distance to recover." *Phillip Morris Inc.*, 241 F.3d at 701 (internal citation omitted).

### i. Plaintiffs' injuries are too remote from the alleged misconduct

Apple argues that Plaintiffs' theory is far too speculative to sustain antitrust standing. To illustrate its argument, Apple identifies eight steps between its alleged misconduct and Plaintiffs' injury.[2] These eight steps, according to Apple, reveal that its conduct is not the proximate cause of Plaintiffs' injuries or that Plaintiffs are either the direct or immediate victims of the alleged misconduct. *See Eagle v. Star-Kist Foods*, 812 F.2d 541 (9th Cir. 1987) ("The chain of causation between the injury and the alleged restraint in the market should lead directly to the 'immediate victims' of any alleged antitrust violation").

While Plaintiffs aptly point out that virtually any process can be deconstructed into

---

[2] First, if Apple did not require use of WebKits, developers would create browser apps for iOS that would run on non-WebKit browser engines. Second, this would result in developers creating PWAs for such browser engines. Third, a critical mass of consumers would begin using those non-WebKit, browser engine-based PWAs. Fourth, the new non-WebKit browsers would "unify" the allegedly disparate and incompatible Android and iOS platforms because all PWAs could, at least theoretically, run on either platform. Fifth, the unifying force of browser apps would attract entry by new operating systems. Sixth, these new operating systems would attract entry by new smartphone original equipment manufacturers ("OEMs"). Seventh, the new smartphone or operating system would gain sufficient market acceptance and compete with the iPhone, which; eighth, would result in Apple lowering the prices of iPhone-iOS products and services.

1  multiple incremental steps, Apple's illustrations do in fact cast doubt on whether Plaintiffs are the
2  correct class of harmed individuals to bring this case. Even simplifying Apple's eight-steps to
3  Plaintiffs' most basic theory of causation, the injury and the alleged misconduct are significantly
4  remote from each other. Plaintiffs aver that the ultimate injury they experience is having to pay
5  "supracompetitive prices" for iPhones due to Apple's requirement that browsers on iOS run on the
6  WebKit engine. Between that cause and purported effect lies a gulf of uncertainty. If Apple did not
7  require WebKit, Plaintiffs theorize that non-WebKit browsers would emerge with the ability to
8  run PWAs across a variety of platforms. As a result, developers would elect to create PWAs
9  because they are cheaper, cross-platform, and consist of similar features to native apps, and
10 consumers would flock to PWAs because of their increasing availability and native-like design
11 and function. If Plaintiffs were to stop here, their theory of causation might be at least arguably
12 plausible to sustain antitrust standing. Indeed, the chicken-or-egg problem Plaintiffs identify
13 explains that if a critical mass of apps were available on a new entrant's smartphone and SOS,
14 consumers would be drawn to those products, which, in turn, would result in a proliferation of
15 apps being developed for the new smartphones and SOSs. Further, because PWAs are native-like
16 and are often "indistinguishable in look, feel, and function from native apps," it is plausible that a
17 critical mass of consumers would then elect to use PWAs over native apps.
18     However, Plaintiffs' claims require the existence of additional links in the causal chain: to
19 wit, the proliferation of a critical mass of PWAs that would permit third parties in the SOS and
20 smartphone markets to emerge and compete with Apple, causing Apple to lower the price of the
21 iPhone. It is in these last steps where Plaintiffs' claims falter. Plaintiffs provide the example of
22 Mozilla, which entered both the Smartphone and SOS markets when it created Firefox OS and
23 seven commercial devices that ran Firefox OS. These devices were built using Mozilla's Gecko, a
24 cross-platform browser engine that runs PWAs. Plaintiffs aver that Mozilla was unable to enter the
25 smartphone and SOS markets at scale because it ran into the MEBE, reinforced by Apple's
26 WebKit agreements. Today, according to Plaintiffs, Mozilla's Gecko can overcome the barriers it
27 initially faced and serve as a cross-platform browser engine, but Mozilla's entry is prevented by

Apple's WebKit agreements.

The contention that third parties will enter the SOS and smartphone markets at scale and supported largely by PWAs but for the WebKit agreements falls short of plausibility. Plaintiffs have failed to explain how those third parties will overcome hurdles identified in the Complaint to create new PWA-supporting SOSs and smartphones.[3] The idea that Mozilla was barred from entering at scale the SOS and smartphone markets because of the WebKit agreements is also unsupported by anything other than sheer speculation. Further, Plaintiffs' theory of harm entirely depends on third parties entering both the smartphone and SOS markets and competing with Apple such that it would lower the price of iPhones. Plaintiffs cannot assume the conduct of these numerous sets of third parties without explanations as to why those independent actors would behave as Plaintiffs suggest. *See Allen v. Wright*, 468 U.S. 737, 759 (1984) (explaining that the chain of causation is weak because it involves numerous third parties "who may not even exist" and "whose independent decision may not collectively have a significant effect on" alleviating the asserted injury).

Plaintiffs invoke *Novell v. Microsoft Corporation* in support of their claims. 505 F.3d 302 (4th Cir. 2007). In that case, the plaintiff Novell was a software company that created office productivity applications, bringing various antitrust claims against defendant Microsoft, which created its own personal computer operating system and office-productivity applications. That case presented a similar chicken-and-egg problem as the one here—that is, "(1) most consumers prefer operating systems for which a large number of applications have already been written; and (2) most developers prefer to write for operating systems that already have a substantial consumer base." *Novell*, 505 F.3d at 306 (internal citation omitted). The court determined Novell had antitrust standing because "Microsoft's alleged anticompetitive conduct was *directly* aimed at

---

[3] Other hurdles Plaintiffs identify in the Complaint include: modifying an available Operating System kernel to enter the SOS market, provide hardware, obtaining qualified engineering personnel, complying with regulations, creating (or obtaining) compatible hardware, all with the resources to research, develop, test, and market this new SOS.

ORDER GRANTING MOTION TO DISMISS
CASE NO. 24-cv-00476-RS

11

Novell, [so] there is little risk that any damages Novell might prove would need to be allocated or apportioned among any more-directly injured parties." *Id*. at 319.

*Novell* is instructive to show that Plaintiffs' have not established that they are the direct or immediate victims of Apple's misconduct. Apple identifies PWA or browser developers as well as third-party SOS developers as potential classes of victims that are far less removed from the alleged misconduct than Plaintiffs. "[T]he existence of an identifiable, more-directly harmed class of victims with the incentive to sue under the antitrust laws weighs against granting standing to a more remote plaintiff." *Id*. at 318 (citing to *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 543-44 (1983)); *see also Eagle*, 812 F.2d at 541 ("The chain of causation between the injury and the alleged restraint in the market should lead directly to the 'immediate victims' of any alleged antitrust violation"). Here, the fact that the causal chain requires several additional links to draw a line between Plaintiffs' injuries and Apple's alleged misconduct necessarily means that there are other more direct and immediate victims that weigh against finding antitrust standing. This is true even accepting Plaintiffs' theory that the emergence of cross-platform browser engines will result in the emergence of PWAs.

### ii. The alleged injury did not occur in the market where competition is restrained.

Apple argues that antitrust standing is independently unsatisfied because Plaintiffs' alleged injury occurs in the smartphone and SOS market and manifest as supracompetitive iPhones prices, and Plaintiffs have failed to allege injury "in the market where competition is allegedly being restrained," that is, in the U.S. mobile browser market. *F.T.C. v. Qualcomm Inc*., 969 F.3d 974, 992 (9th Cir. 2020). Plaintiffs insist that they are market participants because they directly purchased their iPhones from Apple, and, in turn, directly bought iOS from Apple. Yet, the issue is not whether Plaintiffs are direct or indirect purchasers of the iPhone. What matters is whether Plaintiffs' alleged injury in the smartphone market amounts to a claim of antitrust injury in the U.S. mobile browser market. Here, Apple's restraint is characterized as the WebKit requirement, which prohibits a non-WebKit browser engine from deploying on iOS (thereby restraining PWA

developers). The injury as alleged is the iPhone's supracompetitive price. The distinct markets here weigh against a determination of antitrust standing because whether Plaintiffs' injuries flow from "that which makes Defendant's conduct unlawful" is unclear. *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1028 (N.D. Cal. 2015) (citing *Am. Ad Mgmt.*, 190 F.3d at 1055.

Plaintiffs argue that they are the appropriate class of individuals to bring the instant action because only iPhone purchasers can recover for an iPhone overcharge. In support, Plaintiffs invoke *Apple v. Pepper*, where the Supreme Court held that an antitrust defendant "may be liable to different classes of plaintiffs—both to downstream consumers and upstream markets." 139 S. Ct. 1514, 1525 (2019). Plaintiffs further maintain that the fact that the WebKit agreements may also injure browser or PWA developers does not mean that Plaintiffs are deprived of antitrust standing. Here, however, the site of Plaintiffs' injury is the smartphone market, while Apple's alleged anticompetitive conduct occurs in the U.S. mobile browser market, as it relates to the development and distribution of PWAs. The iPhone users in *Pepper* sustained injuries in the same market as the upstream app developers, that is, in the app market. Those circumstances are absent here.

### C. Redressability

Plaintiffs also lack Article III standing as to their claims for injunctive relief. To establish Article III standing, "it must be likely, as opposed to merely speculative, that [the plaintiffs'] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (cleaned up). In the Complaint, Plaintiffs allege that the cessation of the WebKit requirement would permit browsers running on Google's Blink engine and Mozilla's Gecko engine to run on iOS, which would, in turn, erode the MEBE. In support of this argument, Plaintiffs point out that Google already has a version of Blink ready for iOS that it would deploy but for the WebKit requirement. Even accepting the position that Google will deploy Blink on iOS if an injunction is granted, browser developers are only one set of the third parties on whom Plaintiffs' injunctive remedy depends. In response to an injunction, SOS developers and smartphone OEMs must create new operating systems and smartphones, respectively, at scale and with the ability to compete with the iPhone, to redress adequately Plaintiffs' injuries. The reliance on these third parties is too speculative. *See*

*Levine v. Vilsack*, 587 F.3d 986, 993 (9th Cir. 2009). Accordingly, Plaintiffs have no standing for injunctive relief.

### D.  CONCLUSION

For the reasons discussed herein, Apple's motion to dismiss is granted on the basis that Plaintiffs lack antitrust standing for all their claims and Article III standing for injunctive relief. Whether Plaintiffs plead a viable claim under Sections 1 or 2 of the Sherman Act beyond their failure plausibly to aver antitrust injury or whether their claims are otherwise untimely need not be addressed. Plaintiffs are granted leave to amend within 30 days of this order.

**IT IS SO ORDERED**.

Dated: July 11, 2024

_____
RICHARD SEEBORG
Chief United States District Judge